

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

In re UNIVERSAL SERVICE FUND   )
TELEPHONE BILLING PRACTICES   )
LITIGATION   )
   )

MDL No. 1468

THIS DOCUMENT RELATES TO
ALL CASES

**Jury Trial Demanded**

---

## SECOND CONSOLIDATED AND AMENDED CLASS ACTION COMPLAINT

---

Plaintiffs, by their attorneys, bring this action on their own behalf and on behalf of all others similarly situated, and allege as follows:

### NATURE OF THE ACTION

1.    This Second Consolidated and Amended Class Action Complaint ("Complaint") amends and supersedes the individual complaints which have been filed in, transferred to, or removed to this Court as part of MDL No. 1468 and the First Consolidated and Amended Class Action Complaint.

2.    This is a class action against defendants AT&T Corp. ("AT&T") and Sprint Communications Company, L.P. ("Sprint"), seeking relief on behalf of a class of business and residential customers of defendants and of MCI WORLDCOM Network Services, Inc. ("MCI"), arising out of defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, Sections 201 and 202 of the Federal Communications Act, 47 U.S.C. § 201, *et seq.*, and state law.

3.    The federal Universal Service Fund ("USF") program is designed to help make phone service affordable and available to all Americans. The Telecommunications Act of 1996 ("1996 Act") changed the way the USF program is funded. The 1996 Act requires all carriers that provide service

between states and internationally, including Sprint, AT&T and MCI WorldCom ("long distance carriers") to pay a specific percentage of their interstate and international gross revenues ("long distance revenue") into the revised and expanded USF program. The program began July 1, 1998, and continues through the present. The USF program uses the funds to grant aid to subscribers in low income areas, rural areas, hospitals, schools and libraries to pay for long distance telephone service.

4.      The percentage of long distance revenue the FCC requires the long distance carriers to remit to the USF is called the "contribution factor." The contribution factor is adjusted each quarter, depending on the needs of the USF program and the consumers it is designed to help. The contribution factor has varied from around 5% in 1998, to around 6.8% for most of 1999-2001, to the current factor of 7.28%. In the years 1998 through 2001, carriers remitted an aggregate of approximately $15 billion to the USF program.

5.      Although the long distance carriers are not required by any law to do so, they pass their required contributions to the USF program on to their customers in the form of a line item charge (the "USF surcharge"), usually called a "Universal Connectivity Charge" by AT&T and a "Federal Universal Service Fee" or a "Carrier Universal Service Charge" by Sprint. AT&T's current USF surcharge for residential customers is 11%, while Sprint's USF surcharge for residential customers is 9.6%. For most business customers, AT&T's current USF surcharge is 9.6%; Sprint's is 8.3%.

6.      As alleged herein, defendants have combined and conspired to fix the percentages at which they set USF program surcharges, collected and retained USF surcharges in unreasonable amounts, discriminated in the collection of the USF surcharges and misrepresented the nature of the USF surcharges they impose on their customers.

7.      In an effort to shield themselves from liability for antitrust violations and for collecting excessive and discriminatory surcharges, defendants have engaged in a pattern of public misrepresentations regarding the nature of the USF surcharge. In addition to their wrongful imposition of excess USF surcharges, defendants conspired and agreed simultaneously to insert dispute resolution and liability limitation clauses into their residential customers' contracts, which clauses purport to require their customers to, *inter alia,* arbitrate disputes, pay excessive arbitration fees, keep all arbitration results confidential, forego their right to trial by jury, waive their right to conduct full discovery, waive their statutory right to participate in class actions, waive their right to seek punitive damages, agree to a shortened statute of limitations and, in some instances, pay defendants' attorneys' fees if a motion to compel arbitration is granted.

8.      While representing publicly that they merely "pass through" their USF costs, defendants actually collect from their long distance customers USF surcharge revenue well in excess of the amount they actually remit to the USF program. In addition, for all or part of the Class Period, defendant AT&T has imposed this surcharge only on its direct-dial long distance customers, thereby discriminating against them in favor of its dial-around and prepaid calling card customers and customers it deems unbillable.

9.      Defendants force this USF surcharge on their long distance customers without their consent or authorization, without adequate notice or explanation, and in a way that conceals from their customers the excessive nature of the charges and falsely portrays the USF surcharges as a mere "pass-through" of an expense incurred by defendants.

10.     On the invoices Defendants send to their long distance customers, Defendants describe the USF charge as a tax, surcharge or regulatory fee, thereby representing the USF surcharge to be a legally-required 100% "pass-through" of the amount Defendants must pay to the government. In paying their telephone bills, all of Defendants' long distance customers, including Plaintiffs,

necessarily reviewed and relied upon Defendants' false representations in the invoices that the USF surcharge is a legally required 100% "pass-through" of an amount they must pay to the government.

11.     This action seeks injunctive and declaratory relief, treble damages and costs of suit, including reasonable attorneys' fees, by reason of defendants' violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  Further, this action seeks to recover damages sustained by plaintiffs and members of the Class resulting from defendants' unfair and deceptive practices and imposition of higher USF charges than are just and reasonable, and costs of suit, including reasonable attorneys' fees.  Plaintiffs also seek damages resulting from AT&T's discriminatory practice of overcharging direct-dial long distance customers, in part to make up for AT&T's practice of not collecting USF surcharges from their dial-around and prepaid calling card customers and customers it deems unbillable.  Plaintiffs also seek equitable relief, including restitution and the disgorgement of the revenues defendants realized from their wrongful practices, punitive damages and an order restraining defendants from further engaging in their wrongful practices.

12.     Plaintiffs do not allege  violations of Federal Communications Act §§ 201 and 202 based upon conduct occurring before August 1, 2001.  From August 1, 2001, plaintiffs challenge defendants' practices of charging USF surcharges in unreasonable and discriminatory amounts and representing, in an unjust, unreasonable, unclear and inexplicit manner,  that such surcharges were merely "pass through" charges, when in reality the USF surcharges imposed were much higher than defendants were required to and actually did remit to the USF program.

13.     In addition, plaintiffs seek a declaratory judgment that the clauses included in some of defendants' customers' contracts that purport to require mandatory, binding arbitration and attempt to limit the liability of the defendants, are unenforceable.  Pursuant to the judgment of the United States District Court for the Northern District of California, in the case titled *Darcy Ting et al. v. AT&T Corp.*, Case No. C 01-2969 BZ, *aff'd*, 2003 U.S. App. LEXIS 2395 (9th Cir. Feb. 11, 2003),

AT&T is prohibited from enforcing the liability limitations clause, namely, Section 4, in its Customer Service Agreement with residential customers ("CSA"), and the arbitration clause, Section 7, in its CSA against current AT&T residential long distance customers in California or against any former AT&T residential long distance customers in California at any time on or after August 1, 2001. AT&T has posted a notice on its website that reads: "While AT&T's appeal is pending, if you have a dispute against AT&T, you are not bound by Section 4 and Section 7 of the CSA you received prior to February 25, 2002. You may file or join a class action lawsuit against AT&T, and the time limits within which you must file a lawsuit against AT&T are set by statute and not the CSA." Accordingly, Californians with residential long distance service provided by AT&T are not subject to the liability limitations and arbitration provisions of AT&T's CSA.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over these consolidated actions pursuant to 47 U.S.C. § 207, 28 U.S.C. §§ 1331 and 1337, and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. This complaint is also filed and these proceedings are instituted to obtain injunctive relief and to recover the damages allowed by law, the costs of suit, including reasonable attorneys' fees, for the injuries plaintiffs and Class members sustained by reason of defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. This Court has supplemental jurisdiction over the state law claims alleged herein under 28 U.S.C. § 1367.

15.     Venue is proper in this District pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391, because plaintiff Thome resides within this District and defendants conduct business or maintain offices in this District. In addition, many of the acts and transactions giving rise to the violations of law complained of herein occurred in this District. Venue is also proper for all pretrial proceedings pursuant to 28 U.S.C. § 1407.

16.     Defendants used the means and instrumentalities of interstate commerce and the United States mails in connection with the acts, conduct and other wrongs complained of herein, including the charging and fixing of artificially high USF surcharges.

## PARTIES

### PLAINTIFFS

17.     Plaintiff Roger Gerdes is a resident of Carpinteria, California.  Plaintiff has been and is a residential long distance telephone service subscriber of AT&T during the Class Period.  He used, and paid for, AT&T's direct-dial long distance services during the Class Period, including paying for USF surcharges described by AT&T as "Universal Connectivity Charges." Plaintiff Gerdes has been damaged as a result of AT&T's conduct in collecting revenue under the guise of merely passing on its USF program obligations.  In addition, he has been damaged by defendants' collusive activities with regard to the setting of the percentages at which USF surcharges are assessed and the insertion of arbitration and other remedy-limiting provisions in customer agreements.

18.     Plaintiff Thomas F. Cummings is a resident of Coatesville, Pennsylvania. Plaintiff has been and is a residential long distance telephone service subscriber of AT&T during the Class Period. He used, and paid for, AT&T's direct-dial long distance services during the Class Period, including paying for USF surcharges described by AT&T as "Universal Connectivity Charges."  Plaintiff Cummings has been damaged as a result of AT&T's conduct in collecting revenue under the guise of merely passing on its USF program obligations.  In addition, he has been damaged by defendants' collusive activities with regard to the setting of the percentages at which USF surcharges are assessed and the insertion of arbitration and other remedy-limiting provisions in customer agreements.

19.     Plaintiff Darrell D. Gest is a resident of Austin, Texas. Plaintiff has been and is a residential and a business long distance telephone service subscriber of AT&T during the Class Period. He used, and paid for, AT&T's direct-dial residential and business long distance services

during the Class Period, including paying for USF surcharges described by AT&T as "Universal Connectivity Charges." Plaintiff Gest has been damaged as a result of AT&T's conduct in collecting revenue under the guise of merely passing on its USF program obligations. In addition, he has been damaged by defendants' collusive activities with regard to the setting of the percentages at which USF surcharges are assessed and the insertion of arbitration and other remedy-limiting provisions in customer agreements.

20.    Plaintiff Goldman & Hellman, P.A., is a professional association with its principal place of business in Fort Lauderdale, Florida. Plaintiff Goldman & Hellman has been and is a business long distance telephone service subscriber of AT&T during the Class Period. Plaintiff Goldman & Hellman used, and paid for, AT&T's direct-dial long distance services during the Class Period, including paying for USF surcharges described by AT&T as "Universal Connectivity Charges." Plaintiff Goldman & Hellman has been damaged as a result of AT&T's conduct in collecting revenue under the guise of merely passing on its USF program obligations. In addition, it has been damaged by defendants' collusive activities with regard to the setting of the percentages at which USF surcharges are assessed.

21.    Plaintiff Lady Di's, Inc., has its principal place of business in Indianapolis, Indiana. Plaintiff Lady Di's has been and is a business long distance telephone service subscriber of AT&T during the Class Period. It used, and paid for, AT&T's direct-dial long distance services during the Class Period, including paying for USF surcharges described by AT&T as "Universal Connectivity Charges." Plaintiff Lady Di's has been damaged as a result of AT&T's conduct in collecting revenue under the guise of merely passing on its USF program obligations. In addition, it has been damaged by defendants' collusive activities with regard to the setting of the percentages at which USF surcharges are assessed.

22.     Plaintiff Sterling Beimfohr, d/b/a Sterling Sails has his principal place of business in Chicago, Illinois.  Plaintiff Beimfohr has been and is a business long distance telephone service subscriber of AT&T during the Class Period.  He used, and paid for, AT&T's direct-dial long distance services during the Class Period, including paying for USF surcharges described by AT&T as "Universal Connectivity Charges."  Plaintiff Beimfohr has been damaged as a result of AT&T's conduct in collecting revenue under the guise of merely passing on its USF program obligations.  In addition, he has been damaged by defendants' collusive activities with regard to the setting of the percentages at which USF surcharges are assessed.

23.     Plaintiff Michael Thome is a resident of Overland Park, Kansas.  Plaintiff Thome was a residential long distance telephone service subscriber of Sprint from June 2000 to August 2002.  Plaintiff Thome used, and paid for, Sprint's direct-dial long distance services during the period indicated, including paying for USF surcharges described by Sprint as "Carrier Universal Service Charges."  Plaintiff Thome has been damaged as a result of Sprint's conduct in collecting revenue under the guise of merely passing on its USF program obligations.  In addition, he has been damaged by defendants' collusive activities with regard to the setting of the percentages at which USF surcharges are assessed and the insertion of arbitration and other remedy-limiting provisions in customer agreements.

24.     Plaintiff Tomi White Bryan is a resident of Greensboro, North Carolina.  Plaintiff Bryan has been and is a residential long distance telephone service subscriber of Sprint during the Class Period.  Plaintiff Bryan used, and paid for, Sprint's direct-dial long distance services during the Class Period, including paying for USF surcharges described by Sprint as "Carrier Universal Service Charges."  Plaintiff Bryan has been damaged as a result of Sprint's conduct in collecting revenue under the guise of merely passing on its USF program obligations.  In addition, she has been damaged by defendants' collusive activities with regard to the setting of the percentages at which USF

surcharges are assessed and the insertion of arbitration and other remedy-limiting provisions in customer agreements.

25.     Plaintiff Elizabeth Tiffany is a resident of San Pedro, California. Plaintiff Tiffany has been and is a residential long distance telephone subscriber of Sprint during the Class Period. Plaintiff used, and paid for, Sprint's direct-dial long distance services during the Class Period, including paying for USF surcharges described by Sprint as "Carrier Universal Service Charges." Plaintiff Tiffany has been damaged as a result of Sprint's conduct in collecting revenue under the guise of passing on its USF program obligations. In addition, she has been damaged by defendants' collusive activities with regard to the setting of the percentages at which USF surcharges are assessed and the insertion of arbitration and other remedy-limiting provisions in customer agreements.

26.     Plaintiff Pressman Toy Co. is a corporation with its principal place of business in New Brunswick, New Jersey. Plaintiff Pressman Toy Co. has been and is a business long distance telephone service subscriber of Sprint during the Class Period. Plaintiff Pressman Toy Co. used, and paid for, Sprint's direct-dial long distance services during the Class Period, including paying for USF surcharges described by Sprint as "Carrier Universal Service Charges." Plaintiff Pressman Toy Co. has been damaged as a result of Sprint's conduct in collecting revenue under the guise of merely passing on its USF program obligations. In addition, it has been damaged by defendants' collusive activities with regard to the setting of the percentages at which USF surcharges are assessed.

27.     Plaintiff B&C Values, Inc., is a corporation with its principal place of business in Gurnee, Illinois. Plaintiff B&C Values, Inc., has been and is a business long distance telephone service subscriber of Sprint during the Class Period. It used, and paid for, Sprint's direct-dial long distance services during the Class Period, including paying for USF surcharges described by Sprint as "Carrier Universal Service Charges." Plaintiff B&C Values, Inc., has been damaged as a result of Sprint's conduct in collecting revenue under the guise of merely passing on its USF program

37932.1                                       9

obligations. In addition, it has been damaged by defendants' collusive activities with regard to the setting of the percentages at which USF surcharges are assessed.

28.     Plaintiff Kathy Snavely is a resident of Galloway, New Jersey. Plaintiff Snavely has been and is a residential long distance telephone service subscriber of Sprint during the Class Period. Plaintiff Snavely used, and paid for, MCI's direct-dial long distance services during the Class Period, including paying for USF surcharges described by MCI as a "Federal Universal Service Fee." Plaintiff Snavely has been damaged by defendants' collusive activities with regard to the setting of the percentages at which USF surcharges are assessed and the insertion of arbitration and other remedy-limiting provisions in customer agreements.

29.     Plaintiff Carol Zinsmeister is a resident of Los Angeles, California. Plaintiff Zinsmeister has been and is a residential long distance telephone service subscriber of MCI during the Class Period. Plaintiff Zinsmeister used, and paid for, MCI's direct-dial long distance services during the Class Period, including paying for USF surcharges described by MCI as a "Federal Universal Service Fee." Plaintiff Zinsmeister has been damaged by defendants' collusive activities with regard to the setting of the percentages at which USF surcharges are assessed and the insertion of arbitration and other remedy-limiting provisions in customer agreements.

30.     Plaintiff NYLB, Inc. d/b/a Siany ("NYLB") is a corporation with its principal place of business in Los Angeles, California. Plaintiff NYLB has been and is a business long distance telephone service subscriber of MCI during the Class Period. Plaintiff NYLB used, and paid for, MCI's direct-dial long distance services during the Class Period, including paying for USF surcharges described by MCI as a "Federal Universal Service Fee." Plaintiff NYLB has been damaged by defendants' collusive activities with regard to the setting of the percentages at which USF surcharges are assessed.

## DEFENDANTS

31.     Defendant AT&T Corp. is a New York corporation which has its principal place of business in Basking Ridge, New Jersey.  AT&T is among the world's largest telecommunications companies, providing voice, data, and video communications services to large and small businesses, consumers, and government entities.  AT&T and its subsidiaries furnish domestic and international long distance, regional, local and wireless communications services, cable television and Internet communications services.  AT&T also provides billing, directory, and calling card services to support its communications business.  AT&T is the largest provider of domestic and international long distance service to residential customers in the United States.  AT&T, by itself or through its divisions, subsidiaries, affiliates, joint venture partners, agents or otherwise, provides telecommunications and related services throughout the United States and is legally responsible for the acts of its subsidiaries, affiliates, joint venture partners, agents, and predecessors-in-interest. AT&T transacts business in, contracts to provide services in, regularly solicits business in, derives substantial revenue from services rendered in, breached contracts in and has caused tortious injury by acts and omissions in the Districts of Kansas, New York and New Jersey.

32.     Sprint Communications Company, L.P. ("Sprint"), is a Delaware limited partnership with its principal place of business in Kansas.  Sprint is the third largest provider of long distance services in the United States.  Sprint, by itself or through its divisions, subsidiaries, affiliates, agents or otherwise, including Sprint Corporation, provides telecommunications services throughout the United States and is legally responsible for the acts of its subsidiaries, agents, and predecessors in interest.  Sprint transacts business in, contracts to provide services in, regularly solicits business in, derives substantial revenue from services rendered in, breached contracts in and has caused tortious injury by acts and omissions in the District of Kansas.

33.     Both defendants and MCI are "non-dominant" interexchange carriers within the meaning of the Communications Act of 1934, as amended, 47 U.S.C.§ 151, *et seq.* ("Communications Act"). Defendants conduct business in all fifty states and the District of Columbia (the "United States"). Defendants provide interstate and international long distance telephone service to residential and business customers throughout the United States.

## NON-PARTY CO-CONSPIRATORS

34.     Various individuals, partnerships, corporations and associations not named as defendants in this Complaint (the "co-conspirators"), including MCI WORLDCOM Network Services, Inc., and MCI WorldCom Communications, Inc., participated in the violations of the federal antitrust laws for which plaintiffs seek relief and performed acts and made statements in furtherance thereof.

35.     MCI WORLDCOM Network Services, Inc., is a Delaware corporation with its principal place of business in Tulsa, Oklahoma. MCI WORLDCOM Network Services, Inc., formerly known as MCI Telecommunications Corporation, used to be the MCI entity that provided telecommunications services to customers in the United States, and had its principal place of business at 1801 Pennsylvania Avenue, N.W., Washington, D.C. MCI WorldCom Communications, Inc., the MCI entity which currently provides telecommunications services to customers in the United States, is a wholly-owned subsidiary of MCI WORLDCOM Network Services, Inc., and it has its principal place of business in Clinton, Mississippi.

36.     MCI WORLDCOM Network Services, Inc., and MCI WorldCom Communications, Inc. (collectively "MCI") are subsidiaries of WorldCom, Inc., and like WorldCom, Inc., they have recently filed for bankruptcy protection. The automatic stay issued pursuant to the United States Bankruptcy Code currently precludes plaintiffs from naming MCI WORLDCOM Network Services, Inc., and MCI WorldCom Communications, Inc., as defendants herein.

## CLASS ACTION ALLEGATIONS

37.    Plaintiffs bring this action on their behalf and on behalf of all other members of the

Class ("Class"), defined as:

> All long distance customers of AT&T, Sprint or MCI in the United
> States who paid a USF charge on or after July 1, 1998.
>
> Within the Class are two subclasses defined as follows:
>
> All long distance customers of AT&T in the United States who paid a
> USF charge on or after July 1, 1998, and on or before March 31, 2003
> (the "AT&T Subclass"); and
>
> All long distance customers of Sprint in the United States who paid a
> USF charge on or after July 1, 1998, and on or before March 31, 2003
> (the "Sprint Subclass").
>
> Excluded from the Class and Subclasses are defendants and MCI; any
> parent subsidiary, affiliate of defendants or MCI or any employees,
> officers, or directors of defendants or MCI; legal representatives,
> successors, or assigns of defendants or MCI; and any justice, judge or
> magistrate judge of the United States who may hear the case, and all
> persons related to any such judicial officer, as defined in 28 U.S.C. §
> 455(b).

The Class Period is July 1, 1998, through the present.

38.    MCI/WorldCom has declared bankruptcy and is not joined as a defendant in the

lawsuit, but is identified as a non-party co-conspirator.  Because MCI customers suffered injuries as a

result of the conspiracy, and are entitled to joint and several damages from co-conspirators AT&T

and Sprint, MCI's customers are proper members of the proposed Class with respect to the antitrust

claim.

39.    Separate subclasses are proposed for plaintiffs' remaining claims against AT&T and

Sprint because plaintiffs assert these claims against AT&T solely on behalf of AT&T customers and

against Sprint solely on behalf of Sprint customers.  The state law claims against Sprint arise under

Kansas law, while those against AT&T arise under New York state law.  The definitions for the

Sprint and AT&T Subclasses are otherwise identical to the proposed overall Class definition. This action has been brought and may properly be maintained as a Class action under Rule 23(a)(1)-(4) and Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

40. Plaintiffs do not know the exact size of the Class, as such information is in the exclusive control of defendants. However, based on the nature of the trade and commerce involved, plaintiffs believe that Class members number in the millions and that members of the Class are geographically dispersed throughout the United States. Therefore, individual joinder of all members of the Class would be impracticable.

41. Common questions of law or fact exist as to all members of the Class. Additional questions of law or fact are common to each of the Subclasses. These questions predominate over the questions affecting only individual Class or Subclass members. These common legal or factual questions include:

A) Common to the Entire Class.

(1) Whether defendants and MCI engaged in a combination or conspiracy to raise, fix, stabilize and maintain USF surcharges at supra-competitive levels;

(2) Whether defendants and MCI engaged in a combination or conspiracy to implement similar dispute resolution clauses requiring their customers to, *inter alia*, arbitrate all disputes;

(3) The duration and extent of the combination or conspiracy alleged herein;

(4) Whether each of defendants and MCI was a participant in the combination or conspiracy alleged herein;

(5) Whether the alleged combination and conspiracy violated Section 1 of the Sherman Act; and

.

(6)     The effect of the combination or conspiracy upon the percentages charged for USF fees and the ability of customers to obtain effective relief for the wrongful conduct of defendants and MCI;

B)     <u>Common to Each Subclass.</u>

(1)     Whether the USF surcharges imposed by the defendant w**ere** unjust or unreasonable and, therefore, in violation of 47 U.S.C. § 201(b), in that:

(a)     the defendant, on and after August 1, 2001, charged and collected amounts purportedly for remittance to the USF program which it did not actually remit;

(b)     defendant AT&T, on and after August 1, 2001, charged its direct-dial long distance customers USF surcharges, but not its dial-around and other customers; and

(2)     Whether it is discriminatory and, therefore, in violation of 47 U.S.C. § 202 for defendant AT&T to charge its direct-dial long distance customers USF surcharges, but not its dial-around or other customers;

(3)     Whether defendant AT&T's representations or omissions about its USF surcharges violate New York's Consumer Protection from Deceptive Acts and Practices law, N.Y. Gen. Bus. Laws, Ch. 20, Art. 22-A §§ 349, *et seq.*, in that the representations and omissions:

(a)     were misleading in a material respect; and;

(b)     injured the members of the AT&T Subclass;

(4)     Whether defendant Sprint's representations or omissions about its USF surcharges violated Kansas' Consumer Protection Act, K.S.A. § 50-626, in that those representations and omissions:

      (a)     constitute representations that the USF surcharge has sponsorship, approval, or characteristics that it does not have; or

      (b)     involve the willful use, in an oral or written representation, of falsehood as to a material fact; or

      (c)     involve the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact;

      (5)     Whether the defendant intentionally or negligently misrepresented, concealed or suppressed the truth about its USF surcharges, so as to toll any applicable statutes of limitation;

      (6)     Whether the defendant's actions in charging higher USF surcharges than the amounts it was actually required to remit or actually remitted to the USF program constituted a breach of contract;

      (7)     Whether the difference between the USF surcharges collected by the defendant and the amounts it remitted to the USF program constitute funds which, in equity and good conscience, should be restored to the Subclass pursuant to the doctrine of money had and received;

      (8)     The appropriate measure of damages; and

      (9)     Whether the members of the Subclass are entitled to declaratory or injunctive relief.

      42.     Plaintiffs' claims are typical of the claims of the Class and their respective Subclasses, in that plaintiffs are or were, during the Class Period, customers of at least one of the defendants, from whom that defendant collected USF surcharges. Plaintiffs are, therefore, no different in any relevant respect from any other Class and Subclass member, and the relief sought is common to the Class and Subclass.

43.     Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class or Subclass members they seek to represent, and they have retained counsel competent and experienced in conducting complex class action litigation. The interests of the Class and Subclass members will be adequately protected by plaintiffs and their counsel.

44.     A class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by each individual Class or Subclass member will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by defendants' conduct. Thus, it would be virtually impossible for the Class and Subclass members individually to redress effectively the wrongs done to them. Moreover, even if the Class and Subclass members themselves could afford such individual litigation, the judicial system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the judicial system due to the complex legal and factual issues presented by this case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

45.     In the alternative, the Class may be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class as a whole.

## BACKGROUND

## A.     The Long Distance Market

46.     To make a long distance telephone call, a telephone user must access a long distance carrier network. There are several methods by which consumers can access long distance carrier

networks.  The most common method of accessing a long distance carrier network is to simply dial a "1" before dialing the area code and local telephone number.  To utilize that method, known as "direct-dialing," a long distance carrier must be designated by the customer as the primary carrier for the telephone line used to make the long distance call.

47.     Another method of accessing a long distance carrier network is dialing a seven digit access code (each carrier has its own unique access code or codes beginning with the prefix "10-10").  A telephone line need not be pre-subscribed to a particular long distance carrier to utilize this method.  Because consumers can make long distance calls using the "10-10" method without the ongoing subscriber-provider relationship necessary to make direct-dial long distance telephone calls, the use of these methods is known as "dial-around" or "10-10" service.  AT&T maintains a dial-around service marketed as the Lucky Dog Phone Company.  It may be accessed by dialing 10-10-345.

48.     Other methods of accessing a long distance carrier network include using a prepaid calling card or using a public payphone.  Dial-around, prepaid calling cards and public payphone services are generally referred to as "casual caller" services.

49.     During the Class Period, interstate and international end-user telecommunications ("end-user long distance") revenue in the United States was approximately $80 billion annually.  During the Class Period, AT&T's share of the end-user long distance market was approximately 40%, MCI's share was approximately 25%, and Sprint's share was approximately 10%.

**B.      Universal Service Support Mechanisms**

50.     Since its creation in the 1930's, the Federal Communications Commission ("FCC") has had a policy to promote telephone service to all households that desire such service, including low income customers and customers who reside in areas where the cost of telephone service is high.

51.     For many years, the support mechanisms for these customers were handled privately by the telephone industry, primarily by AT&T.  In 1982, when AT&T was broken up, the FCC initiated steps to ensure that the rates of local telephone companies would remain affordable to consumers.  The first USF program began in 1985.

52.     In 1996, the Federal Communications Act was amended and expanded by the Telecommunications Act of 1996 (the "1996 Act").  The 1996 Act expanded the USF program to provide support to schools, libraries, and rural health care providers.  The 1996 Act also expanded the types of providers required to contribute to the USF program to include all telecommunications carriers that provide service between states-- including long distance companies, local telephone companies, wireless telephone companies, paging companies, and payphone providers (collectively, the "carriers").

53.     Beginning in 1998, all carriers were required by the FCC to contribute a certain percentage of their revenues (the "contribution factor") to the USF program to support the goal of ensuring delivery of affordable telecommunications services to areas of need.  Between First Quarter 1998 ("Q1 1998") and Third Quarter 2002 ("Q3 2002"), the quarterly contribution factors set by the FCC ranged from 3.62% to 7.28% of the respective carriers' long distance revenue.  In the years 1998 through 2001, carriers remitted an aggregate of approximately $15 billion to the USF program.

54.     Before February 1, 2003, to determine the percentage of end-user long distance revenue needed to support the USF program, the Common Carrier Bureau ("CCB") of the Federal Communication Commission ("FCC") calculated a quarterly contribution factor based on the ratio of total projected quarterly costs of the universal support mechanisms to total consumer long distance revenues.  Both direct-dial and casual caller long distance revenues were included in the end-user long distance revenue calculation.

55.     Before February 1, 2003, prior to the start of each quarter, the Universal Service Administrative Company ("USAC"), the organization responsible for administering the USF program, submitted its projections of demand and administrative expenses for the operation of the universal service support mechanisms ("Total Program Collection") for the upcoming quarter.  For example, for Q2 2002, the USAC said it would require $1.385254 billion.  This amount consisted of the projected program support plus administrative costs, minus the application of interest income and the application of periodic "true-ups" and carried forward amounts (*i.e.*, unused funds from the prior period that are applied to reduce the amount to be collected from the carriers).

56.     Prior to February 1, 2003, the USAC also submitted estimates of end-user long distance revenues for the prior quarter.  For Q2 2002, the USAC submitted to the FCC the amount of $19.219015 billion as the projected amount of end-user long distance revenues for the period October through December 2001.

57.     Prior to February 1, 2003, in order to calculate the Quarterly Contribution Base, the CCB decreased the three-month estimate of long distance end-user telecommunications revenue by one percent to account for uncollectible contributions.  For example, for Q2 2002, the amount of end-user long distance revenues of $19.219015 billion - 1%  (*i.e.* $192,190,150) = $19.026825 billion.

58.     Before February 1, 2003, in order to calculate the proposed contribution factor, the CCB calculated the Total Program Collection divided by the Quarterly Contribution Base to determine the percentage of each carrier's revenues to be remitted to the USF:  $1.385254 / $19.026825 = 7.2805%.  The CCB then issued a public notice containing the proposed contribution factor.  If the FCC took no action regarding the proposed factor, the factor was deemed approved by the FCC.

59.     Beginning February 1, 2003, the FCC has directed USAC to assess contributions based upon projections provided by contributors of collected end-user interstate and international

telecommunication revenues for the following quarter. The FCC's modified methodology also allows contributions to estimate uncollectible revenues (subject to periodic "true-ups"). Otherwise, the prior contribution methodology will continue.

60. The FCC does not require carriers to recover their contributions from their customers. Each carrier is allowed to make its own business decision about whether and how much to assess customers to recover USF costs. Both defendants and MCI bill and charge their customers to recover this cost.

61. Although the FCC does not require and has not specified a particular method of recovery, the FCC does require that contributors not shift more than an equitable share of their contributions to any customer group or customers, and that carriers provide accurate, truthful, and complete information regarding the nature of the charge. Further, the FCC has stated that "[i]f contributors [to universal service] choose to pass through part of their contributions and to specify that fact on customer's bills, contributors must be careful to convey information . . . that accurately describes the nature of the charge." 12 FCC Rcd 8776, ¶ 855 (1997).

62. On December 13, 2002, the FCC issued a "Report and Order and Second Notice of Proposed Rulemaking" in which it prospectively limited the amount that contributors may shift to customers. Specifically, the FCC's new requirement prohibits carriers from collecting USF surcharges above the relevant contribution factor as of April 1, 2003. As well, as of April 1, 2003, carriers can no longer characterize any administrative costs associated with the USF contribution as "regulatory fees" or "universal service charges" on customers' bills.

**C.    Defendants' Combination And Conspiracy To Fix The Amount Of The USF Surcharges Imposed On Their Customers and To Insert Arbitration and Other Oppressive Provisions in Customer Agreements.**

**The USF Surcharges**

63.    Beginning in July 1998, defendants and MCI passed through to their customers a surcharge described by defendants and MCI as recovery of a contribution they are required to make to the USF program.  AT&T began by instituting a flat USF surcharge of $0.93 per month in July 1998, later raising it to $1.38 per month in November 1999.  MCI and Sprint passed along their USF charges using percentages between 6.0% - 7.2% and 5.8% - 8.4%, respectively.

64.    In Q2 2000, AT&T replaced the flat monthly USF surcharge on its customers' bills with a fee equal to 8.6% of the direct-dial customers' total interstate and international charges.  Sprint maintained its USF surcharge at 8.4%, and MCI joined the other two carriers by raising its fee from 7.2% to 8.3% in Q2 2000.

65.    The Telecommunications Research and Action Center ("TRAC") estimated that in Q2 2002 that telephone subscribers were paying between 20% and 40% more for long distance service than they were in December 1999, mostly due to the new USF surcharges and increased prices for directory assistance and calling card calls.

66.    For Q1 2001, AT&T increased its USF surcharge to 9.9%, effective on January 1, 2001.  On February 1, 2001, MCI and Sprint increased their USF surcharges to 9.9% and 9.6%, respectively.

67.    In Q2 2001, Sprint further raised its USF surcharge to 9.9% to match exactly AT&T's previous quarter's increase to 9.9%.  In Q2 2001, MCI raised its USF surcharge to 12%.

68.    In Q3 2001, after AT&T and Sprint declined to match MCI's increase, MCI returned to 9.9%, matching AT&T and Sprint exactly.  All carriers maintained that percentage until Q1 2002, when AT&T raised its USF surcharge to 11.5%.  Sprint followed in Q3 2002 by raising its USF fee to

11.3%.

69.     AT&T claimed to the FCC that "each individual telecommunications carrier bears all of the risk of not recovering its universal service obligations from its customers . . . which forces carriers to engage in complex calculations to account for such variables as uncollected revenues, credits and the need to recover universal service contributions from a declining revenue base." *AT&T Comments on USF Contribution Further Notice of Proposed Rulemaking* at 5, filed with the FCC April 22, 2002. AT&T further asserted to the FCC that "because each carrier faces a different risk of nonrecovery, their good faith efforts to fashion recovery mechanisms *inevitably* result in line-item charges of substantially varying amounts." *Id.* (Emphasis in original).

70.     MCI similarly asserted to the FCC that individual carriers have "unique administrative costs not borne by all members of the industry." *Comments of WorldCom, Inc.*, filed with the FCC on April 22, 2002.

71.     Yet, despite AT&T's assertion that it is "inevitable" that the USF surcharges would be substantially different, and MCI's assertion that the costs of USF are "unique" to each carrier, the defendants have consistently charged nearly identical USF surcharges.

72.     The following chart shows the uniformity of the residential USF surcharges charged by defendants and non-party co-conspirator MCI:

| Quarter | USF factor | AT&T surcharge | MCI surcharge | Sprint surcharge |
|---------|-----------|----------------|---------------|------------------|
| Q4 2000 | 5.67% | 8.6% | 8.3% | 8.6% |
| Q1 2001 | 6.68% | 9.9% | 9.9% | 9.6% |
| Q2 2001 | 6.88% | 9.9% | 12% | 9.9% |
| Q3 2001 | 6.89% | 9.9% | 9.9% | 9.9% |
| Q4 2001 | 6.92% | 9.9% | 9.9% | 9.9% |
| Q1 2002 | 6.81% | 11.5% | 9.9% | 9.9% |

| | | | |
|---|---|---|---|
| Q2 2002 | 7.28% | 11.5% | 9.9% | 9.9% |
| Q3 2002 | 7.28% | 11.0% | 9.9% | 11.3% |

73.     The long distance telephone market is particularly susceptible to price fixing.  Long distance services in the United States are controlled by a few dominant companies.  AT&T, MCI and Sprint control approximately 75% of the market.  In addition, the product—long distance service—is highly standardized and fungible: there are not different qualities or grades of long distance telephone calls.  Finally, defendants and MCI have a great deal of excess capacity to provide long distance services.

74.     Defendants and their co-conspirators, acting in unison, have: (1) entered into a mutual understanding or consensus regarding USF surcharges, advertising and other notices to consumers of the USF surcharges and the terms and conditions of providing service; and (2) promoted mutual confidence that there will be adherence to these decisions.  They do so by instituting same or similar pass-through and other regulatory charges, by issuing same or similar increases with regard to surcharges, by issuing same or similar consumer service agreements, and by publicly stating that all the major carriers are passing through charges or raising those charges, thus confirming adherence to their plan.

75.     For example, AT&T has sought to make the overcharges more palatable to its customers by explaining that no matter which carrier a consumer chooses, they will incur similar percentage USF surcharges.  On its website, AT&T explained: "Every telecommunications carrier in the industry must contribute to the USF.  All major telecommunications companies are recovering their USF contributions from residential customers through a separate charge.  Most major carriers are charging it as a percentage of their customers' long distance charges and the amount of the percentage charge does not vary significantly among the major carriers."

76.     Regarding calling card rates, in February 2001, William E. Cheek, a Sprint Vice President for Sales and account management stated publicly that "[e]veryone follows AT&T's rates . . . The rates are pegged based on what that dominant carrier charges." Seth Schiesel, *For Some Who Use Calling Cards, the Number is 1-800-BEWARE*, New York Times, Feb. 15, 2001 at A1.

77.     AT&T, MCI and Sprint all charge $1.99 to their customers who utilize the companies' directory assistance services.  In addition, AT&T, Sprint and MCI all implemented an identical $1.50 charge for customers who want to receive their long distance billing on their local phone bill.

## History Of Collusion On Pricing For Long Distance

78.     Defendants and MCI have a long history of collusion on their pricing for long distance service.  These long distance carriers have for years engaged in coordinated interaction and charged supra-competitive prices to customers.  Every time AT&T announced a price increase, for example, its two main competitors, MCI and Sprint, immediately followed.  The lock-step pattern of price increases persisted even though the carriers' actual costs had not changed.  And MCI and Sprint communicated their commitment to follow AT&T's pricing by declaring, publicly and otherwise, that they would accept AT&T's pricing decisions as their own.  These declarations signaled agreement on price.

79.     The carriers' long distance charges, moreover, failed to keep pace with reductions in their costs.  Gradual erosion in the market shares of AT&T, Sprint, and MCI and declines in per minute charges have not resulted in lower price-cost margins for them.  Indeed, as nominal prices have fallen, costs have dropped even more, particularly access charges that long distance carriers pay local exchange carriers for use of their networks.  Even dramatic reductions in access charges in the later 1990s have not produced lower prices; the carriers pocketed the savings as profits instead. Consumers of long distance services have thus paid and continue to pay supra-competitive prices as a result of collusion on the part of the three major long-distance carriers.  Systemic collusion among

AT&T, Sprint, and MCI has produced the supra-competitive prices to their customers.

**Opportunities For Collusion On Responses To USF Obligations And Detariffing**

80.     The FCC's drive to detariff long distance service disturbed what had become a cozy relationship among AT&T, Sprint, and MCI.  In fact, in ordering that long distance carriers detariff, the FCC cited the "risk that tariffs might serve to facilitate price fixing" as support for doing away with tariffing of any kind, including permissive tariffing.  *MCI WorldCom v. FCC*, 209 F.3d 760, 763 (D.C. Cir. 2000).  The filing of tariffs provided defendants and MCI a visible means to announce price changes, signal agreement on prices, and police the agreement.  These carriers resisted detariffing in part to prevent losing this way of camouflaging their price-fixing behavior.

81.     The regulatory structure and routine of the FCC gave defendants and MCI opportunities to collude on a strategy for dealing with impending changes.  AT&T and Sprint supplemented the frequent contacts their representatives had in connection with FCC matters by co-founding the Coalition for Affordable Local and Long-Distance Service ("CALLS").  CALLS, among other things, made joint proposals and other submissions to the FCC on USF charges, access charges, and     other     matters     relating     to     pricing     for     long     distance.     *See* http://www.phonepolicy.com/proposal/reform.html.  AT&T and MCI likewise supplemented frequent contacts by partnering with each other in another lobbying group, the Coalition for Sustainable Universal Service ("CoSUS"), which also made proposals to the FCC on issues concerning USF contributions and charges.  Sprint publicly supported the CoSUS proposal for changing USF requirements as an alternative to its own.  The same lawyers and law firm, moreover, represented both CALLS and CoSUS before the FCC.  The joint membership in CALLS and CoSUS, joint submissions by CALLS and CoSUS, and joint retention of the same counsel for CALLS and CoSUS provided opportunities for defendants and MCI to collude on their responses to detariffing and imposition of USF charges.

**Economic Irrationality Of Behavior In Absence Of Collusion**

82.    The conduct of defendants and MCI in setting their USF charges at closely parallel levels above their contribution percentages and inserting nearly identical arbitration and other remedy-limiting provisions in customer agreements and imposing the restrictions makes economic sense only if they set the charges and inserted the provisions as a result of collusion.  Absent collusion, it would be in a carrier's self-interest to charge lower USF charges and not to impose remedy-limiting contract provisions in order to capture greater market share and maximize profits.   Agreeing among themselves to impose nearly identical USF charges and dispute resolution provisions, on the other hand, operated to insulate the carriers from loss of market share and lower profits.  The carriers' behavior promoted their self-interest (receipt of supra-competitive profits) if they agreed to act in the same way but would have injured them if they acted alone (loss of market share and profits).

**Oversupply of Long Distance Services As Not Inhibiting Prices**

83.    Defendants' imposition of high USF charges and remedy-limiting provisions had the effect of raising prices in a time of oversupply of long distance services.  Excess capacity has existed in the networks of defendants and MCI for years, partly as the result of aggressive building campaigns.  In a competitive market, the abundance of transmission facilities would result in lower cost-price margins and significantly cheaper prices.  That high cost-price margins and prices have persisted despite oversupply evidences collusion among AT&T, Sprint, and MCI.

**Industry Structure Conducive To Collusion**

84.    Defendants and MCI together have controlled a substantial share of the United States market for long distance services (more than 60 percent currently), and their total share has given them market power for the past decade.  Their sales areas, moreover, have a high degree of geographic overlap, and their offerings likewise consist of directly competing, interchangeable products.  These conditions help make the long distance industry's structure conducive to collusion

among the three largest carriers.

## Collusion on Customer Agreements

85.     The 1996 Act required the FCC to forbear from applying any regulation that was not necessary.  On March 25, 1996, the FCC issued a Notice of Rulemaking, seeking comments on whether to prohibit non-dominant interexchange carriers (like AT&T, Sprint and MCI) from filing tariffs.

86.     In that Notice, the FCC noted that "a tariff filing requirement harms consumers by undermining the development of vigorous competition." *Notice of Proposed Rulemaking* at ¶ 29. In addition, the FCC concluded that "forbearance from requiring tariff filings for non-dominant carriers will promote competition and deter price coordination." *Id.* at ¶ 30. In that Notice, the FCC specifically sought information on whether the interstate interexchange market has oligopolistic tendencies or characteristics, as distinct from being effectively competitive. *Id.* at ¶¶ 80-81. And, the FCC also specifically noted that detariffing "would eliminate possible invocation by carriers of the filed rate doctrine" which could be used to "limit their liability for damages." *Id.* at ¶ 34.

87.     Although the 1996 Act was passed in the expectation that telecommunications carriers would actively seek detariffing, *see* 47 U.S.C. § 160(c), AT&T, MCI and Sprint strongly objected to detariffing. Defendants and MCI did not dispute the FCC's conclusion that tariffing was no longer necessary, but rather complained that they would incur "substantial transaction costs to establish and maintain relationships with millions of customers . . . ." *Reply Comments of AT&T Corp.* (May 24, 1996) at ii. MCI noted that it, AT&T and Sprint would most likely pass on to their customers the costs of dealing directly with them. *Reply Comments of MCI Telecommunications Corp.* (May 24, 1996) at 10.

88.     After the comment period ended, the FCC ordered mandatory detariffing. MCI appealed the order. After numerous unsuccessful appeals, the last of which was decided on April 28,

2000, the FCC's order of mandatory detariffing took effect May 9, 2000. After that date, interexchange carriers could file new tariffs for mass market customers during the transition period, scheduled to expire on January 31, 2001. Interexchange carriers could not file new or revised tariffs for contract tariff offerings or other long-term service arrangements.

89.    The detariffing deadline was eventually extended to July 31, 2001. The FCC allowed carriers until August 1, 2001, to form contracts with their customers. Prior to the effective date of detariffing, a group of AT&T employees discussed AT&T's detariffing plan. Stephen S. Adams, of AT&T's Consumer Markets Division, e-mailed Denise Janiec-Domino and seven others, including Wesley Dvorak. In the e-mail, Adams noted that consumer reporters "will be all over this when it goes effective." He expressed the need to have "more information concerning the FCC's and other carriers' plans to communicate this event to the public." In response, Dvorak remarked that "it would help to know. . . What our friends at MCI and Sprint are planning (so we don't look like we are doing less than them)." Internal AT&T e-mails, dated January 18, 2001.

90.    Despite no such provisions having ever been used in mass market telecommunications, AT&T, Sprint and MCI simultaneously instituted nearly identical agreements with all of their customers containing substantially similar dispute resolution and liability limitation clauses which purported to require their residential customers to arbitrate all disputes with them, to keep any results confidential, to waive their right to a jury trial, to limit the time in which they can sue, to waive their right to conduct full discovery, to waive their right to certain types of damages and to waive their right to participate in class actions. Recognizing that the filed rate doctrine would not even arguably immunize them from liability as to the rates they charge, AT&T, Sprint and MCI colluded in the drafting and implementation of the terms of their customer service agreements in an effort to make it more difficult to hold them liable under the new regime.

91.    As the AT&T executive responsible for developing and implementing his company's

response to detariffing testified in a deposition, the simultaneous insertion of nearly identical provisions in mid-2001 resulted from "discussions" between AT&T and "some attorneys from MCI and Sprint". Before those discussions, according to an April 21, 2001 letter to AT&T's chief executive officer, AT&T alone had decided to include arbitration clauses in its customer agreements. After the discussions, the executive testified, he "was under the impression that we weren't going to [be] the only ones that were going to offer arbitration." The executive's admission is direct evidence of the illegal conspiracy among AT&T, Sprint, and MCI.

### Trade And Commerce

92.     The trade and commerce relevant to this action is telecommunications services, including USF surcharges and customer agreements.

93.     During the Class Period, defendants sold long distance telephone services in a continuous and uninterrupted flow of interstate commerce to customers located in states other than in the states from which defendants issued their charges for USF fees. In addition, the long distance telephone services provided to plaintiffs and Class members were in the form of interstate long distance telephone connections. The business activities of defendants which are the subject of this Complaint thus were within the flow of and substantially affected interstate trade and commerce.

### Violations Alleged

94.     Beginning as early as 1998, defendants and their co-conspirators entered into and engaged in a combination and conspiracy in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

95.     This combination and conspiracy has consisted of a continuing agreement, understanding and concert of action among the defendants and their co-conspirators, the substantial terms of which have been to fix, raise, maintain and stabilize the amounts of USF surcharges and oppressive contract terms they have imposed, and continue to impose, on their customers.

96.     For the purpose of formulating and effectuating this combination and conspiracy, defendants and their co-conspirators did the following: (a) discussed and agreed on general increases or a stabilized percentage for USF surcharges and on arbitration clauses and other remedy-limiting provisions for customer agreements; (b) approved and issued public notices regarding increases or a stabilized percentage for USF surcharges to reflect their agreements to increase or stabilize the percentages charged; (c) monitored and enforced adherence to the agreed-upon levels for percentages of USF surcharges and contract terms; (d) created misinformation about USF surcharges and contract terms so that customers would not understand the basis for the USF surcharges or the nature of the rights defendants and MCI sought to take from them; and (e) created obstacles to the enforcement of the antitrust and other laws, if customers attempted to sue defendants and their co-conspirators for their illegal activities.

97.     This combination and conspiracy was made and refined through meetings, telephone conversations and public signaling among representatives of the defendants and their co-conspirators, including through discussions among lawyers for defendants and MCI.

98.     Each defendant and their co-conspirators have participated in one or more overt acts in furtherance of the conspiracy alleged in this Complaint and have participated in conspiratorial activities, meetings and communications.

### Effects

99.     The combination and conspiracy alleged in this Complaint has had the following effects, among others: (a) competition in the sale of long distance telephone services in the United States has been restrained and suppressed; (b) the amounts imposed as USF surcharges have been raised, fixed, maintained and stabilized at artificially high and non-competitive levels throughout the United States; and (c) purchasers of long distance telephone services have been deprived of the benefit of free and open competition.

**Injury To Plaintiffs And The Class**

100.    Plaintiffs and Class members purchased long distance telephone services and paid USF surcharges, and, by reason of the antitrust violations alleged in this Complaint, paid more for such surcharges than they would have in the absence of such antitrust violations.  As a result, plaintiffs and each member of the Class they represent have been injured and damaged in their business and property.

**D.    Defendants' and MCI's Misrepresentations and Other Wrongful and Discriminating Conduct**

**AT&T**

101.    Beginning on or about July 1, 1998, AT&T arbitrarily imposed a USF surcharge of up to 11.5% on its direct-dial customers' long distance charges, informing customers only that the surcharge is for the USF program.  Their invoices expressly or implicitly represent that the entire USF surcharge is merely a pass-through of a required expense.  But, AT&T has failed to disclose that the amounts collected by AT&T as a USF surcharge far exceed the amounts remitted by AT&T for the USF program.

102.    In addition, AT&T discriminates in that it imposes a USF surcharge only on its direct dial long distance customers.  AT&T does not impose a USF surcharge on customers that use AT&T's casual caller services, such as its "10-10" dial-around long distance service.  Rather, it charges its direct-dial customers even more in USF surcharges to make up for the lack of collections from its casual caller customers.

103.    As a result of AT&T's practices with regard to the imposition and collection of USF surcharges, AT&T has charged plaintiffs and other Subclass members substantially more than its USF program contribution factor.  Furthermore, AT&T has employed and continues to employ deceptive and misleading practices and statements to conceal from plaintiff and the AT&T Subclass the nature

and extent of the overcharge on the USF program fee. Through this practice, AT&T wrongfully has reaped and continues to reap millions of dollars from unsuspecting consumers nationwide to which it is not entitled.

104.    From the inception of the USF surcharge to the present, AT&T misrepresented the USF surcharge as a legally required, 100% "pass-through" charge on its invoices to business customers by designating it as a "regulatory fee," and on its invoices to residential customers by designating it, at different times, as a "national access contribution" or a "universal connectivity charge." Plaintiffs Gerdes, Cummings, Gest, Goldman & Hellmann, Lady Di's, Beimfohr, and the members of the AT&T Subclass received AT&T's invoices monthly, reviewed the invoices, and necessarily relied on AT&T's misrepresentations and omissions regarding the USF surcharge in paying the invoices. As a result, Plaintiffs and the members of the AT&T Subclass paid more to AT&T every month than AT&T actually passed through to the USF.

105.    AT&T does not disclose on telephone bills sent to its customers that its customers are charged more in USF surcharges than AT&T actually remits to the USF. AT&T does not inform its direct-dial customers that they are charged a marked-up USF surcharge, in part, to account for the lack of collection of the USF fee from dial-around and other casual caller customers. AT&T does not inform its customers that they would not have to pay the USF surcharge if they use AT&T's "10-10" dial-around number or a prepaid calling card. Finally, even if an AT&T direct dial long distance customer is able to discover that he or she is being overcharged for the USF, AT&T will not discontinue or waive the surcharge.

106.    AT&T imposes and recovers USF surcharges well in excess of the amount that it is required to and actually does contribute to support the USF program. In addition, AT&T discriminates by charging all of its direct-dial customers more in USF surcharges to make up for the lack of collection from its dial-around and other casual caller customers.

107.    For example, for the Q4 2000, the FCC established a contribution factor of 5.6688%. Defendant AT&T charged its residential customers a USF surcharge of 8.6%, a mark- up of over 50%. AT&T's charges for the ensuing quarters were as follows:

| Quarter | Contribution factor | USF surcharge by AT&T | |
|---|---|---|---|
| | | residential | business |
| Q1 2001 | 6.68% | 9.9% | 8.00% |
| Q2 2001 | 6.88% | 9.9% | 8.00% |
| Q3 2001 | 6.89% | 9.9% | 8.00% |
| Q4 2001 | 6.92% | 9.9% | 8.00% |
| Q1 2002 | 6.81% | 11.5% | 8.00% |
| Q2 2002 | 7.28% | 11.5% | 10.60% |
| Q3 2002 | 7.28% | 11.0% | 9.60% |

108.    The magnitude of AT&T's overcharge is remarkable. For example, in Q2 2001, the FCC established a contribution factor of 6.8823%. AT&T set its USF surcharge to residential customers at 9.9%. Using these percentages, an AT&T residential customer with $100 in monthly long distance charges paid $9.90 to AT&T supposedly for the USF program, even though AT&T's required contribution to the USF program for every $100 in long distance revenue was only $6.89.

109.    AT&T's business customers are similarly overcharged. For example, in Q2 2002, the contribution factor was 7.28% and AT&T charged its business customers 10.60%. Using these percentages, an AT&T business customer with $100 in monthly long distance charges paid $10.60 to AT&T supposedly for the USF program, even though AT&T's required contribution to the USF program for every $100 in long distance revenue was only $7.28.

110.    Even though AT&T collects and retains revenues beyond what it is required to and does contribute to the USF program, its website indicated that it had "implemented these charges to

recover its costs, and does not expect to recover more than the costs it is incurring." At another page in the same website, AT&T noted that its USF surcharge, referred to as the Universal Connectivity Charge, "covers our contributions to the [Universal Service Fund] as well as the administrative costs associated with the program." AT&T also stated that it "continue[s] to make every effort to recover these costs in a fair and equitable manner." In light of AT&T's huge overcharge, these statements were false and misleading, suggesting to customers that all of AT&T's USF revenues were passed-through to the USF program.

111.    On the toll-free number listed on AT&T residential customers' bills, a recorded message stated that "[a]ll major telecommunications companies are recovering their Universal Service Fund contributions from residential customers though a separate charge" and that "the amount of the percentage charged does not vary significantly among the major carriers." The message also noted that: "The money collected from the Universal Connectivity Charge enables AT&T to support its Universal Service Fund obligations and *is intended to simply recover our costs.* We have chosen to be straightforward in presenting these charges to you so that you know exactly how your long distance dollar is being spent." (Emphasis added.)

112.    In a statement to the press, AT&T has claimed that a recent increase in its surcharge is "strictly to cover the increased contribution that the FCC has asked of us and the rest of the industry." Andrew    Backover,    *AT&T's    Residential    Rates    to    Rise*,    U.S.A.    Today,    at http://www.usatoday.com/money/telecom/te/0047.htm.

113.    Until July 31, 2001, as a common carrier, AT&T was allowed by the Telecommunications Act, 47 U.S.C. § 243, to file and maintain with the FCC a schedule or "tariff" setting forth its charges, classifications, regulations, and practices with respect to its long distance telephone services. On February 18, 2000, AT&T filed a tariff of general applicability titled AT&T Tariff FCC No. 27 ("AT&T Tariff"), which purports to set the surcharge it collects for the USF

program. The AT&T Tariff states: "a Universal Connectivity Charge applies monthly per billed telephone number account and is equal to 8.6% of the customer's total billed interstate and international charges (excluding taxes)."

114. The descriptions of the USF surcharge under which AT&T purports to collect USF fees from its direct-dial long distance customers are misleading and deceptive.

115. AT&T drafted its Tariff and its website notices in an intentionally inaccurate, untruthful, and incomplete fashion in an effort to cloak its practice of collecting and retaining excess revenue under the guise of a pass-through USF program expense.

116. Because AT&T has claimed and continues to claim that it is not generating income on the USF surcharge, AT&T has actively concealed its illegal overcharge. Thus, AT&T's practice of making a profit on the USF surcharge was not, in the exercise of reasonable diligence, discoverable and, therefore, any statutes of limitations applicable to the plaintiffs' and other Class members' claims were tolled and AT&T is estopped from asserting any applicable statute of limitations as a defense to any of the plaintiff's and Class members' claims.

**SPRINT**

117. Beginning on or about July 1, 1998, Sprint imposed a USF surcharge of up to 11.3% on its customers' long distance charges, informing customers only that the surcharge is for the USF program. Sprint's billing statements expressly or impliedly represent that the entire USF surcharge is legally required for the USF program, *i.e.*, is a legally authorized pass-through of expenses for a public purpose. The amounts collected by Sprint as USF surcharges far exceed the amounts remitted by Sprint to the USF program.

118. As a result of Sprint's practices, Sprint has charged plaintiffs and other Subclass members substantially more than its USF program contribution factor. Furthermore, Sprint has employed and continues to employ deceptive and misleading practices and statements to conceal from

plaintiffs and the Sprint Subclass the nature and extent of its mark-up on the USF program fee. Through these practices, Sprint wrongfully has reaped and continues to reap millions of dollars from unsuspecting consumers nationwide to which it is not entitled.

119.   From the inception of the USF surcharge to the present, Sprint misrepresented the USF surcharge as a legally required, 100% "pass-through" charge on its invoices by designating it as a tax or regulatory charge. Plaintiffs Thome, Bryan, Tiffany and the members of the Sprint Subclass received Sprint's invoices monthly, reviewed the invoices, and necessarily relied on Sprint's misrepresentations and omissions regarding the USF surcharge in paying the invoices. As a result, Plaintiffs Thome, Bryan, Tiffany and the members of the Sprint Subclass paid more to Sprint every month than Sprint actually passed through to the USF.

120.   Sprint has never disclosed to its customers that they are charged more in USF surcharges than Sprint remits to the USF program. Sprint actively conceals its revenue gain from collection of the USF surcharge. Finally, even if a Sprint customer is able to discover that he or she is being charged the hidden overcharge on the USF, Sprint will not discontinue or waive the surcharge.

121.   Sprint imposed and recovered USF surcharges at a rate well in excess of the amount that it was required to and actually did contribute to the USF program. For example, for Q4 2000, the FCC established a USF program contribution factor of 5.6688%, but Sprint charged its business and residential customers 8.6%, a mark-up of over 50%. Sprint's charges for the ensuing quarters were as follows:

| Quarter | Contribution Factor | Sprint's USF surcharge | |
| --- | --- | --- | --- |
| | | residential | business |
| Q1 2001 | 6.68% | 9.6% | 7.50% |
| Q2 2001 | 6.88% | 9.9% | 7.50% |
| Q3 2001 | 6.8% | 9.9% | 7.50% |

|          |       | ..    |       |
|----------|-------|-------|-------|
| Q4 2001  | 6.92% | 9.9%  | 7.50% |
| Q1 2002  | 6.81% | 9.9%  | 8.30% |
| Q2 2002  | 7.28% | 9.9%  | 9.90% |
| Q3 2002  | 7.28% | 11.3% | 9.90% |

122.    The magnitude of Sprint's overcharge is remarkable. In Q2 2001, the FCC established a USF program contribution factor of 6.8823%. Sprint's USF surcharge to residential long distance customers was 9.9%. Using these percentages, a Sprint residential customer with $100 in monthly long distance charges paid $9.90 to Sprint as a USF surcharge, even though Sprint's required contribution to the USF program was only $6.89 for every $100 in long distance revenue.

123.    Sprint's business customers are similarly overcharged. For example, in Q2 2002, the contribution factor was 7.28% and Sprint charged its business customers 9.90%. Using these percentages, a Sprint business customer with $100 in monthly long distance charges paid $9.90 to Sprint as a USF surcharge, even though Sprint's required contribution to the USF program for every $100 in long distance revenue was only $7.28.

124.    Even though Sprint collected large amounts of revenue beyond what it was required to contribute to the USF program, Sprint's website explained the USF surcharge to its residential long distance customers as follows:

> Universal Service Fee (USF): 9.9% of your monthly recurring/usage charge, interstate and international usage. Sprint, as well as all other long-distance carriers, is required to contribute to various federal Universal Service Programs, including programs that provide subsidized local telephone service to consumers in rural areas and low income consumers, and programs that provide discounted services of various kinds to schools, libraries and rural healthcare providers.

125.    Sprint went on to state on its website at http://csg.sprint.com/faq/cc_accessfaq/ that Sprint's USF surcharge "is intended to recover Sprint's costs of contributing to these Universal Service programs." Sprint's statement did not disclose that only 6.88% of its long distance revenues

were required to be remitted to the USF program at the time, not the 9.9% charged by Sprint, or that it did not remit the entire 9.9% to the USF program.

126. These statements were intentionally false and misleading, suggesting to customers that all USF surcharges by Sprint are remitted to the USF programs.

127. In 1996, in written comments to the FCC about the USF, *Recommended Decision of the Federal-State Joint Board on Universal Service*, at n. 2556, Nov. 6, 1996 (Sprint comments at 20), Sprint acknowledged that its costs to collect and remit funds to the USF should be minimal if contributions are based on revenues.

128. Until July 31, 2001, as a common carrier, Sprint was allowed by the Telecommunications Act, 47 U.S.C. § 243, to file and maintain with the FCC a schedule or "tariff" setting forth its charges, classifications, regulations, and practices with respect to its long distance telephone services. On or about October 31, 2000, Sprint filed FCC Tariff No. 1 ("Sprint Tariff"). The Sprint Tariff states:

> [R]esidential customers, unless otherwise specified, will be assessed a Carrier Universal Service Charge ("CUSC") of 8.6%, subject to billing availability on all interstate and international retail charges (including usage, non-usage and Presubscribed Line Charge) billed.

129. The description of the USF surcharge under which Sprint purports to collect USF surcharges from its long distance customers is intentionally misleading and deceptive.

130. Sprint drafted its tariff and its website notices in an intentionally inaccurate, untruthful, and incomplete fashion in an effort to legitimize its practice of collecting and retaining excess revenue by means of its USF surcharge.

131. Sprint does not disclose on its customers' telephone bills that Sprint customers are charged more in USF surcharges than Sprint remits to the USF program. Sprint actively conceals its revenue gain and profits derived from the collection of the USF surcharge. Finally, even if a Sprint

customer is able to discover that he or she is being charged the hidden overcharge on the USF, Sprint will not discontinue or waive the surcharge.

132.    Because Sprint has claimed and continues to claim that it is not generating income and profits on its USF surcharge, Sprint has concealed its illegal practices.  Thus, Sprint's practice of profiting from its USF surcharge was not, in the exercise of reasonable diligence, discoverable and, therefore, any statutes of limitations applicable to the plaintiffs' and other Class members' claims were tolled and Sprint is estopped from asserting any applicable statute of limitations as a defense to any of the plaintiffs' and Class members' claims.

## MCI

133.    Beginning on or about July 1, 1998, MCI arbitrarily imposed a surcharge of up to 12% on its direct-dial customers' long distance charges, informing customers only that the surcharge is for the USF.  Its invoices expressly or implicitly represent that the entire USF fee is legally required and will be paid to the USF program (*i.e.*, is a legally required pass-through charge).  Beginning in December 2001, MCI assessed this same surcharge on its dial-around, 10-10 customers.  The amounts collected by MCI under the USF rubric far exceeded the amounts remitted by MCI to the USF program.

134.    As a result of MCI's practices, MCI has charged its customers substantially more than the USF contribution factor.  Furthermore, MCI customers have paid such overcharges in connection with their long distance bills.  Through this practice, MCI has reaped millions of dollars of wrongfully received revenues from unsuspecting consumers nationwide, money to which it is not entitled.

135.    In addition, MCI discriminated by imposing, until December 2001, a surcharge only on its direct-dial long distance customers. MCI did not impose the USF surcharge on customers that used MCI's "10-10" dial-around long distance services.  Rather, it overcharged its direct-dial

customers even more in USF surcharges to make up for its intentional lack of collections from its dial-around customers.

136.    MCI does not disclose on its customers' telephone bills that MCI customers are charged more USF fees than MCI remits to the USF. MCI actively conceals its revenue gain from collection of the USF surcharge. MCI does not inform its direct-dial customers that they are charged a marked-up USF surcharge in part to account for the lack of collection of the USF fee from dial-around customers. Prior to December 2001, MCI did not inform its customers that they would not have had to pay the USF surcharge had they used MCI's "10-10" dial-around numbers. Finally, even if an MCI customer is able to discover that he or she is being overcharged for the USF, MCI will not discontinue or waive the surcharge.

137.    MCI imposes and recovers USF fees well in excess of the amounts it is required to and actually does contribute to the USF program. For example, the FCC established a contribution factor of 5.67% for the Fourth Quarter of 2000, but MCI charged its business and residential customers 8.3%. MCI's charges for the ensuing quarters were as follows:

| Quarter | Contribution Factor | MCI's USF surcharge | |
|---|---|---|---|
| | | residential | business |
| Q1 2001 | 6.68% | 9.90% | 8.20% |
| Q2 2001 | 6.88% | 12.0% | 9.30% |
| Q3 2001 | 6.89% | 9.90% | 9.30% |
| Q4 2001 | 6.92% | 9.90% | 9.30% |
| Q1 2002 | 6.81% | 9.90% | 9.30% |
| Q2 2002 | 7.28% | 9.90% | 9.90% |
| Q3 2002 | 7.28% | 9.9% | 9.9% |

138.   The magnitude of MCI's overcharge is remarkable. In Q2 2001, the FCC established a contribution factor of 6.8823%. MCI's USF surcharge to direct-dial residential long distance customers was 12%. Using these percentages, a MCI residential customer with $100 in monthly long distance charges paid $12.00 to MCI as a Universal Service Fee, even though MCI's required contribution to the FCC was only $6.89 for every $100 in long distance revenue.

139.   MCI's business customers are similarly overcharged. For example, in Q2 2002, the contribution factor was 7.28% and MCI charged its business customers 9.90%. Using these percentages, an MCI business customer with $100 in monthly long distance charges paid $9.90 to MCI for the Universal Service Fund, even though MCI's required contribution to the FCC for every $100 in long distance revenue was only $7.28.

140.   Even though MCI collected and retained revenues beyond what it was required to and did contribute to the USF program, MCI represented with regard to the Universal Service Fee that the "funds collected through these fees are then returned to the [authority subsidizing the Universal Service program]." Further, in describing the Federal Universal Service Fund, MCI stated that the "fee goes to fund the federal universal service program." MCI also provided residential customers with information about their bills at a page in its website that it called "Consumers' Corner." In response to the question "Do telecom carriers profit from fees, taxes or surcharges?" MCI stated:

> Taxes assessed by local, state, and federal governments are merely collected by telecommunications carriers and return [sic] to the government to contribute to government subsidized programs. Monthly minimums, calling plan fees and surcharges are designed by carriers to simply recover their own costs.

URL http://www.mci.com/about_mci/consumers_corner/phone_bill_brochure.jsp (Nov. 12, 2001). Most recently, MCI stated "The funds collected through [USF] fees are then returned to the [federal government]". http://www.mci.com/customer_service/info_and_answers/Phone_Bill_Charges.html

(May 1, 2002). These statements were false and misleading, suggesting to customers that all USF surcharges are passed through to the government.

141.    On direct-dial customers' phone bills, MCI has stated: "All telecommunications carriers are required to contribute to the Federal Universal Service Fund. MCI WorldCom collects its contributions to the fund in a Federal Universal Service Fee (FUSF). This fee, assessed on your state-to-state and international long distance charges, will change to 12% on April 1, 2001."

142.    MCI has publicly stated that its policy is to recover "no more and no less" than it owes the government: "We will continue to recover our cost." MCI's spokesman Peter Lucht claimed in USA Today that "We do not profit from universal service fee collections." Lucht cited the need to offset the administrative cost of collecting the fee, and the need to make up for dial-around ("10-10") customers, from whom MCI did not collect the USF fee until December 2001. Paul Davidson, *Proposal Calls for Phone Bill Cuts*, USA Today, May 9, 2001, at B1.

143.    Plainly, the rate at which MCI overcharged its customers is more than could possibly be required to cover administrative costs. In fact, in 1996, in written comments to the FCC about the Universal Service Fund, *Recommended Decision of the Federal-State Joint Board on Universal Service*, (Nov. 6, 1996) at n. 2556; MCI comments at 3, MCI stated that no carrier should be exempt from contributing to the fund, because contributor and administrator costs should be minimal if contributions are based on revenues.

144.    In addition, until December 2001, MCI discriminated by charging some of its customers disproportionately high USF fees in order to, in part, make up for its decision to not assess USF fees on dial-around customers.

145.    Until July 31, 2001, as a common carrier, MCI was allowed by the Telecommunications Act, 47 U.S.C. § 243, to file and maintain with the FCC a schedule or "tariff" setting forth its charges, classifications, regulations, and practices with respect to its long distance

telephone services. On or about March 22, 2001, MCI filed a tariff of general applicability titled MCI

Tariff FCC No. 1 ("Tariff"), which purports to set the surcharge it collects for the USF. That Tariff

states only that the charge to customers will be 12% for the Federal Universal Service Fee.

146.    The description of the USF surcharge under which MCI purports to collect USF fees

from its direct dial long distance customers is vague, misleading and deceptive.

147.    MCI drafted its Tariff and its website notices in intentionally inaccurate, untruthful,

and incomplete fashions in an effort to conceal its practice of collecting and retaining revenue from

the USF surcharge.

148.    Because MCI has claimed and continues to claim that it is not generating income on

the USF surcharge, MCI has concealed its wrongful practices.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Declaratory judgment on behalf of all AT&T Subclass
members whom AT&T claims are subject to an agreement to arbitrate
and limit liability and all Sprint Subclass members whom Sprint claims
are subject to an agreement to arbitrate and limit liability)**

149.    Plaintiffs incorporate by reference and reallege the preceding paragraphs of this

Complaint as if fully set forth herein.

150.    A substantial controversy exists between plaintiffs Cummings, Gest and other Class

members and defendant AT&T and between plaintiffs Thome, Bryan, Tiffany and other Class

members and defendant Sprint over provisions that purport, among other things, to require binding

arbitration of disputes between defendants and certain of their customers, waiver of the right to trial

by jury, waiver of the right to bring or participate in a class action, waiver of the right to full

discovery, and loss of the right to recover compensatory and exemplary damages and attorneys' fees.

151.    Plaintiffs Cummings, Gest, Thome, Bryan and Tiffany accordingly request, under Rule

57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201, a judgment declaring the liability

limitations and dispute resolution provisions of the customer service agreements to be illusory, illegal, unconscionable, against public policy or otherwise unenforceable under applicable law by defendant AT&T against plaintiffs Cummings, Gest and the other members of the AT&T Subclass whom AT&T claims are subject to an agreement to arbitrate, and by defendant Sprint against plaintiffs Thome, Bryan, Tiffany and the other members of the Sprint Subclass whom Sprint claims are subject to an agreement to arbitrate.

## SECOND CAUSE OF ACTION
**(Claim by all Class Members for violations of the Antitrust Laws against both defendants)**

152.     Plaintiffs incorporate by reference and reallege the preceding paragraphs of this Complaint as if fully set forth herein.

153.     The combination or conspiracy alleged in this complaint consisted of a continuing agreement, understanding or concert of action by defendants, and their other co-conspirators, the substantial terms of which were to raise, fix or maintain at artificially high and non-competitive levels the percentages at which they charged USF.

154.     In addition, defendants and MCI engaged in a combination or conspiracy to implement similar dispute resolution clauses requiring their customers to, *inter alia,* arbitrate all disputes in an effort to shield themselves from liability for their wrongful conduct.

155.     As the result of defendants' and MCI's wrongful conduct, Plaintiffs and the other members of the Class paid higher USF surcharges than they would have paid but for Defendants' and MCI's anticompetitive conduct, have been injured in their business or property, and have suffered damages in an amount to be determined at trial.

156.     Plaintiffs and the Class are entitled to recover all damages allowed under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, and an injunction prohibiting defendants' unlawful combination or conspiracy alleged in this Complaint, against Defendants, jointly and severally, together with their costs of suit, including reasonable attorneys'

fees.

### THIRD CAUSE OF ACTION
#### (Violation of the Federal Communications Act, 47 U.S.C. § 201(b), against AT&T on behalf of the AT&T Subclass and against Sprint on behalf of the Sprint Subclass)

157.   Plaintiffs incorporate by reference and reallege the preceding paragraphs of this Complaint as if fully set forth herein.

158.   Section 201(b) of the Federal Communications Act requires: "All charges, practices, classifications, and regulations for and in connection with [the provision of long distance telephone services] shall be just and reasonable, and any such charge, practice, Classification, or regulation that is unjust or unreasonable is declared to be unlawful."

159.   Defendants' practice of collecting a surcharge for the USF that vastly exceeded the amount they remitted to the USF program or, alternatively, that exceeded the amount they remitted to the USF program, plus reasonable costs of administration was unjust and unreasonable and thus in violation of Section 201(b) of the Communications Act, 47 U.S.C. § 201(b), for the time period beginning August 1, 2001, and continuing through March 31, 2003.

160.   Plaintiffs and the other members of the AT&T Subclass and the Sprint Subclass suffered damages beginning August 1, 2001, and will continue to suffer damages as a result of defendants' above-described violations until March 31, 2003, in an amount to be determined at trial.

161.   Pursuant to Sections 206 and 207 of the Federal Communications Act, 47 U.S.C. §§ 206 and 207, plaintiffs and the other members of the AT&T Subclass and the Sprint Subclass are entitled to recover the full amount of damages sustained as a result of defendants' above-described violations, together with reasonable attorneys' fees.

### FOURTH CAUSE OF ACTION
#### (Discrimination in Violation of Federal Communications Act, 47 U.S.C. § 202, against AT&T on behalf of the AT&T Subclass)

162.   Plaintiffs Gerdes, Cummings, Gest, Goldman & Hellman, Lady Di's and Beimfohr

incorporate by reference and reallege the preceding paragraphs of this Complaint as if fully set forth herein.

163.    Under Section 202 of the Federal Communications Act, it is unlawful for a carrier to discriminate in providing telephone services: "It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage."  47 U.S.C. § 202.

164.    Defendant AT&T has discriminated and continues to discriminate against plaintiffs Gerdes, Cummings, Gest, Goldman & Hellman, Lady Di's, Beimfohr and other similarly situated Class members in that it chooses to overcharge its direct-dial long distance customers, in part to make up for the lack of USF charges on casual caller customers and services AT&T deems unbillable.

165.    The direct-dial services, direct-dial services that AT&T deems unbillable, and casual caller services that AT&T provides are "like communications services" for purposes of AT&T's discrimination, pursuant to Section 202 of the Federal Communications Act.

166.    Additionally, AT&T's discrimination is "unreasonable" pursuant to Section 202 of the Federal Communications Act for lack of a neutral, rational basis.  The FCC has ordered AT&T to contribute to the USF a percentage of its total long distance revenue with no distinction made between revenue from casual caller customers and revenue from direct-dial long distance customers. AT&T, accordingly, has no neutral, rational basis for exempting casual caller customers from its USF surcharge while placing the burden on its direct-dial long distance customers to pay the part of its USF contribution attributable to the casual caller customers.

167.    As a consequence of defendants' above-described practice of discrimination, plaintiffs

Gerdes, Cummings, Gest, Goldman & Hellman, Lady Di's, Beimfohr and other similarly situated members of the AT&T Subclass have suffered actual and consequential damages in an amount to be proven at trial.

168.    Pursuant to Sections 206, 207, and 406 of the Federal Communications Act, plaintiffs Gerdes, Cummings, Gest, Goldman & Hellman, Lady Di's, Beimfohr and similarly situated members of the AT&T Subclass are entitled to recover the full amount of damages sustained as a result of defendants' above-described violations, together with reasonable attorneys' fees, and an order enjoining defendants from their wrongful conduct.

**FIFTH CAUSE OF ACTION**
**(Violations of the Statutory Consumer Fraud Act**
**of New York against AT&T on behalf of the AT&T Subclass)**

169.    Plaintiffs Gerdes, Cummings, Gest, Goldman & Hellman, Lady Di's and Beimfohr incorporate by reference and reallege the preceding paragraphs of this Complaint as if fully set forth herein.

170.    New York has enacted statutes to protect consumers against unfair, deceptive or fraudulent business practices, unfair competition and false advertising.  At all relevant times, such statutes were in effect in New York.  The New York Consumer Protection From Deceptive Acts and Practices Act provides: "Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." N.Y. Ch. 20, Art. 22-A, §§ 349 et seq.

171.    From the inception of the USF surcharge to the present, AT&T misrepresented the USF surcharge as a legally required 100% "pass-through" charge on its invoices to business customers by designating it as a "regulatory fee," and on its invoices to its residential customers by designating it, at different times, as a "national access contribution" or a "universal connectivity charge."  Plaintiffs Gerdes, Cummings, Gest, Goldman & Hellman, Lady Di's, Beimfohr, and the

members of the AT&T Subclass received AT&T's invoices monthly, reviewed the invoices, and necessarily relied on AT&T's representations and omissions regarding the USF surcharge in paying the invoices.  As a result, Plaintiffs and the members of the AT&T Subclass paid more to AT&T every month than AT&T actually passed through to the USF.

172.   By reason of AT&T's deceptive acts, including, specifically, AT&T's misrepresentations and omissions regarding the USF surcharge contained in AT&T's invoices which they and the other members of the AT&T Subclass reviewed and relied upon to their detriment, resulting in damages to them, Plaintiffs Gerdess, Cummings, Gest, Goldman & Hellman, Lady Di's, Beimfohr and similarly situated members of the AT&T Subclass are entitled to restitution, actual damages, equitable and injunctive relief, costs and attorneys' fees, the precise amount of which will be determined at trial.

## SIXTH CAUSE OF ACTION
### (Violations of the Statutory Consumer Fraud Act of Kansas against Sprint on behalf of the Sprint Subclass)

173.   Plaintiffs Thome, Bryan and Tiffany incorporate by reference and reallege the preceding paragraphs of this complaint as if fully set forth herein.

174.   Kansas has enacted statutes to protect consumers against unfair, deceptive or fraudulent business practices, unfair competition and false advertising.  At all relevant times, such statutes were in effect in Kansas, Sprint's principal place of business.  The Kansas Consumer Protection Act, K.S.A. § 50-626 provides in relevant part:

> (a) No supplier shall engage in any deceptive act or practice in connection with a consumer transaction.

> (b) Deceptive acts and practices include, but are not limited to, the following, each of which is hereby declared to be a violation of this act, whether or not any consumer has in fact been misled:

* * *

(2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact;

* * *

(3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact.

175.    By reason of its acts detailed in this complaint, including, specifically, Sprint's misrepresentations and omissions regarding the USF surcharge on invoices that Sprint sent to its customers, which Plaintiffs Thome, Bryan, Tiffany and the other members of the Sprint Subclass reviewed, and upon which they and the  other members of the Sprint Subclass relied to their detriment, Sprint has violated the Kansas Consumer Protection Act.  From the inception of the USF surcharge to the present, Sprint misrepresented the USF surcharge as a legally required 100% "pass-through" charge on its invoices by designating it as a tax or regulatory charge.  Plaintiffs Thome, Bryan, Tiffany and the other members of the Sprint Subclass received Sprint's invoices monthly, reviewed the invoices, and necessarily relied on Sprint's representations and omissions regarding the USF surcharge in paying the invoices.  As a result, Plaintiffs and the members of the Sprint Subclass paid more to Sprint every month than Sprint actually passed through to the USF.

176.    Plaintiffs Thome, Bryan and Tiffany and similarly situated Sprint residential customers are entitled to actual damages, and reasonable attorneys' fees pursuant to K.S.A. § 50-634.

### SEVENTH CAUSE OF ACTION
#### (Money Had and Received under
#### New York law on behalf of the AT&T Subclass against AT&T and under Kansas law on
#### behalf of the Sprint Subclass against Sprint)

177.    Plaintiffs incorporate by reference and reallege the preceding paragraphs of this complaint as if fully set forth herein.

178.    As a result of defendants' practices with regard to their assessment of and

37932.1                                                    50

representations, omissions and deceptive practices regarding USF surcharges, plaintiffs and other Class members have paid excessive USF fees.  This has resulted in the receipt and retention by defendants of millions of dollars properly belonging to plaintiffs and the other Subclass members, which money, in equity and good conscience, should be returned to plaintiffs and the Subclasses.

**EIGHTH CAUSE OF ACTION**
**(Breach of Contract under New York law on behalf of the AT&T Subclass against AT&T and under Kansas law on behalf of the Sprint Subclass against Sprint)**

179.    Plaintiffs incorporate by reference and reallege the preceding paragraphs of this complaint as if fully set forth herein.

180.    Beginning on August 1, 2001, Defendants contracted to provide plaintiffs and Subclass members long distance service pursuant to various service plans.

181.    The contracts obligated defendants to charge plaintiffs and Subclass members a USF surcharge on a strictly pass-through basis (*i.e.*, all amounts collected were to be passed on to the USF program).

182.    Defendants charged and collected from plaintiffs and Subclass members a greater amount for USF surcharges than they passed on to the USF program, thereby breaching their contracts with plaintiffs and Subclass members.

183.    As a result of charging USF fees in excess of what they remitted to the USF program, defendants have breached their contracts with plaintiffs and Subclass members.  Specifically, Sprint breached section 10.1 of its "Terms and Conditions" of Schedule No. 3 of its business customers' contracts, and section 4, "Taxes and Surcharges," of its "Sprint Terms and Conditions of Service" for its residential customer contracts.  AT&T breached the "General Terms and Conditions" of its Business Service Guide, part of its business customer contracts, and the "Miscellaneous Charges and Taxes" section of its Service Guide that constitutes part of its residential customer contracts.

184.    Plaintiffs and the other Class members are entitled to recover the full amount of

damages proximately caused by defendants' above-described violations, such amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs, on behalf of themselves and on behalf of the other members of the Class and the Subclasses, request judgment and relief on all causes of action as follows:

A.  An order certifying that this action is properly brought and may be maintained as a Class action under Rule 23 of the Federal Rules of Civil Procedure, that plaintiffs be appointed as Class Representatives and Subclass Representatives, and plaintiffs' Co-Lead Counsel be appointed Class Counsel;

B.  The alleged combination and conspiracy among the defendants and their co-conspirators be adjudged and decreed by the Court and jury to be an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and that plaintiffs and the members of the Class have been injured in their business and property as a result of such violations by defendants;

C.  A judgment entered against defendants, jointly and severally, and in favor of plaintiffs and each member of the Class they represent for threefold the amount of damages as allowed by law as determined to have been sustained by them, together with the costs of suit, including reasonable attorneys' fees;

D.  A judgment enjoining defendants from continuing the unlawful combination and conspiracy alleged herein;

E.  A judgment declaring that the liability limitations and dispute resolution provisions of the customer service agreements are illusory, illegal, unconscionable, against public policy, and/or are otherwise unenforceable under applicable law, including Section 1 of the Sherman Act, by defendants against plaintiffs Cummings, Gest, Thorne, Bryan and Tiffany and the other AT&T Subclass and Sprint Subclass members whom defendants claim are subject to an agreement to arbitrate or limit

their liability.

F.      A judgment requiring defendants to cease and desist all deceptive, unjust, and unreasonable practices described herein;

G.      A judgment requiring defendants to notify and properly disclose to those whom they have charged a USF surcharge the true nature of the surcharge;

H.      Compensatory damages in an amount to be proven at trial, including all damages provided for by statute and all consequential and incidental damages and costs suffered by plaintiffs and the other Class and Subclass members due to defendants' wrongful conduct;

I.      A judgment requiring an accounting for, and imposition of a constructive trust upon, all monies received by defendants as a result of the unlawful and unjust conduct alleged herein;

J.      A judgment awarding reasonable attorneys' fees and costs of this suit, including fees of experts;

K.      A judgment awarding pre- and post judgment interest; and

L.      Such other and further relief as the Court may deem necessary or appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues which may be so tried.

Isaac Diel KBA#14376
**DIEL & SEELMAN P.C.**
4121 West 83rd Street, Suite 254
Prairie Village, Kansas 66208
Telephone: 913-383-8711
Fax: 913-383-8712

**PLAINTIFFS' LIAISON COUNSEL**

Barry C. Barnett
John J. Hopkins
**SUSMAN GODFREY L.L.P.**
901 Main Street, Suite 4100
Dallas, Texas 75202-3775

Tele:  214-754-1900
Fax:  214-754-1933

Marc M. Seltzer
Maurice Suh
**SUSMAN GODFREY L.L.P.**
1880 Century Park East, Suite 950
Los Angeles, CA 90067
Tele: (310) 789-3100
Fax: (310) 789-3150

Samuel D. Heins
Daniel E. Gustafson
Renae D. Steiner
Daniel C. Hedlund
**HEINS, MILLS & OLSON, P.L.C.**
3550 IDS Center
80 South Eighth Street
Minneapolis, Minnesota 55402
Tele:  (612) 338-4605
Fax: (612) 338-4692

Marc R. Stanley
Roger L. Mandel
Martin Woodward
**STANLEY, MANDEL & IOLA, L.L.P.**
3100 Monticello Avenue, Suite 750
Dallas, Texas 75205
Tele: (214) 443-4300
Fax: (214) 443-0358

**PLAINTIFFS' CO-LEAD COUNSEL**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on counsel of record via regular U.S. mail, on this _____ day of March, 2003, addressed as follows:

| | |
|---|---|
| Lynn S. McCreary, KS #16658<br>Shelly K. Gray, KS #20482<br>Bryan Cave LLP<br>1200 Main Street, Suite 3500<br>Kansas City, MO 64105-2100<br>(816) 374-3200<br>(816) 374-3300 fax<br>*Attorneys for Defendant AT&T Corporation* | Mark B. Blocker<br>Sidley Austin Brown & Wood<br>Bank One Plaza<br>10 South Dearborn Street<br>Chicago, IL 60603<br>(312) 853-7036 fax |
| Julie E. Grimaldi<br>6450 Sprint Parkway, Building #14<br>Mailstop: KSOPHN0412 (4A253)<br>Overland Park, KS 66251<br>(913) 315-9442<br>(913) 252-9843 fax<br>*Sprint Corp.*<br>*Sprint International Communications Corp.* | Mark D. Hinderks<br>Stinson Morrison Hecker LLP<br>9200 Indian Creek Parkway<br>9 Corporate Woods, Suite 450<br>Overland Park, KS 66210-2008<br>(913) 451-8600<br>(913) 451-6352 fax |

Isaac Diel KBA #14376
DIEL & SEELMAN, P.C.
4121 West 83rd Street, Suite 254
Prairie Village, Kansas 66208
Telephone: (913) 383-8711
Fax: (913) 383-8712