```
 1              IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF KANSAS
 2
 3   IN RE:  UNIVERSAL SERVICE FUND      MDL No. 1468
             TELEPHONE BILLING
 4           PRACTICES LITIGATION
 5
 6                   TRANSCRIPT OF PROCEEDINGS
                            before
 7             THE HONORABLE JOHN W. LUNGSTRUM
                              on
 8                      AUGUST 15, 2002
 9
                          APPEARANCES
10
     For the Consensus
11   Plaintiffs:            Barry C. Barnett
                            SUSMAN GODFREY, LLP
12                          901 Main Street, Suite 4100
                            Dallas, Texas 75202
13
                            Stacey L. Mills and Renae D. Steiner
14                          HEINS MILLS & OLSON
                            700 Northstar East
15                          608 Second Avenue South
                            Minneapolis, Minnesota 55402
16
                            Marc Stanley
17                          STANLEY MANDEL & IOLA, LLP
                            3100 Monticello Avenue, Suite 750
18                          Dallas, Texas 75205
19                          Issac Diel and Todd Seelman
                            DIEL & SEELMAN, PC
20                          4121 W. 83rd Street, Suite 254
                            Prairie Village, Kansas 66208
21
                            Barry McClain
22                          MUCH, SHELIST, FREED, et al.
                            200 N. LaSalle, Suite 2200
23                          Chicago, Illinois 60601
24                          Daniel C. Levin
                            LEVIN FISHEIN SEDRAN & BERMAN
25                          510 Walnut Street, Suite 500
                   BECKY S. RYDER, RMR, CRRvania 19106
```

Page 2

```
 1                Michael G. Wimer
                  WIMER & JOBE
 2                3653 Sweeten Creek Road
                  P.O. Box 370
 3                Arden, North Carolina 28704
 4
                  Rex A. Sharp
 5                GUNDERSON, SHARP & RHEIN, P.C.
                  4121 W. 83rd Street, Suite 256
 6                Prairie Village, Kansas 66208
 7    For Litigating
      Plaintiffs:    Larry Schad
 8                BEELER, SCHAD & DIAMOND
                  332 S. Michigan Avenue
 9                Chicago, IL 60604-4398
10                Kenneth T. Goldstein
                  KRISLOV & ASSOCIATES
11                20 North Wacker Drive, Suite 1350
                  Chicago, Illinois 60606
12
                  David Morris
13                THE MORRIS LAW FIRM, LLC
                  210 W. 19th Terrace
14                Kansas City, Missouri 64108
15    For Defendant AT&T:  Mark B. Blocker
                  SIDLEY AUSTIN BROWN & WOOD
16                Bank One Plaza
                  10 South Dearborn Street
17                Chicago, Illinois 60603
18                Lynn S. McCreary
                  BRYAN CAVE, LLP
19                7500 College Boulevard, Ste. 1100
                  Overland Park, Kansas 66210-4035
20
                  Howard Spierer
21                ATTORNEY AT LAW
                  Room 1146L1
22                295 North Maple Avenue
                  Basking Ridge, New Jersey 07920
23
      For Defendant
24    Sprint:      David P. Murray
                   WILKIE, FARR & GALLAGHER
25                 1155 21st Street, N.W.
                  BECKY S. RYDER, RMR, CRR6
```

Page 3

```
 1
                  Julie Grimaldi
 2                ATTORNEY AT LAW
                  6450 Sprint Parkway, Building 14
 3                Overland Park, Kansas 66251
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                   BECKY S. RYDER, RMR, CRR
```

Page 4

```
 1          THE COURT:  The court would call Case No.
 2   02-MDL-1468, In Re Universal Fund Telephone Billing
 3   Practices Litigation.  We're here this morning for
 4   an initial scheduling conference.  Let me ask the
 5   parties to state their appearances, and I will begin
 6   with counsel for the group of plaintiffs who have
 7   denominated themselves the consensus plaintiffs.
 8   Who appears on behalf of the consensus plaintiffs?
 9          MR. DIEL:  Your Honor, Ike Diel of Diel &
10   Seelman on behalf of the consensus plaintiffs.
11   Today we have a lot of counsel from out of town
12   representing the consensus plaintiffs.  In front of
13   me here is Barry Barnett with Susman & Godfrey.
14          MR. BARNETT:  Morning, your Honor.  I just
15   want to say it is an honor to be in your Honor's
16   court.
17          THE COURT:  Thank you.
18          MR. DIEL:  The consensus plaintiffs, the
19   reason we have been termed the consensus plaintiffs,
20   or we have used that name, is we represent counsel
21   for 48 out of the 57 cases.  We denominated three
22   people among our group to act as our lead counsel
23   for our group.  That's Barry Barnett, who you just
24   met; Heins, Mills & Olson -- Stacey Mills is from
25   that office -- and Marc Stanley from Stanley, Mandel
                  BECKY S. RYDER, RMR, CRR
```

Page 5

```
 1   & Iola.
 2      Additional people, additional counsel for the
 3   consensus plaintiffs here today are Renae Steiner
 4   with Heins, Mills & Olson; Barry McClain with the
 5   Much, Shelist firm; Dan Levin with Levin & Fishein;
 6   Mike Wimer, Wimer & Jobe; my partner, Todd Seelman;
 7   and Rex Sharp.
 8          THE COURT:  Thank you very much.  Now, for
 9   the group that has been denominated the litigating
10   plaintiffs.
11          MR. MORRIS:  Your Honor, David Morris, and
12   I am acting as local counsel on behalf of Mr. Schad
13   and Mr. Goldstein; and I believe Mr. Schad, who is a
14   former classmate and long time friend of
15   approximately the same number of years that you
16   spoke about before, is going to be speaking for the
17   litigating plaintiffs, your Honor.
18          THE COURT:  Very well.
19          MR. SCHAD:  Thank you, your Honor.
20          THE COURT:  Again -- you introduced
21   yourselves previously, but for the record again?
22          MR. SCHAD:  I'm sorry.  Your Honor, it's a
23   delight to be in your courtroom.  Larry Schad,
24   Beeler, Schad & Diamond, from Chicago.
25          MR. GOLDSTEIN:  Ken Goldstein from Krislov
                  BECKY S. RYDER, RMR, CRR
```

Page 6

1 & Associates.
2     THE COURT: Thank you. Thank you.
3     MS. MCCREARY: Your Honor, Lynn McCreary
4 with the Brian, Cave law firm, acting as local
5 counsel for AT&T. I'm appearing with Mark Blocker.
6     MR. BLOCKER: Morning, your Honor. Mark
7 Blocker from the Sidley, Austin, Brown & Wood law
8 firm in Chicago. We're the lead counsel for AT&T.
9     THE COURT: For Sprint?
10     MR. BLOCKER: I'm sorry, and I should also
11 introduce, your Honor, in-house counsel for AT&T.
12 Howard Spierer, in-house counsel.
13     THE COURT: For Sprint?
14     MR. MURRAY: Good morning, your Honor.
15 David Murray from the law firm of Wilkie, Farr &
16 Gallagher appearing as lead counsel for defendant
17 Sprint, and with me is Julie Grimaldi, in-house
18 counsel.
19     THE COURT: All right. Thank you. Let me
20 just give you an overview of what it is I intend to
21 cover and address today after I deal with a couple
22 of additional preliminaries, and then I will head
23 into it. I want to cover with us today first of all
24 the organization of counsel, denomination of lead
25 counsel and so forth for the plaintiffs. I think
           BECKY S. RYDER, RMR, CRR

Page 7

1 that's the most appropriate place to start.
2     Second, I want to put to you some miscellaneous
3 questions concerning some of the individual cases
4 that have previously been filed.
5     I then want to deal with the scheduling issue,
6 putting in place a scheduling order at least on a
7 preliminary basis subject to what good cause may
8 dictate as to change in the future.
9     I want to address some procedural and
10 housekeeping issues, and naturally, as every judge
11 at every opportunity desires, I want to address the
12 issue of settlement and whether or not that's
13 something we should be talking about formally,
14 informally, or otherwise.
15     Let me start with two preliminaries that I
16 simply want to address with you and then move on.
17 The first of those is I wanted to put on the record
18 my reasons for the conclusion that there is no need
19 for me to recuse from this case, although AT&T is
20 currently my long distance provider, has been my
21 long distance provider in the past. There was a
22 period of time during the early 2002 in which MCI
23 was my long distance provider. I got lured by some
24 points on Southwest Airlines or whatever it might
25 happen to have been, but in any event went back to
           BECKY S. RYDER, RMR, CRR

Page 8

1 AT&T at the conclusion of that, and here is my
2 thinking.
3     There are, I think, two issues that are raised
4 by virtue of the fact that I have been in the past
5 and am now a customer of AT&T.
6     First is whether I'm already a party to the
7 case as a putative class member and whether my
8 status as a customer who could be affected by the
9 outcome of the case is relevant. I should add also
10 that I have two adult children, actually three adult
11 children, although the youngest is a college
12 student, so you can cast your own judgment about
13 that. But in any event -- I pay her telephone bill,
14 but the other children do have their own telephone
15 bills. I have consulted with them. One of them is
16 an AT&T customer; the other one is an MCI customer,
17 but I will address that as I go along as well.
18     First of all, let me deal with the subject of a
19 judge as a putative class member. 28 U.S.C. Section
20 455 mandates that a judge disqualify him or herself
21 if the judge or any person within the third degree
22 of relationship to the judge is a party to the
23 proceeding. See that particular statutory section
24 at 455(b)(5)(i). While the Tenth Circuit has not
25 addressed the issue of whether putative class
           BECKY S. RYDER, RMR, CRR

Page 9

1 members are deemed to be parties to the proceedings,
2 the few courts that have addressed the issue have
3 concluded that they are not. See, for example,
4 Tramonte v. Chrysler Corporation, 136 F.3d 1025 at
5 1030, Fifth Circuit from 1998, finding that members
6 of a putative class are not parties to a class
7 action for purposes of Section 455(b)(5); and MDCM
8 Holdings Inc. v. Credit Suisse First Boston Corp,
9 205 F.Supp.2d 158 Southern District of New York,
10 2002, Judge Scheindline's opinion where she makes
11 what I think is an important and almost clearly
12 logical point that by definition a putative class
13 member is only a potential class member rather than
14 a party in fact.
15     Even if I could be considered as party to the
16 proceeding, the relevant ethical opinions clearly
17 indicate that I need not disqualify myself so long
18 as I opt out of the class or waive any rights to
19 participate in the class. See, for example, In Re
20 Initial Public Offering Securities Litigation, 174
21 F.Supp.2d 70 at 93, Southern District of New York,
22 2001. The issue of whether the district court judge
23 should disqualify him or herself because of being a
24 potential class member was moot where the judge
25 waived her status as a potential class member. It
           BECKY S. RYDER, RMR, CRR

Page 10

1  was affirmed at 294 F.3d 297, pages 305 and 306,
2  Second Circuit, 2002, finding no abuse of discretion
3  in refusing to recuse where the district court judge
4  waived any interest she may have had as a class
5  member.
6      I hereby waive my rights, if any, to
7  participate in any class that is potentially
8  certified here, and I will opt out of any class that
9  is certified here; moreover, my children have agreed
10 to waive any rights they may have and will opt out
11 of any class.
12     The second issue is the judge as a customer of
13 one of the parties in the case, in this situation,
14 AT&T. 28 U.S.C. Section 455(b)(4) provides that a
15 judge must disqualify him or herself if the judge or
16 a minor child residing in the judge's household has
17 a financial interest or any other interest that
18 could be substantially affected by the outcome of
19 the proceeding. The Tenth Circuit, addressing an
20 analogous issue, held that it was error for a
21 district court judge to recuse himself in an MDL
22 case just because of that judge's status as a
23 natural gas consumer. See In Re New Mexico Natural
24 Gas Antitrust Litigation, 620 F.2d 794 at 795, Tenth
25 Circuit, 1980. The district court judge in that
                BECKY S. RYDER, RMR, CRR

Page 11

1  case said that he would opt out of the class but was
2  nonetheless concerned because he would still receive
3  the benefit of any lower utility bills resulting
4  from the litigation.
5      Analyzing the recusal under Section 455(b)(4),
6  the circuit held that a remote contingent benefit
7  such as a possible beneficial effect on future
8  utility bills is not a financial interest within the
9  meaning of the statute, id at 796, expressly
10 agreeing with the Fourth Circuit's conclusion in In
11 Re Virginia Electric & Power Company, 539 F.2d 357,
12 Fourth Circuit, 1976. The Tenth Circuit determined
13 that a possible beneficial effect on future utility
14 bills is an "other interest" requiring
15 disqualification only if that interest could be
16 substantially affected. Id.
17     Under the substantially affected test the
18 circuit held that the district court judge's
19 interest was simply too insubstantial to require
20 recusal or justify disqualification. The court
21 further noted that even assuming the judge saved as
22 much as $31 per year on his utility bill, the
23 highest amount estimated by the parties, such a
24 savings was minor. Id. The circuit also expressed
25 its belief that Congress did not intend to require
                BECKY S. RYDER, RMR, CRR

Page 12

1  disqualification in all cases in which the judge
2  might benefit as a member of the general public.
3  Id.
4      Clearly I fall below the $31-a-year mark in
5  my -- what I would -- at least analyzed from what
6  I've seen from the papers, would be any potential
7  benefit that I would gain from this case. As I
8  understand the methodology, my monthly direct dial
9  long distance bills are at the absolute most $50 a
10 month, and probably quite a bit less most months. I
11 have a cell phone; my wife has a cell phone; my
12 children have cell phones; and as those of you in
13 the delivery of the telephone services are well
14 aware, that's eating into long distance revenues;
15 and certainly the Lungstrum family has helped that
16 erosion. We spend our money talking on cell phones
17 long distance. So if I assume -- if I understand
18 the lay of the land correctly, even a reduction of
19 some 3 or 4 percent a month on the universal service
20 charge against my particular long distance bill
21 would relate -- or would result in no more than
22 about a dollar-and-a-half to two-dollar-a-month
23 change in my phone bill, which would fall well below
24 the $31. Moreover, I recognize that there is also
25 the prospect that in the event that the plaintiffs
                BECKY S. RYDER, RMR, CRR

Page 13

1  seek the relief that they -- pardon me, achieve the
2  relief that they seek here, that there could be
3  other ways in which the defendants would recoup some
4  of those losses by other charges which I as a
5  customer of the phone company would have to pay,
6  which means that the benefit would probably be even
7  somewhat less on a net basis than the $24 that I
8  think it seems like the highest likely amount of
9  benefit that I could recover. So I don't think it's
10 a substantial interest; I don't think it's something
11 that requires recusal.
12     Of course, the circuit's opinion in the natural
13 gas case is not completely analogous to the
14 situation here, as I have a choice among long
15 distance carriers, where all of the judges in New
16 Mexico were natural gas consumers, and thus all
17 would have been disqualified on Judge Bratton's
18 rationale in that particular case.
19     Here, of course, this is not quite the same
20 situation. But if the statute, in fact, mandates
21 that all interstate carriers contribute to the
22 universal services fund, then the outcome of this
23 case would probably in the end affect all carriers,
24 not just those who are named as defendants in this
25 case. I would suspect as a practical matter there
                BECKY S. RYDER, RMR, CRR

Page 14

1  would be a ripple effect, which would have some
2  impact on other carriers as a practical matter, so
3  it would be more difficult to find any judge who
4  utilized land line interstate long distance services
5  who would not receive some benefit comparable to the
6  benefit that I would receive if I stayed in this
7  case.
8      I will concede that there probably is a judge
9  some place who relies exclusively on his or her cell
10 phone for long distance purposes, but I really don't
11 think the drafters of the statute had in mind
12 searching around the country for the one judge who
13 never makes a long distance call in order to preside
14 over this particular case.  So I do believe that it
15 would be potentially difficult to find a judge that
16 would not be affected in some way by the outcome of
17 the case, assuming plaintiffs are successful.
18     For that reason the facts of the Tenth Circuit
19 case are more analogous to the situation here than
20 at first might meet the eye.  Absent any authorities
21 indicating otherwise, I find that the facts of that
22 Tenth Circuit case are sufficiently analogous to
23 guide my actions here.
24     Moreover, the Tenth Circuit's opinion is
25 supported by several relevant ethical opinions.  The
              BECKY S. RYDER, RMR, CRR

Page 15

1  Committee on Codes of Conduct authorized by the
2  Judicial Conference of the United States to publish
3  formal advisory opinions on issues regarding
4  judicial conduct has made it clear that a district
5  court judge's mere status as a utility rate payer is
6  not itself disqualifying.  See advisory opinion
7  No. 78.
8      The Compendium, a summary of selected published
9  and unpublished opinions issued by the Committee on
10 Codes of Conduct, expands upon Advisory Opinion No.
11 78.  Compendium Section 3.1-6[4], for example,
12 addresses class actions.  Referencing Advisory
13 Opinion No. 78, the section of the Compendium states
14 that if a judge remains a member of the class
15 entitled to receive damages as a customer of a
16 public utility, the judge should recuse.  If the
17 judge, however, opts out of the class, which I have
18 agreed to do here, the judge is not required to
19 recuse merely because of the judge's status as a
20 utility customer, notwithstanding the possible
21 beneficial effect on future utility bills, unless
22 the savings as a customer might reasonably be
23 considered to be substantial.
24     Compendium Section 3.1-7[1] also addresses the
25 issue of the judge as a utility ratepayer.  I'm
              BECKY S. RYDER, RMR, CRR

Page 16

1  almost finished, so please bear with me.  This
2  section reiterates that a judge's status as a
3  utility customer does not indicate recusal in cases
4  involving the utility unless the outcome of the case
5  could substantially affect the judge's utility bill.
6  In this case it said that a $10-per-month increase
7  is one which might reasonably be considered
8  substantial, and accordingly recusal was suggested.
9  Recusal is not necessary where the proceeding will
10 likely affect rates only remotely or not at all.
11 Again my analysis here, subject to you all setting
12 me straight, is that $10 a month is not even
13 remotely within the range of what the individual
14 impact on me would be.
15     Based on the above authorities, I see no
16 problem with my continuing to preside over this case
17 unless someone presents a compelling argument or
18 evidence that the outcome of this litigation could
19 substantially affect my long distance bill such that
20 I would, in fact, fall within the parameters of that
21 particular provision.
22     Thank you for your indulgence.  Does anybody
23 have any comments or questions of me on that
24 particular subject?  All right.  Thank you.
25     The other preliminary matter I simply wanted to
              BECKY S. RYDER, RMR, CRR

Page 17

1  address briefly was to acknowledge on the record
2  that the court has received the notice of bankruptcy
3  and suggestion of automatic stay of defendants MCI
4  Communications Corp., et al., and obviously these
5  proceedings are going forth without the MCI parties
6  involved in it, and the stay is, of course, being
7  respected.
8      All right.  With those matters behind us, let's
9  talk about the subject of organization of counsel.
10 My first question is this:  Do the plaintiffs'
11 counsel wish to discuss this matter either off the
12 record and/or out of the presence of defendants'
13 counsel, or do you wish to proceed with defendants'
14 counsel present?  I would be happy to proceed either
15 way.  I think in many respects it's something that
16 defendants' counsel could enjoy a little break in
17 the action here while we talk about it, but I leave
18 that to you.  I guess Mr. Barnett and Mr. Schad are
19 the people who I should look to for guidance here?
20     MR. BARNETT:  Yes, your Honor.  I don't
21 think that it would be useful for us to go off in
22 the other room and talk.  We have been talking.
23     THE COURT:  No, no, I'm sorry.  My
24 question was, do you want me to invite the defense
25 lawyers to exit the room while we talk about this
              BECKY S. RYDER, RMR, CRR

Page 18

1  issue, or do you want to deal with this subject in
2  the presence of the defense lawyers?
3      MR. BARNETT: I do think that's a good
4  idea.
5      THE COURT: Mr. Schad?
6      MR. SCHAD: I demur. I think it is a fine
7  idea.
8      THE COURT: Defense counsel?
9      MR. BLOCKER: I'm kind of looking forward
10 to watching it.
11     THE COURT: I understand. We will let you
12 know when your presence will be required again.
13 And, Sharon, if you could make them comfortable some
14 place, I would appreciate it.
15     (Defense counsel exited the conference
16 room and the following portion of the transcript,
17 pages 19 through 49, was ordered sealed by the
18 court:)
19
20
21
22
23
24
25
              BECKY S. RYDER, RMR, CRR

Page 19

1      (Defense counsel reentered the conference
2  room.)
3      THE COURT: If the defendants would come a
4  little closer now that we have sorted out the
5  plaintiffs' side, and my aging eyes won't be
6  strained so bad.
7      In the absence of counsel for the defendants
8  the court has ruled on the issue of designation of
9  colead counsel and has designated the Susman,
10 Godfrey; Heins, Mills & Olson; and Stanley, Mandel &
11 Iola firms as colead counsel for the plaintiffs in
12 this case.
13     Now, let me ask some couple of questions here.
14 Who with regard to the defendants, how are you
15 approaching this? You aren't -- you haven't had any
16 disagreements about it, but is one of you speaking
17 for both sets? Are both of you speaking? How
18 should I address you all in that?
19     MR. BLOCKER: Judge, we talked with
20 various plaintiffs' counsel about this, about who
21 would be the liaison counsel or how we plan to
22 speak. Mr. Murray speaks only for Sprint; I'm going
23 to speak only for AT&T. And our intention with your
24 Honor's permission is sort of each of us serve as
25 liaison counsel for our own clients, since there's
              BECKY S. RYDER, RMR, CRR

Page 20

1  only two of us, and we will be speaking for our own
2  clients.
3      THE COURT: All right. Is there any
4  objection to that, Mr. Barnett?
5      MR. BARNETT: No, your Honor.
6      THE COURT: In terms of the liaison
7  function, what do you envision in terms of service
8  of papers and so forth? Do you envision service of
9  papers on all four law firms or do you -- pardon me,
10 on three law firms and on Sprint directly? How do
11 you envision that working?
12     MR. MURRAY: The two law firms, Sidley &
13 Austin for AT&T, and Wilkie, Farr for Sprint.
14     THE COURT: Is Ms. McCleary supposed to be
15 getting papers? How is that all going to work?
16     MR. BLOCKER: Well, I think we will do it
17 however you want, your Honor. But it certainly --
18 if we can just serve either one of the three
19 plaintiffs' firms or just these three --
20     MS. MCCREARY: I think he's talking
21 about --
22     THE COURT: I'm talking about you all.
23 You're going to serve the liaison counsel. And I
24 forgot to tell you that. That's Mr. Diel, the Diel
25 & Seelman firm. That's who you will serve on, and
              BECKY S. RYDER, RMR, CRR

Page 21

1  Mr. Diel will take care of distribution.
2      MR. BLOCKER: Okay.
3      THE COURT: I would like to have it, if --
4  without making work for Ms. McCreary, but I would
5  like to comfortably look to Ms. McCreary as a local
6  presence to have papers served on and make
7  distribution accordingly, but I don't want to impose
8  some structure on you all that you don't want. It
9  seems like it would be more simple that way, if that
10 function could be played. Now, is that -- does that
11 work?
12     MR. BLOCKER: Judge, Ms. McCreary's office
13 in Overland Park only has five attorneys, and our
14 office in Chicago has a few more than that, and so
15 we would suggest actually serving Sidley in Chicago
16 just because we have more staff to circulate stuff.
17     THE COURT: That sounds perfectly fine.
18 Is that all right with the Sprint counsel?
19     MR. MURRAY: Yes. Although we spoke with
20 plaintiffs' counsel in our meet-and-confer
21 conference before today, and there was no objection
22 to serving both Sidley and Wilkie with the papers,
23 if that's all right.
24     I take it you don't have any objection.
25     MR. BARNETT: That's fine, your Honor.
              BECKY S. RYDER, RMR, CRR

Page 22

1    THE COURT: I will defer to that. I'm not
2  going to impose something on you that you all don't
3  want. I do want to have a local presence, however,
4  that I can latch onto if I need to. I doubt I will,
5  but I would like to be able to have a local
6  presence. I assume Ms. McCreary or Ms. Gramaldi are
7  the local presences that could be latched onto if
8  necessary. Is that a fair?
9    MS. GRAMALDI: Latch way.
10   MR. BLOCKER: That's correct, your Honor.
11   THE COURT: All right. Very good. All
12 right. Let me talk about a couple specific
13 questions I have. First of all, I'm curious about
14 the status of the Ting case on appeal in the Ninth
15 Circuit. Who can tell me about that?
16   MR. BLOCKER: I can tell you about that,
17 your Honor. We filed the appeal some time ago.
18 It's fully briefed. Motion to expedite the appeal
19 was granted. There was originally an oral argument
20 date set in August, which was vacated. We think our
21 expectation, without knowing the court, obviously,
22 is that it will be set for argument sometime in
23 September, and in the interim the notice
24 requirements that the injunction imposed have been
25 stayed by the Ninth Circuit, so there's nothing
           BECKY S. RYDER, RMR, CRR

Page 23

1  physically that's changed at AT&T, but we are for
2  the moment prohibited from seeking to arbitrate
3  claims from California consumers. But it's fully
4  briefed and ready to go.
5    THE COURT: All right. Have you been in
6  contact with the plaintiff's side in this case,
7  Mr. Barnett?
8    MR. BARNETT: Yes, your Honor, we have.
9    THE COURT: Can you give me any report on
10 it from their perspective that may be any -- shed
11 any different light or a new light on what
12 Mr. Blocker has told me?
13   MR. BARNETT: I don't believe so.
14 Mr. Stanley may know more about it than I do.
15   MR. STANLEY: I think what Mr. Blocker
16 said is absolutely correct, and TLPJ anticipates a
17 hearing also I think in September.
18   THE COURT: Thank you. My next question
19 was, we discussed the Boomer case, and your papers
20 are replete with the status of the Boomer case, but
21 is there anything new or different that ought to be
22 called to my attention other than what has been
23 already been in the papers about the status?
24   MR. BLOCKER: I don't think so, your
25 Honor. The only wrinkle in Boomer is that the
           BECKY S. RYDER, RMR, CRR

Page 24

1  plaintiffs were given a extension of time to file
2  their response brief, so briefing won't be complete
3  until this coming Wednesday, but the court has
4  issued an order saying when briefing is complete,
5  oral statements still will take place on
6  September 5. Given how quickly they expedited the
7  case, it's our expectation that they will issue an
8  opinion relatively promptly after oral argument.
9    THE COURT: Once they issue that
10 opinion -- strike that. What relief are the
11 appellates seeking in the Seventh Circuit?
12   MR. BLOCKER: We are seeking to have our
13 motion -- the lower court ruling reversed that
14 denied our motion to compel arbitration; and if we
15 get the relief we're seeking, the claim will be
16 arbitrated rather than litigated in court.
17   THE COURT: All right. If your relief is
18 denied, what will happen?
19   MR. BLOCKER: It will depend on the manner
20 in which it is denied what will happen next. We
21 have been trying not to think about that, but if it
22 is denied, it will depend on what the court says in
23 its opinion and we will have to evaluate what the
24 opinion says. If it is granted, our view is it will
25 very much have an impact on what may happen before
           BECKY S. RYDER, RMR, CRR

Page 25

1  your Honor, depending again on what the opinion
2  says.
3    THE COURT: Because of the power of the
4  reasoning of the Seventh Circuit or some other
5  reason?
6    MR. BLOCKER: Frankly, yes, and because
7  one of the arguments presently before the Seventh
8  Circuit is whether some of the state law claims or
9  some of the state law arguments rendered against our
10 arbitration clause are preempted by the Federal
11 Communications Act, and we expect that the Seventh
12 Circuit will weigh in on that, and that is why I say
13 it will have some impact here.
14   THE COURT: In the event that you are
15 wholly unsuccessful in the Seventh Circuit, I assume
16 that the Boomer case would be ripe for transfer to
17 this court as part of the MDL process. Would that
18 be right?
19   MR. BLOCKER: If we are wholly
20 unsuccessful, I would say the answer is yes with the
21 exception of, depending on what the opinion says, I
22 mean, it depends in what manner we're wholly
23 unsuccessful. There's a jurisdictional challenge as
24 well to the appeal, so I don't know if by that you
25 mean they get beyond jurisdiction, they deny our
           BECKY S. RYDER, RMR, CRR

Page 26

1   claim.
2          THE COURT:  I'm really thinking on just
3   the lowest of levels, that obviously as long as the
4   appeals are pending in Ting and Boomer, both of
5   those cases are beyond the jurisdiction of some
6   district court proceeding.  And I'm simply
7   attempting to assess in my own mind not only the
8   interesting fact that we may have a couple circuit
9   courts of appeal decisions to think about as we
10  process other issues in the case, but also the more
11  meat-and-potatoes issue that, are there a couple
12  more cases out there that there are circumstances
13  under which they could wind up being transferred
14  here as well?
15         MR. BLOCKER:  Let me address that, your
16  Honor.  The Ting case is not a USF case; it was
17  solely a challenge brought by consumers to the
18  enforcability of the arbitration clause, so it's
19  solely with respect to the enforceability.  And so
20  even -- no matter which way that goes, it won't come
21  to your Honor.
22         THE COURT:  Gotcha.
23         MR. BLOCKER:  The Boomer case was a USF
24  case, and depending on what happens there, it could
25  well be on its way, your Honor.
            BECKY S. RYDER, RMR, CRR

Page 27

1          THE COURT:  Thank you.  I appreciate that
2   clarification.
3          MR. BARNETT:  Your Honor, I may have
4   misread the docket sheet, but I understand that the
5   District Court in Chicago has actually transferred
6   the trial court file to this court, so there's a
7   piece of it that's hanging up there in the Seventh
8   Circuit, but the rest of it is here.
9          THE COURT:  Yeah.  That would square with
10  my understanding of where things sit.  It was
11  originally transferred under the name Jiminez, I
12  believe, but that was then changed to Boomer.
13         MR. BARNETT:  And there is a motion to
14  dismiss for lack of jurisdiction that's pending in
15  the case as well.
16         THE COURT:  All right.  The next issue
17  I've got just for some clarification on, I notice
18  that in the Ielo v. Sprint Corporation case in the
19  Central District of California there's a motion to
20  dismiss for lack of personal jurisdiction.
21         MR. MURRAY:  Yes, sir.
22         THE COURT:  I'm interested in, that is an
23  issue that only appeared on the docket sheets in
24  that particular case, and I wondered about the
25  status of that issue.  Is that as simple as the
            BECKY S. RYDER, RMR, CRR

Page 28

1   plaintiffs there served the wrong Sprint entity and
2   therefore that's something that ought to be able to
3   be straightened out, or is there something more to
4   it?
5          MR. MURRAY:  I believe it's just misnaming
6   the proper defendant, and it actually is an issue in
7   three of the cases that are before you, your Honor,
8   including the Brown case, which was originally filed
9   in your court.  I have spoken to Mr. Barnett about
10  that, and I think his expectation was that that
11  would be corrected through a consolidated amended
12  complaint.  Mr. Wimer and I have had this issue in
13  his North Carolina case, and he simply dismissed
14  Sprint Corporation and amended his complaint to name
15  Sprint Communications Company LLP.  I also have this
16  issue in the Baines case in Washington.
17         THE COURT:  All right.  Mr. Barnett, do
18  you concur with that assessment of that issue?
19         MR. BARNETT:  Yes, I do.
20         THE COURT:  It appears to me then that
21  with regard to the personal jurisdiction questions
22  raised by Sprint in certain cases, including IELO,
23  that that is a matter that we should simply defer
24  any further consideration of unless and until an
25  issue arises again in light of the filing of the new
            BECKY S. RYDER, RMR, CRR

Page 29

1   complaint.
2          MR. BARNETT:  I agree.
3          THE COURT:  Now, with that having been
4   said, and with carving those out to retain those
5   motions as alive, so to speak, is there any reason
6   why -- well, let me strike that.  Let me take that
7   back.  Is there any reason really why all of the
8   motions currently pending, other than those in the
9   cases that were transferred to this court, shouldn't
10  simply be mooted?  And then we're going to put in
11  place a new schedule for filing motions here now,
12  but this is pure clerk's office housekeeping stuff.
13  They get concerned having to account for what the
14  record reflects, and it appears to me there's no
15  reason for all these motions to be hanging out
16  there.  They are either to stay or to transfer or to
17  dismiss or to compel arbitration, so on and so
18  forth, all of which either in the transfer or stay
19  category truly are moot and in the substantive
20  categories with regard to compelling arbitration or
21  seeking other kinds of relief are going to be part
22  of the master schedule we put in place here.  So it
23  appears to me those simply ought to be mooted.  Does
24  anybody disagree with that?
25         MR. MURRAY:  No.
            BECKY S. RYDER, RMR, CRR

Page 30

1    THE COURT:  Then I will --
2    MR. STANLEY:  Remand?
3    MR. BARNETT:  Mr. Stanley raises the
4  question of remand, whether those ought to be
5  treated any differently from the other motions.
6    THE COURT:  Is your concern that by
7  mooting them that would somehow have a time hiatus
8  before you filed your consolidated remand motion?
9    MR. BARNETT:  I think that's right, your
10 Honor.
11   THE COURT:  With regard to the -- let's
12 do -- with regard to the remand motions, I want to
13 put in place a schedule here, and upon the filing of
14 the newly ordered remand motions, at that point I
15 will moot the individual case remand motions to make
16 sure there is no technical procedural gap.  I cannot
17 see a similar issue with regard to the arbitration
18 question because that's not a time -- there's no
19 timing issue especially, other than the extent to
20 which the trial judge tells us how we want to do it.
21 So I don't see any reason not to just clear those
22 out up until now.
23    But, Ms. Scheurer, my direction to you is to
24 leave the motions to dismiss concerning jurisdiction
25 in the three cases alive pending the filing of a new
                BECKY S. RYDER, RMR, CRR

Page 31

1  complaint.  When that new complaint is filed that
2  the allegations are made against Sprint --
3     Is it Sprint Communications?
4    MR. MURRAY:  Sprint Communications Company
5  LLP.
6    THE COURT:  That would seem to me to be a
7  basis to moot those motions when the remand motion
8  is filed that I will order a schedule on here in a
9  little bit, will moot the remand motions, and all
10 the other motions can be mooted either now or then,
11 whichever way Ms. Scheurer and the clerk's office
12 think is an easier way to do it.
13    All right.  Now, moving from that, let's talk
14 about scheduling.  I've looked at your various
15 proposals with regard to scheduling, and let me just
16 ask a couple of questions there.  How many cases are
17 out of the 57, or whatever the number is -- I'm not
18 sure how that counts the North Carolina cases that
19 have been actually moot here.  But whatever the
20 number of cases is, how many actually do involve
21 remand issues?
22   MR. BARNETT:  I'm not sure I have a count
23 on them, your Honor.  And let me add, I think some
24 of the cases in which we have remand motions pending
25 will not ultimately have remand motions made as to
                BECKY S. RYDER, RMR, CRR

Page 32

1  them.  We're going to be selective in which ones a
2  remand is sought for.
3    THE COURT:  It's a fair statement, is it
4  not, that the remand motions, although obviously as
5  to those cases a place where I must start because it
6  questions the subject matter jurisdiction of the
7  court, are limited in number to a relative handful
8  of cases?
9    MR. BARNETT:  I believe that's right, your
10 Honor.
11   THE COURT:  Almost two handfuls of cases,
12 but not that many cases; is that correct?
13   MR. BARNETT:  I believe that's right, and
14 there will be fewer.
15   THE COURT:  All right.
16   MR. MURRAY:  Your Honor, I can give you at
17 least as of yesterday what I understand to be the
18 current count for Sprint.  We have 16 cases that are
19 subject to the MDL order, either original transfer
20 or tag along or we expect to be tag alongs.  Of
21 those, there are six remand motions pending.  Nine
22 of them were removed -- I'm sorry, of the 16, nine
23 were removed from state court; six involved remand
24 motions that have either been made or we have been
25 told by counsel will be made; the three remaining
                BECKY S. RYDER, RMR, CRR

Page 33

1  cases, we don't know whether remands will be sought
2  or not, but we had agreed at the outset to stay all
3  proceedings in the matter in deference to the MDL
4  order.
5    THE COURT:  Do you have any insight,
6  Mr. Blocker, on AT&T?
7    MR. BLOCKER:  I can tell you there are
8  remand -- I don't have the exact numbers offhand,
9  but I can tell you there are remand petitions
10 pending in probably 15 of the cases, but a number of
11 them are ones in which we understand the consensus
12 plaintiffs to be involved, and we have had
13 discussions with Mr. Barnett about whether they
14 intend to pursue those or not, and so what the
15 ultimate number is going to look like, I don't know.
16 You may well be correct that ultimately it is a
17 limited number.
18   THE COURT:  It sounds -- as a worse case
19 scenario it is less than -- certainly less than half
20 of all the cases, to be conservative about it.  Let
21 me ask this question also to counsel for the
22 plaintiffs.  In your papers suggesting a scheduling
23 process, which does not stage things as discretely
24 as the defendants did, but it suggests some overlap.
25 You make the point in opposition really to the
                BECKY S. RYDER, RMR, CRR

Page 34

1  defendants' point that they are entitled to get this
2  arbitration issue resolved, which is certainly a
3  very good point, that not all of the plaintiffs are
4  subject to an arbitration order. And -- or
5  arbitration agreement, rather, in the contracts; and
6  you cited the business customers and so forth.
7  Would you elaborate on that point for me a little
8  bit in terms of the scope of -- let's say there were
9  the necessity to arbitrate individuals. Where does
10 that leave you in terms of the parties to the case
11 going forward otherwise?
12        MR. BARNETT: Your Honor, I'm going to
13 defer to Ms. Mills. She's prepared to address that.
14 I should mention one thing to your Honor as we
15 mentioned to the defendants yesterday. Ms. Mills
16 conveyed this to the defendants yesterday. We had
17 mentioned in, I think, our preliminary statement
18 that we might be filing an amended complaint that
19 added claims that hadn't been asserted before. It
20 is likely that the consolidated complaint we file
21 will include a Sherman Act claim, Section 1 claim.
22 So part of the challenge that the antitrust claim
23 will have is the promulgation and use of these
24 arbitrations and other limits on remedies among
25 these long distance carriers that makes it very
                BECKY S. RYDER, RMR, CRR

Page 35

1  difficult to separate merits from arbitration
2  issues. So with that I'll ask Ms. Mills to respond.
3        THE COURT: Thank you. Ms. Mills?
4        MS. MILLS: In answer to your question
5  about the differences, possible differences, between
6  class members with respect to whether there's an
7  arbitration clause or not, it's our information and
8  belief that most, if not all, of the business
9  customers for long distance of AT&T and Sprint do
10 not have an arbitration clause in those contracts,
11 and it's also our information and belief that
12 approximately 60 percent of the long distance
13 revenues are generated by the business customers as
14 opposed to the residential customers. So if that
15 is, in fact, the case and those arbitration clauses
16 are not present in those contracts, that would be a
17 significant portion of the class claims that would
18 not be affected by a decision on an arbitration
19 hearing.
20        THE COURT: Thank you, Ms. Mills. Counsel
21 for the defendants, do you want to respond to that
22 evaluation of the situation with regard to the
23 arbitration clause?
24        MR. BLOCKER: Your Honor, it is certainly
25 correct that some of our business customers are
                BECKY S. RYDER, RMR, CRR

Page 36

1  not -- we do not have arbitration clauses with them;
2  it's not true of all AT&T business customers. There
3  are some for whom we have arbitration agreements.
4  I'm not really in a position to comment on the
5  revenue figures, but the reason we continue to
6  believe it makes sense to stage the arbitration
7  issue before we get to the merits is it certainly
8  makes sense to decide if the consumer claims are
9  going to be part of the case or they are going to be
10 arbitrated, and I think you'll hear Mr. Murray say
11 it's going to make sense to have -- to determine
12 whether all the Sprint cases are going to be here or
13 not or whether those are all going to be arbitrated.
14 So we continue to think it makes sense to have that
15 staged rather than conflating the various issues up
16 front.
17        THE COURT: What difference in the
18 processing of the case would it make to not deal
19 with the arbitration issue preliminarily to the
20 merits discovery going forward?
21        MR. BLOCKER: You mean if we -- I guess
22 I'm not following your Honor's question.
23        THE COURT: The plaintiffs have proposed a
24 schedule that does not carve out, as your schedule
25 does, a decision on the arbitrability issue or the
                BECKY S. RYDER, RMR, CRR

Page 37

1  compulsion-to-arbitrate issue before really getting
2  into the meats of the merit matters. My question to
3  you is, what impact would there be on the defendants
4  or from the defendants' perspective from the
5  schedule proposed by the plaintiffs that would have
6  those processes going at the same time?
7        MR. BLOCKER: I think it would be
8  helpful -- the impact it would have, I think, your
9  Honor, is this, that the business side of AT&T's
10 business and the consumer side are run, not
11 independently, but in a different fashion, and it
12 would certainly make sense to decide where discovery
13 is going to need to be taken from at one time so
14 that if we have to do discovery on consumer claims,
15 we can collect documents from consumer and business
16 at the same time; whereas, if we do these all at
17 once, our concern will be that we will have to turn
18 over documents about consumer or do things relating
19 to the consumer side before your Honor has had a
20 chance to determine whether consumer claims should
21 be arbitrated.
22        MR. MURRAY: If I might add, your Honor,
23 from Sprint's perspective, some of our business
24 customers, in fact, have arbitration provisions, and
25 the larger business customers, my understanding is
                BECKY S. RYDER, RMR, CRR

Page 38

1  that's done on a contract-by-contract basis. But we
2  certainly are interested in having the arbitration
3  issue decided as a threshold issue because one of
4  the protections of the arbitration clause is to
5  avoid the cost of merits discovery and so forth and
6  have a more efficient way of resolving these types
7  of disputes. So if we're entitled to arbitration,
8  we would like to have that determined while our
9  rights underlying that are still reserved.
10        THE COURT: Mr. Barnett or Ms. Mills,
11 whichever wishes to speak to this -- and I don't
12 want leave you out either, Mr. Stanley. But with
13 regard to merits discovery on consumer cases, what
14 does that consist of in your opinion here?
15        MS. MILLS: I'll address that in just a
16 moment, your Honor. One thing -- one additional
17 point that we should all have in mind in having this
18 discussion is that there will be consumers who do
19 not have arbitration clauses as well because
20 detariffing went into effect August 1 of 2001, so
21 prior to that time there were no contracts for
22 anybody.
23        THE COURT: Right.
24        MS. MILLS: So it should be the case that
25 both consumer claims -- some consumer claims and
              BECKY S. RYDER, RMR, CRR

Page 39

1  business claims will go forward simultaneously
2  regardless of what happens with the motion to compel
3  arbitration. In terms of differences in discovery
4  between consumer and between the business customers,
5  if, in fact, the companies are using a different
6  methodology to calculate the USF charges for those
7  different groups, then I would imagine we would be
8  looking at different sets of documents.
9         THE COURT: Let me stop you right there
10 and ask that question. Is there a different
11 methodology between business and consumer customers
12 on the USF charge?
13        THE COURT: AT&T says yes. Sprint says
14 yes.
15        MR. MURRAY: Yes, your Honor.
16        THE COURT: Very well. Thanks.
17        MS. MILLS: I would imagine, your Honor,
18 that we have many of the same groups of people, at
19 least overlapping groups, within those companies
20 doing that, using that methodology to do the
21 calculations for what those charges will actually
22 be. So I think it would be very hard to separate
23 out or keep discrete consumer-related discovery
24 from -- or individual/residential-related discovery
25 from business-related discovery in this case, and I
              BECKY S. RYDER, RMR, CRR

Page 40

1  think we will probably see that in all the aspects
2  of discovery that relate to the consumers, whether
3  it's residential or whether it's business.
4         THE COURT: Let me ask you the reverse
5  side of what I asked counsel for the defendants, and
6  that is, defendants' counsel proposed dealing with
7  issues that are in their mind threshold issues,
8  which, as we said, of course, the remand question
9  implicates the jurisdiction of the court, the
10 arbitration issue. I totally agree with the
11 principle articulated by the defendants that they
12 lose the benefit of that arbitration clause if, in
13 fact, it's enforcible, if, indeed, they have to
14 engage in discovery they would not have to otherwise
15 engage in. But what is the downside, the harm, the
16 prejudice to the plaintiffs then from approaching
17 the case along with the structure that the
18 defendants propose?
19        MS. MILLS: The main problem we see in
20 that is the prejudice we would suffer from the
21 inability to begin our discovery against the
22 defendants and against any third parties that we
23 would have to get discovery from. Obviously, the
24 telecommunications industry is in a state of flux.
25 There is a lot of cutting of jobs going on. There
              BECKY S. RYDER, RMR, CRR

Page 41

1  are people leaving the companies. So in order to
2  capture the discovery that we need, time does seem
3  to be of the essence, probably more so than if we
4  had a group of another type of industry defendant
5  here. And under the schedule that they have
6  proposed, we would not be able to begin that
7  discovery until almost a year from now. We think it
8  would be a much more expeditious and efficient
9  process because of the overlap in the discovery that
10 would be necessary for arbitration, for
11 classification, for merits, etc., to have all of
12 this discovery going on at the same time and to have
13 all these matters considered in the case at the same
14 time.
15        THE COURT: Let me go back to the
16 defendants for one more question, subject that we
17 haven't discussed yet, and that is the concept that
18 the defendants are going to move to stay or dismiss
19 on primary jurisdiction grounds, indicating this
20 ought to be looked at in a different forum all
21 together. I would like to get your comment on how
22 that motion, which you have staged basically third
23 in the procedural line up here, how that fits into
24 your thinking about appropriate scheduling order.
25        MR. BLOCKER: Well, we believe that should
              BECKY S. RYDER, RMR, CRR

Page 42

```
 1   come after arbitration simply because we don't -- I
 2   think your Honor said it best.  We don't want to
 3   lose the benefits that we think we get from
 4   arbitrating claims, which is, you know, to avoid
 5   some litigation, and therefore what we would like to
 6   be able to do is to have that issue decided first,
 7   because if your Honor determines these claims should
 8   be arbitrated, the issue about primary jurisdiction
 9   is one you wouldn't need to address, so we thought
10   it would make sense to stage that second; we would
11   only have to address that if you determined that the
12   claims were properly before your Honor.
13            THE COURT:  I assume, however, that even
14   if you are unsuccessful -- strike that.  Even if you
15   are successful as to your motion to compel
16   arbitration as to those customers with an
17   arbitration agreement in place, you would still
18   contend as to those who don't have an arbitration
19   agreement in place primary jurisdiction should
20   dictate a different handling of the matter, wouldn't
21   you?
22            MR. BLOCKER:  Yes.  There would be --
23   there would be actually two arguments with respect
24   to the people whose service with AT&T ceased before
25   the CSA took effect.  The primary attack we would
                BECKY S. RYDER, RMR, CRR
```

Page 43

```
 1   probably make on those claims, your Honor, is that
 2   they are barred by the filed tariff doctrine.  There
 3   are a couple cases on point in the predetariffing
 4   environment, so we would probably argue that they
 5   are barred by the filed tariff doctrine, and that
 6   even if they are not, they should be sent to the FCC
 7   on primary jurisdiction grounds.
 8            THE COURT:  Let me ask counsel on both
 9   sides here with regard to the arbitration
10   question -- and this is an issue that we discussed
11   in passing with regard to our -- not off the record
12   but in our in camera proceeding.  But what needs to
13   be done to prepare the record on the arbitration
14   question so that the court will be in a position to
15   determine whether or not the motion to compel
16   arbitration is capable of being decided as a matter
17   of law as opposed to something which requires
18   individual trials?
19            MS. MILLS:  I think, your Honor, that we
20   would need a couple of months before having to
21   engage in significant briefing on the arbitration
22   issue to conduct certain discovery.  Certain of that
23   discovery could be produced almost immediately.
24   That would be the Ting documents, those documents
25   that were produced by AT&T in that case.  We
                BECKY S. RYDER, RMR, CRR
```

Page 44

```
 1   understand there are approximately 15 boxes of
 2   documents that have been produced there.  We will
 3   need things such as market share information for the
 4   defendants.  We will need information regarding the
 5   arbitration association and defendants' success
 6   rates before those particular associations,
 7   defendants' customers' awareness of the dispute
 8   resolution provisions.  I can continue giving you a
 9   laundry list of things, but it will be some
10   significant document production that will have to
11   occur.  There may be a very limited number of
12   depositions.  I would think that it would probably
13   be less than five, not a substantial number.  And we
14   would need some time to analyze those things before
15   we would have to respond to a motion to compel
16   arbitration.  I would also think that the defendants
17   would want to file their motion to compel after we
18   file our consolidated amended complaint, so there
19   will have to be some time built in allowing us to
20   get that on file because they will want to see, of
21   course, how we have framed our claims in that
22   complaint, and there will be, of course, the
23   additional antitrust claim that has not been in any
24   of the complaints thus far.
25            MR. BARNETT:  Your Honor, if I may, just
                BECKY S. RYDER, RMR, CRR
```

Page 45

```
 1   to add quickly?
 2            THE COURT:  You may.
 3            MR. BARNETT:  We need a trial on the
 4   question of whether the arbitration clause is
 5   enforceable, and it's a class issue, as it was in
 6   Ting.  That was a case that was certified as a
 7   class, and of course there was a trial on the
 8   merits.  It was tried to the bench.  But my
 9   expectation is that we will need to get ready to try
10   that issue.  The question in my mind is whether it
11   makes sense to separate that trial from the merits
12   of the arbitration issue, and specifically the
13   antitrust aspect of it separately from the rest of
14   the case.  I think it makes a lot of sense to do
15   arbitration separately.  If there's a significant
16   difference in the kind of discovery and the kind
17   of -- the time that -- the court's time that's going
18   to be taken up in dealing with it, I just don't see
19   in this case how you can separate those out,
20   particularly because of the antitrust issue that's
21   going to be in the case.
22            THE COURT:  The one issue that I am
23   struggling with here in attempting to reconcile my
24   own perspective about what the best way to handle
25   this is, is the matter of if the defendants were to
                BECKY S. RYDER, RMR, CRR
```

Page 46

1  prevail on the arbitration issues, I hear what you
2  say, Mr. Barnett, but they may simply being unable
3  to do so on a motion in any event. But again your
4  perspective and theirs may not necessarily be the
5  same. So I'm attempting to put both those into some
6  context. If they are able to prevail on their
7  motion to compel arbitration as to some significant
8  portion of the cases, I would not want them to have
9  had to engage in the expense of putting together
10  what would probably be largely sort of
11  damage-related discovery, I mean figuring out what
12  individual consumers had overpaid, quote-unquote, on
13  their universal service fees. That's the rub.
14  Otherwise, frankly, I prefer the approach suggested
15  by the plaintiffs. I think this case should get to
16  trial sooner rather than later. Excuse me, that's
17  just what I think. And I don't think this case is
18  one that can't be handled, given the legal
19  resources. As you mention, Mr. Blocker, Sidley &
20  Austin has more than five lawyers, and I suspect
21  Wilkie, Farr does too. So I suspect that, although
22  burdensome on the defendants to have to fight
23  several battles at once -- and there's a certain
24  order to your approach that would make things
25  logical from that perspective -- I simply think it

BECKY S. RYDER, RMR, CRR

Page 47

1  defers trial too long and prefer the plaintiff's
2  approach to scheduling.
3       I am sensitive though and remain sensitive to
4  the potential for putting the defendants to an
5  unnecessary expense of engaging in discovery of
6  those accounts which would not be ultimately
7  involved in the case if arbitration were granted.
8  Is there a way to stage your discovery within these
9  deadlines -- I believe the answer is yes. That's a
10  rhetorical question, I think. But is there a way to
11  stage your discovery under the scheduling order that
12  we put in place that would allow us to have the kind
13  of schedule that the plaintiffs have proposed; that
14  is, one that would get remand, arbitration, and
15  primary jurisdiction decided as early as possible?
16  And under your proposed schedule I would say we're
17  looking at by December 1. We would have the remand
18  issues decided by February 1, probably; we would
19  have the -- Ty, you didn't want to do anything this
20  winter, did you? We would have whatever we can do
21  at least with regard to arbitration and primary
22  jurisdiction resolved. That's the kind of schedule
23  you proposed, and it's one I'm willing to try to
24  accommodate if we possibly can. Without having
25  committed to the dates that I just suggested, that's

BECKY S. RYDER, RMR, CRR

Page 48

1  what I would have in mind as you look at your
2  schedule. I like that idea, to get those issues
3  resolved, and if the defendants are entitled to
4  relief on their motions, let them get going wherever
5  else they will get going to, but by the same token
6  not leaving the plaintiffs simply twiddling your
7  thumbs and waiting until February to actually be
8  able to do something meaningful as to other aspects
9  of the case.
10      So if we can figure out a way to accommodate
11  those concerns and put together a schedule that does
12  accomplish both of those things, that's the schedule
13  I want to put in place. So you might say I'm
14  starting with the plaintiffs' schedule as the one
15  that -- presumptively the one I want to adopt, but
16  I'm willing to tinker with or adapt that schedule to
17  protect the defendants in the event that they are
18  entitled to some relief. Having said that, how
19  would you address that, counsel for the plaintiffs?
20  And then I'll get the defendants' perspective on
21  that as well.
22      MR. BARNETT: It occurs to me that the
23  thing that Ms. Mills said earlier is the right
24  thing, that the part that might be separable some
25  way is really this accounting kind of issue where

BECKY S. RYDER, RMR, CRR

Page 49

1  you look at the documents and see if they are
2  overcollecting or not or if they are discriminating
3  or not. That is going to be probably a pretty
4  significant battle of the accounting experts, maybe
5  have an actuary or two. It also occurs to me, your
6  Honor, that that is not a big, huge problem.
7  There's a pretty definable universe of documents,
8  and there's probably a small group of people that
9  are involved in doing this. So I don't know how
10  burdensome it would be. I would be skeptical that
11  it's going to be very burdensome at all.
12      THE COURT: If you did not undertake that
13  sort of discovery until after February 1 of 2003,
14  would that significantly delay or derail your
15  schedule otherwise?
16      MR. BARNETT: I hesitate to answer without
17  asking the experts who are going to have to do the
18  work, but I would expect they could do the work if
19  they get the documents pretty timely fashion after
20  that.
21      THE COURT: Let me hear from the
22  defendants now to comment on where we stand in this
23  regard.
24      MR. BLOCKER: Well, just so I understand,
25  your Honor, is the proposal that -- is the schedule

BECKY S. RYDER, RMR, CRR

Page 50

1  that you have in mind one where discovery on merits
2  issues would commence at the same time that these
3  items are being briefed?
4       THE COURT: What I would propose right
5  now -- and I looked at attempting to sit down and
6  make my own schedule based upon attempts to alter
7  it. I concluded actually I thought the plaintiffs
8  proposed a pretty doggone good schedule except for
9  the concern I just articulated; therefore, I would
10 propose to adopt the consensus plaintiffs', as they
11 were denominated when they proposed this schedule,
12 now the colead counsel in the case, proposed
13 schedule. But I do want to be sensitive to how, if
14 at all, that should be adapted or modified to
15 protect the defendants in the event there is relief
16 that you obtain on your motions that would be in
17 essence dispositive of the claims against you in
18 this case.
19      Now, one way I would suggest that -- and I
20 really think this is probably the better way to do
21 that right now -- is that I would propose putting
22 the plaintiffs' schedule in place today, allowing
23 you all on the defense side to evaluate what the
24 impact of that truly is in terms of what you would
25 be losing of your rights under your arbitration
            BECKY S. RYDER, RMR, CRR

Page 51

1  clause or what your benefit of getting a favorable
2  ruling on primary jurisdiction would be, going back
3  to counsel for the plaintiffs and saying, let's
4  alter the schedule; let's flesh the schedule out;
5  let's change the schedule in this way, such as, for
6  example, for the plaintiffs to agree that discovery
7  on the issues that Ms. Mills just articulated would
8  not commence until the ruling on the motions filed
9  in response to the new complaint. Because I promise
10 you, I mean, most of you don't know me, but I'm
11 pretty prompt at getting motions decided. If these
12 motions are at issue when these papers contemplate
13 them, they are going to be decided within a very
14 short period of time after they are at issue. I
15 mean, that's just how I do business. So the grass
16 will not grow under all of this. And I think that
17 hopefully we will alleviate some of the concerns
18 that we have, but I want to give you the opportunity
19 to think about it and then get back to them; and if
20 you can't decide it, we can get together on the
21 telephone and we can hash it out.
22      MR. MURRAY: Your Honor, you've identified
23 several issues that are threshold issues that we
24 absolutely agree should be decided first. Obviously
25 the jurisdictional question, our schedule put that
            BECKY S. RYDER, RMR, CRR

Page 52

1  right up there, and we did it in what we thought was
2  a fairly efficient time frame, not wanting to
3  prejudge how much time you would feel you needed to
4  decide the issue. The arbitration question is one
5  that we really do believe needs to be decided before
6  any merits discovery is undertaken. Otherwise, we
7  lose one of the more significant rights there.
8       THE COURT: And I simply disagree with you
9  because there are a certain category of plaintiffs
10 who are not affected by the arbitration agreement,
11 and therefore as to those plaintiffs some discovery
12 will continue to need to go forward. What I'm
13 suggesting to you is that you and Mr. Blocker
14 identify those categories of discovery which truly
15 would be limited to those individual situations
16 where there are arbitration agreements and you would
17 not otherwise have to engage in that discovery, and
18 I am sensitive to that, but I disagree with and
19 reject the notion that all merits discovery should
20 be stayed simply because some perhaps significant
21 quantity of or number of potential claims or dollars
22 might be affected by the arbitration clause.
23
24      MR. MURRAY: Then I guess another
25 important issue from our perspective would be the
            BECKY S. RYDER, RMR, CRR

Page 53

1  extent to which, for example, the filed rate
2  doctrine might preclude claims even from business
3  customers who are not otherwise subject to
4  arbitration; and if so, getting that issue decided
5  early enough to limit and help us narrow what the
6  focus --
7       THE COURT:  Did you study the proposed
8  schedule plaintiffs submitted?
9       MR. MURRAY: Yes, I've looked at it.
10      THE COURT: Under their schedule they
11 would file their consolidated amended complaint on
12 September 16 as well as their remand motions. On
13 October 16 you would file your motions in response
14 to the complaint, which would include the motion to
15 compel arbitration as well as the motions to
16 dismiss. Under their schedule they have you
17 ultimately filing your reply in support of those
18 motions on January 20, 2003. Actually, that's a
19 pretty generous time frame. If you want to move
20 that up and get, you know, if there's a way to move
21 that up, I wouldn't have any great problem with
22 that. If you file it before the 20th, great, but
23 even if you file it by 20th, it will be no later
24 than mid February by the time they get decided by
25 me. That's pretty expeditious ruling on those.
            BECKY S. RYDER, RMR, CRR

Page 54

1    In the meantime, I believe that discovery which
2 is not uniquely targeted at people who would have
3 the benefit of the arbitration clause should not go
4 forward.  As to issues like the filed rate doctrine
5 or primary jurisdiction, on the other hand, I would
6 not stay discovery in this case simply because those
7 motions to dismiss have been filed.  Even though I
8 would understand that you would, if you prevailed,
9 perhaps not have to make certain discovery, I would
10 not, because it wasn't -- because it was not the
11 fruit of your contractual negotiations but rather
12 simply a matter of a legal position you're taking in
13 this case, I would not stay discovery pending the
14 determination of those motions in any event.  So for
15 those reasons that's why I'm adopting the approach
16 that I am.
17    MR. BARNETT:  Your Honor, could I mention
18 one thing counsel reminded me?
19    THE COURT:  Sure.
20    MR. BARNETT:  Your Honor mentioned the
21 possibility of discussing resolution of this
22 litigation.  We cannot do it without the numbers.
23 We have to look at those.  So as a practical matter,
24 getting a handle on what the potential damages are,
25 we would have to have that discovery.
            BECKY S. RYDER, RMR, CRR

Page 55

1    THE COURT:  Well, I'm going to get to that
2 in a minute, Mr. Barnett.  My thinking here is this.
3 I am going to put into place a schedule which
4 contemplates having a trial in the time frame
5 suggested in the proposal.  Now, that's because I
6 believe that's -- to me that's the appropriate way
7 to approach it, and that's what I want to do, and I
8 want to protect the defendants' legitimate rights
9 that they want to have protected.  On the other
10 hand, when we talk about settlement, then I think we
11 all ought to, you know, loosen our ties, take our
12 coats off, and say, hey, now, what are we really
13 going to do to get this matter resolved?  That's
14 totally independent of the formal schedule I'm going
15 to impose on you absent some consensus that there's
16 a better way to solve this than going through the
17 schedule I'm proposing.  So that's what I'm talking
18 about.  As a result of this conference that is the
19 schedule I'm going to issue, but I leave the door
20 open so you can come back to me with a request to
21 modify the schedule, and we can do that by telephone
22 hearing that we can set up and take care of if you
23 all can't agree.  Hopefully you could agree on ways
24 to modify it.
25    Let's talk about now a few procedural and
            BECKY S. RYDER, RMR, CRR

Page 56

1 housekeeping issues just hopefully fairly quickly.
2    First of all, I have not proposed and you have
3 not necessarily suggested detailed information here
4 about how the discovery requests ought to be
5 processed.  The Manual for Complex Litigation
6 suggests in its form some ways in which those things
7 should be structured.  Failing any input from you
8 all to the contrary, I would likely impose an order
9 that incorporated some of the thoughts of the manual
10 in terms of the way in which discovery ought to be
11 handled, but I want to invite any of you if you have
12 thoughts about interrogatories, discovery requests,
13 disclosures, or the things that you think uniquely
14 need to be tailored, other than the subjects we have
15 already talked about here, in a scheduling order
16 that we put out.
17    All right.  Another issue that we need to deal
18 with is the filing of or imposing of a
19 confidentiality order.  There have been some
20 suggestions made along those lines.  I have not
21 attempted to try to figure out whether or not there
22 are any substantive differences or issues here.
23 Where does that stand?
24    MR. MURRAY:  Your Honor, we have spoken to
25 the plaintiffs about that.  We felt it might be most
            BECKY S. RYDER, RMR, CRR

Page 57

1 fruitful to see what happened this morning and who
2 we should be contacting.  We have some questions and
3 issues with some of the protective order provisions
4 that have been proposed.  We would like to provide
5 some counterproposals to that, see if we can work
6 out something with the plaintiffs.
7    THE COURT:  Mr. Barnett, I assume you're
8 amenable to that?
9    MR. BARNETT:  Absolutely, your Honor.
10    THE COURT:  With regard to that then, I do
11 want to afford you that opportunity to work that out
12 among yourselves, and if you are unable to within
13 the time frame that somebody needs to move forward
14 here and have that fall into place, it's easiest if
15 you file a very simple motion, but get it in front
16 of me so that I can again get you on the telephone,
17 iron it out, and get it resolved as quickly as
18 possible.
19    Another -- I'm sure you all are way beyond
20 needing to worry about designating document
21 depositories and numbering schemes and all those
22 kinds of things, and I don't see any reason to put
23 all that in a scheduling order unless you all think
24 we should.  Obviously there are very sophisticated
25 lawyers on all sides of this case, and I don't
            BECKY S. RYDER, RMR, CRR

Page 58

1  really see any reason to micromanage the way you do
2  those things unless you want some help along those
3  lines.
4       MR. BARNETT:  Can we agree that we will
5  number all exhibits sequentially, starting with one
6  in the first deposition and whatever we end up with
7  at the last deposition?
8       THE COURT:  As opposed to Jones Deposition
9  Exhibit 1 and Schmidt Deposition Exhibit 1?
10      MR. BARNETT:  Yes, your Honor.  It's a lot
11 easier at trial if you do it that way.
12      MR. MURRAY:  As long as we don't have any
13 multi-track depositions.  That's where the
14 complication arises.
15      MR. BARNETT:  I think we could work around
16 that, things being -- we can give sequences to
17 different tracks if we need to.
18      MR. MURRAY:  It sounds like that's
19 something we can talk about.
20      MR. BLOCKER:  As a concept I don't think
21 we would object to that, Barry.  That's how I prefer
22 to do it.
23      THE COURT:  God, you're a good guy,
24 Mr. Blocker, giving in on that point.
25      MR. BARNETT:  As long as this is on the
              BECKY S. RYDER, RMR, CRR

Page 59

1  record, your Honor, this is the first time Mr.
2  Blocker and I have agreed.
3       THE COURT:  He's just showing what a
4  reasonable fellow he really is.  That's good.
5       Is there anything with regard to coordination
6  with later tag-along cases that we need to address
7  here today other than what just inherently is going
8  to happen by virtue of the MDL orders?  Anything you
9  can think of that I need to be aware of?
10      MR. MURRAY:  I would just bring to your
11 Honor's attention we have a case in the Southern
12 District of Illinois that had been remanded.  It had
13 named the wrong Sprint entity.  We have removed it
14 again once they named the correct Sprint entity, and
15 that is the only case at this point that we're
16 unclear on whether or not it will be sent to you.
17 So there's a possibility that we will have a state
18 court action there.  And we have another action in
19 California that raises many of these same issues,
20 but it's brought under the Qui Tam equivalent,
21 California law, and is one that Sprint chose not to
22 remove to federal court.  So there are -- there's
23 going to be some periphery action going on perhaps
24 in other courts, state courts to be specific, and
25 we're obviously going to be interested in what can
              BECKY S. RYDER, RMR, CRR

Page 60

1  be done from the plaintiffs' side.  We will try to
2  coordinate that and also whatever role you might be
3  able to play in helping to coordinate those efforts.
4       THE COURT:  Sure.  I'm obviously a true
5  believer in the process that we're outlining here to
6  be -- attempt to be more efficient and cost-saving
7  and get this all resolved.  Anything I can do to
8  help along those lines, I'm happy to do.
9       Do you know, Mr. Barnett, or any of your
10 cohorts here, whether there are yet additional cases
11 floating around out there that haven't been filed
12 that somebody plans to file?
13      MR. BARNETT:  I would expect, your
14 Honor -- I don't know of any that haven't been filed
15 that are planned to be filed.  My expectation is
16 that some small additional number of cases may be
17 filed in state courts.  I also have the expectation
18 that if cases are remanded or not removed that are
19 brought by people who, if they are not part of our
20 group, are at least coordinating in some way with
21 our group, that they will ask that those cases be
22 stayed pending events in the MDL proceeding, and
23 that's obviously our preference.  That's what we
24 would counsel people who are in our group or
25 sympathetic to our group that that's what they would
              BECKY S. RYDER, RMR, CRR

Page 61

1  do.  Hopefully we don't get into a situation where
2  somebody tries to get out ahead of the MDL
3  proceedings where there might be a question of
4  interference with your Honor's jurisdiction.  I hope
5  we don't get into that situation, but that's a
6  possibility.
7       THE COURT:  But you're unaware of any of
8  that at this juncture?
9       THE COURT:  The Southern District of
10 Illinois cases are the only ones I'm aware of that
11 might be a problem in that respect.  There's also an
12 AT&T case that was remanded, I believe, to Madison
13 County.
14      MR. BLOCKER:  That's correct, your Honor.
15      THE COURT:  All right.  Thank you.
16 Finally, just one other sort of housekeeping issue.
17 As of March of 2003 the District of Kansas will be
18 live on electronic case filing, so if you haven't
19 been given that word in advance, you should be, some
20 of you, I'm sure, experienced with ECF; others may
21 not.  But in any event, that's our schedule in terms
22 of when we're going live.  March Madness, as we're
23 calling it.  Some of us are basketball fans.  And
24 that will simply have some implications for the way
25 in which you get some of this stuff done at some
              BECKY S. RYDER, RMR, CRR

Page 62

1  particular point.
2       MR. BLOCKER:  Your Honor, could I go back
3  to the point you raised about coordinating tag-along
4  actions?  It doesn't affect AT&T, but it might
5  affect the proceeding.  My understanding is that two
6  of the tag-along cases involve other defendants;
7  that one case has been brought against Bell South
8  and one case has been brought against, I think AT&T
9  Wireless, and another case against Qwest.  And those
10 defendants are not currently here.  I don't know how
11 your Honor wanted to fold them into what ultimately
12 would be your schedule, and maybe Mr. Barnett can
13 address that, but those defendants are not currently
14 before you.
15      THE COURT:  Right.
16      MR. BARNETT:  I think the Bell South case
17 was a mistake, that it shouldn't have been tagged
18 and somebody in a clerk's office may have
19 inadvertently got it involved.  I think both Bell
20 South and the plaintiff who has brought the cases
21 are asking the MDL panel not to send them to this
22 court because the claims and the facts are different
23 from the ones here.  The Qwest case, I'm not aware
24 at this time.
25      MS. STEINER:  I believe it was remanded
                  BECKY S. RYDER, RMR, CRR

Page 63

1  before the tag-along proceeding actually got
2  instituted, so that's moot as to Qwest.  As to AT&T
3  Wireless, they tagged it, and I think it's part of
4  the conditional transfer, so it probably will be
5  here.
6       THE COURT:  How does that affect the lay
7  of the land?  I haven't thought about that in terms
8  of AT&T Wireless really.  What I'm thinking of is,
9  is there a universal service fund charge in the
10 wireless context?
11      MR. BLOCKER:  I believe there is.
12      THE COURT:  I'm not reading my cell phone
13 bills.  Sprint -- to make full disclosure, Sprint is
14 my child's, my daughter in college's, provider.
15 Cingular has the contract with the courts, another
16 cell phone I use from time to time, let the record
17 all reflect.  But it appears that my view that it
18 would be very difficult to find somebody who didn't
19 have some impact on them by all of this process is
20 even -- there's even a smaller universe out there
21 than I might have envisioned.  Is that a fair
22 statement?
23      MR. BLOCKER:  That's probably right.  The
24 wireless unit, if they come into the case, will not
25 be represented by us.  They are separately
                  BECKY S. RYDER, RMR, CRR

Page 64

1  represented.  I'm only inquiring what will happen
2  when they do come into the case.  It doesn't affect
3  AT&T or Sprint, but it's something your Honor may
4  want to consider.
5       THE COURT:  Frankly, they are going to
6  have to show me why they shouldn't have to live with
7  this order.
8       MR. BLOCKER:  I'm only making you aware of
9  it.  I'm not suggesting that your Honor change it.
10      THE COURT:  I understand.  And my response
11 was harsher than I meant it to sound.  That's why
12 the starting point would be they would have to come
13 in and show me why this would prejudice them.
14      All right.  Before we talk about settlement
15 aspects, I want to talk about one other sort of a
16 modification, if you will, of the plaintiffs'
17 proposed schedule that I am adopting, and that is I
18 think we should have another conference.  I'm going
19 to set it for November 20.  We will take up oral
20 argument on the remand motions at that time and use
21 that as a follow-up face-to-face meeting.  We will
22 conduct that in the courtroom this time, and I was
23 going to ask you the question, in terms of
24 convenience of travel and so forth, is 10:00 o'clock
25 a convenient time?  Is earlier inconvenient?  How
                  BECKY S. RYDER, RMR, CRR

Page 65

1  does it really work for you best?  I mean, that's my
2  real question.  You're coming from all over.  I
3  travel to Washington quite a bit, and it's fairly
4  difficult to make the connections at the times you
5  would like to.  Chicago is a lot easier.  My
6  daughter lives in Chicago and flies back and forth.
7       MR. MURRAY:  I'm coming in the night
8  before, but if I have as much trouble with the
9  construction as I did this morning --
10      MS. GRAMALDI:  The hardest part of the
11 trip was from Overland Park to Kansas City.
12      MR. MURRAY:   10:00 worked fine for me.
13      MR. BLOCKER:  That's fine.
14      THE COURT:  Did it work for you all?
15      MR. BARNETT:  I think so.  I think the
16 question is always whether you have enough time for
17 people to get in in the morning.  I think it's
18 probably okay for somebody from Dallas or
19 Minneapolis, but if you come from one of the coasts,
20 then I don't think you can do it.
21      THE COURT:  Can you still get out -- I
22 know Chicago, you can get out.  Can you get out that
23 afternoon okay to get to Dallas or Minnesota?
24      MR. BARNETT:  I believe so, your Honor.
25 If the people are going to be coming in the night
                  BECKY S. RYDER, RMR, CRR

Page 66

1  before, it's probably even better to do it earlier
2  rather than --
3        THE COURT: I'm happy to do it -- let's
4  move it up to 9:30 unless somebody is appalled by
5  that in some respect.  The record should reflect
6  here I'm actually set to start a jury trial on the
7  19th of November.  I will keep you posted if
8  something -- I have some reason to think that case
9  could conceivably go away, but there is an outside
10 chance I would have to adjust this schedule.  I
11 don't want to adjust it because I think the 20th
12 would work pretty well in terms of getting that
13 remand motion decided.  So we will -- hopefully we
14 can keep with that, but liaison counsel and Ms.
15 Scheurer will be in contact, I'm sure, to keep this
16 whole thing on track.
17      Finally I want to -- I do want to talk about
18 the subject of settlement.  And let me go off the
19 record initially.
20      (A discussion was had off the record.)
21        THE COURT: Let's go back on the record
22 just for a second here and let me throw the floor
23 open now for anything that I haven't covered that
24 you feel you need to address this morning.
25 Mr. Barnett?
                    BECKY S. RYDER, RMR, CRR

Page 67

1        MR. BARNETT: Your Honor, I just wanted to
2  mention, now that we have been appointed colead
3  counsel, your Honor was very careful in outlining
4  the concerns about being a customer of AT&T and
5  Sprint and possibly being affected and opting out.
6  I just want to say for the record we have no
7  objection or reservations about your Honor presiding
8  in these cases.
9        THE COURT: All right.  Thank you.
10 Anything else that we need to talk about?
11       MR. STANLEY: Would it be helpful to you
12 if we sent you electronically or overnight the
13 electronic file of our proposed practice and
14 procedural order number two?  We would modify it to
15 include the new executive committee member and also
16 reflect liaison counsel for the defendants.
17       THE COURT: If you would, then I will use
18 that as the basis to adapt that to issue my order.
19 That would be very good.
20       MR. STANLEY: We will also send you the
21 schedule.  Do you use E-mail or just overnight it?
22       THE COURT: I would prefer you to E-mail
23 it.  It's easier for me to make the modifications in
24 electronic format.  E-mail it to Ms. Scheurer.  She
25 would continue to be my contact along those lines.
                    BECKY S. RYDER, RMR, CRR

Page 68

1        MR. STANLEY: Okay.  Thank you.
2        THE COURT: Anything from AT&T?
3        MR. BLOCKER: I don't think so, your
4  Honor.
5        THE COURT: From Sprint?
6        MR. MURRAY: No, your Honor.
7        THE COURT: Thank you all very much for
8  coming here today.  I appreciate the opportunity to
9  meet you.  I look forward to working with you, and
10 let's see if we can get all this resolved.
11      (Court was adjourned.)
12            * * * * *
13
14
15
16
17
18
19
20
21
22
23
24
25
                    BECKY S. RYDER, RMR, CRR

Page 69

1             C E R T I F I C A T E
2
3  STATE OF KANSAS
4          ss
5  COUNTY OF JOHNSON
6
7      I, Rebecca Ryder, a Certified Shorthand Reporter
8  and official reporter for the United States District
9  Court, District of Kansas, do hereby certify that as such
10 acting official reporter I was present at and reported in
11 machine shorthand the above and foregoing proceedings.
12     I further certify that a transcript of my
13 shorthand notes was prepared and that the foregoing
14 transcript is a true and correct transcript of my notes in
15 said case to the best of my knowledge and ability.
16     SIGNED, OFFICIALLY SEALED, AND FILED WITH THE
17 CLERK OF THE DISTRICT COURT OF THE UNITED STATES DISTRICT
18 COURT, THIS _____ DAY OF _____, 2002.
19
20           _____
21             REBECCA RYDER, RMR, CRR
22
23
24
25
                    BECKY S. RYDER, RMR, CRR