**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

IN RE: UNIVERSAL SERVICE FUND
TELEPHONE BILLING PRACTICES
LITIGATION                                              Case No. 02-MD-1468-JWL

This Order Relates to All Cases

_____

**MEMORANDUM AND ORDER**

This multidistrict litigation proceeding involves class actions alleging a price fixing

antitrust conspiracy in connection with Universal Service Fund (USF) fees in violation of §

1 of the Sherman Antitrust Act, 15 U.S.C. § 1, and seeking injunctive relief and treble

damages pursuant to § 4 of the Clayton Antitrust Act, 15 U.S.C. § 15.  Additionally, this

MDL proceeding involves breach of contract claims under New York state law.[1]  The court

has certified two classes: the "conspiracy class" for the antitrust claims and the "AT&T

subclass" for the breach of contract claims.  *See In re Universal Serv. Fund Tel. Billing*

*Practices Litig.*, 219 F.R.D. 661, 664-65 (D. Kan. 2004).  This matter is before the court on

AT&T's Motion for Summary Judgment (doc. 827).  For the reasons explained below, this

motion is granted in part and denied in part.[2]  Specifically, it is granted with respect to the

conspiracy class antitrust claims against AT&T for the time period after April 1, 2003, and

_____

[1] All other claims in this case against all other parties have been dismissed or
otherwise resolved.

[2] AT&T's request for oral argument is denied because the court does not believe that
oral argument would be of material assistance in resolving the motion.  *See* D. Kan. Rule 7.2
(requests for oral argument are granted only at the court's discretion).

it is granted with respect to the AT&T subclass business customers' breach of contract claims.  The motion is otherwise denied with respect to the conspiracy class antitrust claims between August 1, 2001, and March 31, 2003, and it is denied with respect to the AT&T subclass residential customers' breach of contract claims.

## STATEMENT OF MATERIAL FACTS

At relevant times, plaintiff Roger Gerdes was a residential long distance telephone service subscriber of AT&T, plaintiff Goldman & Hellman was a business long distance telephone service subscriber of AT&T, plaintiff Lady Di's was a business long distance telephone service subscriber of AT&T, and plaintiff Sterling Beimfohr d/b/a Sterling Sails was a business long distance telephone service subscriber of AT&T.  Plaintiffs used and paid for AT&T's direct-dial long distance services, including paying charges billed by AT&T as a Universal Connectivity Charge (UCC), which AT&T billed them in connection with its required contributions to the federal Universal Service Fund (USF) program.

In plaintiffs' antitrust claim, they allege a price-fixing conspiracy among defendant AT&T Corp. (AT&T), former defendant Sprint Communications Company, L.P.,[3] and non-party MCI Telecommunications Corporation,[4] all of whom at relevant times provided long distance service to business and residential customers throughout the United States.

---

[3] Plaintiffs have settled their claims against Sprint.

[4] MCI filed for bankruptcy in 2002 and was later purchased by Verizon Communications, Inc.

2

Plaintiffs allege that AT&T, Sprint, and MCI engaged in a conspiracy to charge USF fees at artificially high and non-competitive levels.  The court has certified a class as to plaintiffs' antitrust claim.  This "conspiracy class" includes the following:  "All business long distance customers of AT&T, Sprint, or MCI in the United States and all residential long distance customers of AT&T in California who paid a USF charge on or after August 1, 2001."  *In re Universal Serv. Fund Tele. Billing Practices Litig.*, 219 F.R.D. at 664.

In plaintiffs' breach of contract claim, they allege that AT&T breached its contracts with its customers by billing for the USF contribution and/or by charging its customers a USF contribution that exceeded AT&T's own contribution factor.  The court also has certified a class as to this claim.  This "AT&T subclass" includes the following: "All business long distance customers of AT&T in the United States and all residential long distance customers of AT&T in California who paid a USF charge between August 1, 2001, and March 31, 2003."  *Id.* at 665.

## I.     Background of the Universal Service Fund

A long-standing policy of telephone industry regulation has been to make telephone service universally available to all Americans.  Before 1997, this "universal service" goal was funded by implicit subsidies built into telephone rates.  The Telecommunications Act of 1996 restructured the universal service system by providing that the support mechanisms "should be explicit"; expanding the scope of the program to include support for schools, hospitals, and high-cost (generally rural) areas; and delegating to the FCC and a Federal-State Joint Board the task of implementing the program.  On May 8, 1997, the FCC issued

3

the "Universal Service Order," which changed the way the Universal Service Fund (USF) was funded by establishing an obligation that, beginning January 1, 1998, all telecommunications carriers that provide interstate telecommunications services must contribute to the fund.[5]

When this USF contribution (also loosely referred to as a USF tax) was implemented initially, it was a percentage of each carrier's gross billed revenues from interstate, intrastate, and international telecommunications services during the prior year. This percentage, known as the "contribution factor," was set by dividing the "Funding Needs Amount" (the amount budgeted for universal service programs in the upcoming year) by the "Industry Gross-Billed Amount" (the total gross-billed revenues of all carriers during the prior year). Under the Second Order, the Universal Service Administrative Company (USAC) billed each carrier quarterly for an amount equal to the current contribution factor times the carrier's gross billed revenues from the same quarter one year before. In March 2001, the FCC modified the contribution methodology to establish a six-month interval, rather than a twelve-month interval, between the accrual of revenues and the assessment of USF contributions based on those revenues. The contribution factors were set quarterly, and carriers were billed quarterly for the USF tax. The contribution factors were publicly available on the FCC's website each quarter.

---

[5] By 1998, there were at least six hundred telecommunications carriers that provided long distance service. By 2004, the number of long distance carriers had grown to over one thousand.

4

When the FCC initially implemented the USF tax, there was controversy about the program, most of it politically motivated. Additionally, various consumer groups (including the Consumers Union, publisher of *Consumer Reports*) questioned the need for and desirability of the USF tax. The 1997 Universal Service Order provided that "carriers will be permitted, but not required, to pass through their contributions to their interstate access and interexchange customers."

**II.** **AT&T's Statement of Facts**

Following are the facts that AT&T relies on to support its motion for summary judgment. Consistent with the well established standard for evaluating a motion for summary judgment, these facts are either uncontroverted or stated in the light most favorable to plaintiffs, the nonmoving parties.

> **A.** **The FCC's Intervention Regarding Implementation of the USF Tax and Congressional Investigation**

FCC Chairman William Kennard testified in his deposition that he took the position that "if consumers are being asked to pay this charge by the government, that there should be a line item, and that the line item should clearly identify what the charge was for." Chairman Kennard's philosophy was that "[i]f people are being asked to pay for it, put it on the bill."

He wanted the major long distance carriers to implement their recovery of the USF tax on business customers first, and to postpone any charges on residential customers, "because we wanted to make sure that the communication to residential customers was fully

5

thought through and communicated appropriately, so that we didn't have mass confusion among the consuming public about charges appearing on their bills." John Nakahata, FCC Chairman Kennard's Chief of Staff at the time, conveyed this desire to AT&T, MCI, and Sprint that they not impose USF charges on residential customers for the first six months of 1998. Mr. Nakahata separately contacted Mark Rosenblum of AT&T, Jonathan Sallet of MCI, and John Hoffman of Sprint sometime prior to January 1, 1998. He told each of them that the FCC desired that they not impose USF charges on residential customers. On December 18, 1997, AT&T issued a news release announcing that it would not impose USF charges on the bills of its residential customers for the first six months of 1998.

FCC Commissioner Michael Powell commented on the USF charge in a dissenting opinion in a June 1998 FCC order:

> the simple truth is that Universal Service costs money. And as we follow the Act's instruction to move to a more competitive market paradigm in which universal service subsidies are converted from implicit to explicit, we should not be surprised that carriers will seek to recover such subsidies from their customers. Unless we are prepared to return to unenlightened days of strict price regulation in telecommunications, we should not be naive enough to presume that profit-maximizing firms will deduct their universal service contributions from their bottom line, either out of the goodness of their hearts or because we somehow believe that they gave their word not to pass on these costs to their customers.

### B.    Carriers' Response to the New USF Tax

Alleged conspirators and nonconspirators alike elected to recover their USF expenses through a separate line item. From the beginning of the USF tax, carriers not alleged to be part of any conspiracy elected to recover USF expenses through a separate charge on

6

customers.  Some customer groups publicly expressed their preference that carriers use a separate line-item charge to recover the USF tax.  For example, during the FCC proceedings that led to issuance of the May 1997 Universal Service Order, the California Department of Consumer Affairs, the California Small Business Association, and the International Communications Association, an organization representing some eight hundred businesses, argued for a mandatory line-item USF charge rather than permitting carriers to embed the charges in rates.  Chairman Kennard was not aware of any carrier that was not seeking to fully recover its USF obligations from customers.  Chairman Kennard testified that his understanding of how the marketplace works is that carriers do not compete on USF charges.

On December 18, 1997, AT&T transmitted to the FCC a tariff filing that added a new charge, known as the Universal Connectivity Charge (UCC), to the bills of its business customers.  The initial UCC was set to be 4.9% of total net interstate and international charges of all business customers.  The tariff filing provided that this charge would be applied with respect to charges billed after January 25, 1998.  During the period from January 1, 1998, until March 31, 2003, AT&T's business division had a single UCC rate applicable to all business customers and all business calling plans.  On December 19, 1997, MCI transmitted to the FCC a tariff filing that added a new charge to the bills of its business customers that was "intended explicitly to recover certain costs incurred by MCI."  The initial charge was set to be 5% of monthly MCI service usage charges for certain calling plans, and 4.4% for other calling plans and prepaid card instruments.  The tariff specified that it was "scheduled to become effective on January 1, 1998."  On December 31, 1997, Sprint

7

transmitted to the FCC a tariff filing that added a new charge, known as the Carrier Universal Service Charge (CUSC), to the bills of its business customers. The initial CUSC was set to be 4.9% of all interstate and international retail charges. The tariff provided that the CUSC charge would be effective on January 1, 1998.

Because the USF tax was based on the prior year's revenues but carriers recovered their obligations based on current revenues, the USF tax had a different impact on carriers depending on whether their revenues were growing or declining. If a carrier's revenues were declining, then the carrier would need to charge its customers a percentage *higher* than the contribution factor if it wanted to collect the full amount of the tax. If a carrier's revenues were growing, then the carrier would need to charge its customers a percentage *lower* than the contribution factor if it wanted to collect no more than the full amount of the tax. AT&T, MCI, and Sprint each experienced declining interstate and international long distance revenues every year from 1998-2003. Collectively, AT&T, MCI, and Sprint had a declining share of the long distance business. Their combined share of long distance minutes fell from 83% in 1998 to 32% in 2005. AT&T's share of residential long distance minutes fell from 58% to 11% between 1998 and 2005.

Prior to April 1, 2003, most long distance carriers imposed a USF charge that matched the USF contribution factor. The incumbent local exchange carriers, also known as the "Bell Companies" (BellSouth, Qwest, SBC, and Verizon) generally set their USF charge at least equal to the contribution factor. Prior to April 1, 2003, the Bell Companies collected more in USF charges than they paid in USF taxes because they had growing long distance

revenues and were charging their customers using the contribution factor as their USF charge.

Given the way the USF program worked prior to April 2003, one could not tell whether a carrier's revenue from its USF charges exceeded its USF tax expenses simply by comparing its USF rate to the contribution factor. This is because of three factors: (1) the carrier's revenues may have been declining, (2) the USF tax was imposed on gross-billed revenues, which included uncollectible revenues, and (3) until July 2002, the gross-billed revenues included the amounts billed for USF charges in the prior year.

1. *AT&T's Response to the New USF Tax*

At the end of 1997, AT&T had one division that was responsible for business customers, AT&T Business Services (ABS), and another that was responsible for residential customers, AT&T Consumer Services (ACS). ABS and ACS "were run as two separate entities." Each of these divisions adopted a line-item charge, called the "Universal Connectivity Charge" (UCC), but the charges worked differently and were at different levels, as described below. When AT&T received its quarterly bill for the USF tax, it internally divided the tax obligation between ABS and ACS.

**a.     AT&T Business Services (ABS)**

In 1997, ABS assembled a project team to analyze the USF program and recommend a response. The team concluded that, because of the large size of the USF tax, it should be fully recovered from ABS customers. The goal was "to remain revenue neutral by recovering USF from customers." The team also concluded that the USF charge should be

9

presented as separate line item on customer bills and that it should be a percentage of the customer's charges. A January 1998 description of ABS's plans stated that "AT&T's intent is to pass both these charges on to customers, so that they are recognized as 'tax-like' assessments required by the FCC. In this way, the customers will not perceive that these are fees developed by AT&T or the other IXC's to generate revenue." ABS concluded that establishing a separate charge for USF simplified the tariffing requirements because the USF contribution factor was expected to fluctuate over time. If the charge had been built into the basic rates, ABS would have to amend many different sections of every tariff whenever the factor changed. ABS also concluded that imposing the UCC as a separate line item was simpler for ABS's billing systems to implement and for its customer care representatives to explain.

ABS's goal in setting the percentage charge was to fully recover its expenses from the USF program. The percentage was arrived at through complex calculations that took into account projections of revenue subject to the USF tax, projected quarterly changes in the contribution factor, and projected expenses under the USF program. ABS contracted with hundreds of different internal and external billers to issue billing invoices to business customers. Some of these billers were unable to immediately include the USF charges on monthly bills issued after January 25, 1998. Where feasible, customers were notified that the temporarily omitted USF charges would be added to later bills. ABS later added other cost components to the amount that it was attempting to recover through the UCC. In 1999,

ABS began including projected uncollectibles when calculating the UCC rate. It also began including certain administrative expenses.

The ABS administrative expense estimates (sometimes referred to as "overheads") were calculated by taking actual administrative expenses "for all business services," dividing it "by the underlying revenues" to obtain an administrative expense "percentage of total revenues," and multiplying that administrative-expense percentage by the total billed USF revenues. Grant Trevithick, who was at relevant times with ABS, testified in his deposition that it was his understanding that the FCC "did not have a problem with the way [ABS] calculated overheads."[6] Although ABS's goal was to set the UCC charge at a level that would recover its USF costs, the amounts collected from the UCC charge could turn out to be higher or lower than the USF costs depending on the accuracy of the forecasts of future revenues, uncollectibles, unbillables, administrative expenses, or the FCC's contribution factor. ABS never set a rate that was expected to exceed the rate necessary to fully recover its USF costs and associated expenses.

An internal ABS reconciliation of the USF expenses and recoveries for the period from 1998 through year-end 2002 concluded that ABS recovered significantly less than its

---

[6] Plaintiffs' attempt to dispute this statement of fact is without merit. The first statement they quote does not relate to the way ABS calculated overheads and, additionally, it is from a December 2000 email that discusses over-recovery in 1999 and 2000, all of which predates the class period. The second statement they quote is from an internal AT&T document that was authored by Mr. Trevithick, who testified that the statement he made in the document related to the FCC's audits of Qwest, Sprint, and MCI, and that it did not concern AT&T. Thus, plaintiffs have not established that the FCC had a problem with the way AT&T or ABS, in particular, calculated overheads during the class period.

total expenses over that period.  Mr. Trevithick testified that, by his calculations at that time, the "cumulative under-recovery," "without overheads," "was 192.95 million dollars at the end of 2002."  And, with overheads, "at the end of 2002, we were 564.25 million dollars under-collected."  An ABS reconciliation of the USF expenses and recoveries for the period from 1998 through 2004 similarly concluded that ABS recovered significantly less than its total expense over that period.

The FCC conducted periodic audits of AT&T's USF charges, and the FCC never took any enforcement action against AT&T.  During these audits, AT&T explained its methods for calculating its UCC rate.  Following is the quarterly UCC rates charged by ABS from January 1998 through April 1, 2003:

| Quarter | Rate |
|---------|------|
| 1Q98 | 4.9% |
| 2Q98 | 4.9% |
| 3Q98 | 4.1% |
| 4Q98 | 4.1% |
| 1Q99 | 4.1% |
| 2Q99 | 4.9% |
| 3Q99 | 4.9% |
| 4Q99 | 6.6% |
| 1Q00 | 6.6% |
| 2Q00 | 6.6% |
| 3Q00 | 6.6% |
| 4Q00 | 6.6% |
| 1Q01 | 8.0% |
| 2Q01 | 8.0% |
| 3Q01 | 8.0% |
| 4Q01 | 8.0% |
| 1Q02 | 10.6% |
| 2Q02 | 10.6% |
| 3Q02 | 9.6% |
| 4Q02 | 9.6% |

1Q03            9.6%

### b.        AT&T Customer Services (ACS)

In 1997, ACS determined that its contributions to the USF program would be fully passed through to residential customers.  ACS ultimately decided to set its UCC rate as a separate flat monthly charge, rather than a charge based on a percentage of the customer's bill.  As announced by AT&T on June 18, 1998, a flat rate charge was simpler to explain to customers and easier to administer, and it provided a more predictable recovery mechanism. Beginning in July 1998, ACS set a flat rate charge of $0.93 per presubscribed carrier line. The use of flat monthly USF charges led to criticism.  On July 20, 1999, the FCC issued a Notice of Inquiry on the "impact of certain flat-rate charges on single-line residential and business customers who make few, or no, interstate calls."  On October 29, 1999, AT&T filed with the FCC a new tariff to raise its monthly residential UCC flat rate from $0.99 to $1.50.  The FCC responded with an order suspending the tariff filing.  Eventually, AT&T committed to the FCC that it would convert its UCC charge to a percentage rather than a flat rate.  It did so on April 2000.

The USF expenses that ACS sought to recover through the UCC generally did not include administrative expenses arising from the USF program.  The only exception is that in April of 2000 it included in its expense calculations a one-time administration expense that was attributed to its movement from the flat-rate charge to a percentage charge.

When setting its USF rate, ACS had to forecast future revenues of its division, predict what the FCC's contribution factor would be in upcoming quarters, and estimate other factors

such as uncollectibles.  ACS's reconciliation of the USF expenses and recoveries for the period from 1998 through 2004 concluded that ACS recovered significantly less than its total expense over that period.

The FCC conducted two audits of AT&T's USF charges, and the FCC never took any enforcement action against AT&T.  During these audits, AT&T explained its methods for calculating its UCC rate.  Following is the quarterly UCC rates charged by ACS for the period from July 1, 1998, through March 31, 2003:

| Quarter | Rate |
|---------|------|
| 3Q98 | $0.93 |
| 4Q98 | $0.93 |
| 1Q99 | $0.93 |
| 2Q99 | $0.93 |
| 3Q99 | $0.93 |
| 4Q99 | $0.99/$1.38 (rate change on 11/2/99) |
| 1Q00 | $1.38 |
| 2Q00 | 8.6% |
| 3Q00 | 8.6% |
| 4Q00 | 8.6% |
| 1Q01 | 9.9% |
| 2Q01 | 9.9% |
| 3Q01 | 9.9% |
| 4Q01 | 9.9% |
| 1Q02 | 11.5% |
| 2Q02 | 11.5% |
| 3Q02 | 11.0% |
| 4Q02 | 11.0% |
| 1Q03 | 11.0% |

   2.      *Sprint's Response to the New USF Tax*

14

The two Sprint business units – Sprint Business and Sprint Residential – each adopted a percentage line-item charge called the "Carrier Universal Service Charge."  Sprint allocated the total USF tax between Sprint Business and Sprint Residential.

As to Sprint Business, based on its internal revenue forecast for the upcoming period, a team established a CUSC percentage that would likely recover the full amount of the tax, taking into account an estimate of the billings that would be uncollectible.  For the last three quarters of 2001, Sprint Business had two different rates, depending on whether a customer received its bills directly from Sprint (lower rate) or from the local carrier (higher rate). Following is the quarterly CUSC rates charged by Sprint Business for the period from January 1, 1998, through March 31, 2003:

| Quarter | Rate |
|---|---|
| 1Q98 | 4.9% |
| 2Q98 | 4.9% |
| 3Q98 | 4.9% |
| 4Q98 | 4.9% |
| 1Q99 | 4.9% |
| 2Q99 | 4.9% |
| 3Q99 | 4.9% / 4.3% (rate change on 8/1/99) |
| 4Q99 | 4.3% / 6.0% (rate change on 11/1/99) |
| 1Q00 | 6.0% |
| 2Q00 | 6.0% / 6.6% (rate change on 5/15/00) |
| 3Q00 | 6.6% |
| 4Q00 | 6.6% |
| 1Q01 | 7.5% |
| 2Q01 | 7.5% / 9.9% |
| 3Q01 | 7.5% / 9.9% |
| 4Q01 | 7.5% / 9.9% |
| 1Q02 | 7.5% / 9.9% / 8.3% (rate changed to one rate for all business customers on 2/1/02) |
| 2Q02 | 8.3% |
| 3Q02 | 8.3% |

|       |      |
|-------|------|
| 4Q02  | 8.3% |
| 1Q03  | 8.3% |

As to Sprint Residential, initially Sprint did not impose a USF charge on residential customers.  During 1998, personnel from Sprint Residential met internally to discuss how to respond to the Universal Service Order, and concluded that they would attempt to recover the full amount of the USF tax attributable to Sprint Residential customers.  Following is the quarterly CUSC rates charged by Sprint Residential for the period from July 1, 1998, through March 31, 2003:

| Quarter | Rate |
|---------|------|
| 3Q98 | 4.5% |
| 4Q98 | 4.5% / 5.8% (rate change in 12/98) |
| 1Q99 | 5.8% |
| 2Q99 | 5.8% |
| 3Q99 | 6.3% / 7.1% (rate change in 9/99) |
| 4Q99 | 7.1% / 8.4% (rate change in 11/99) |
| 1Q00 | 8.4% |
| 2Q00 | 8.4% |
| 3Q00 | 8.4% / 8.6% (rate change in 7/00) |
| 4Q00 | 8.6% |
| 1Q01 | 8.6% / 9.9% (rate change on 2/1/01) |
| 2Q01 | 9.9% |
| 3Q01 | 9.9% |
| 4Q01 | 9.9% |
| 1Q02 | 9.9% |
| 2Q02 | 9.9% |
| 3Q02 | 9.9% / 9.6% (rate change in 7/02) |
| 4Q02 | 9.6% |
| 1Q03 | 9.6% |

> 3.    *MCI's Response to the New USF Tax*

The MCI personnel who participated in the decision to fully recover MCI's USF tax with a separate line item charge (the FUSF) have testified without qualification that they had

16

no communications with representatives of either AT&T or Sprint, and they were unaware of any other MCI employees having such communication.  Following is the FUSF rates charged by MCI Small Business, MCI Business, and MCI Residential for the period from January 1, 1998 through March 31, 2003:

| Quarter | Small Business | Large Business | Consumer |
|---|---|---|---|
| 1Q98 | 5.0% | 4.4% | N/A |
| 2Q98 | 5.0% | 4.4% | N/A |
| 3Q98 | 5.0% | 4.1% | 5.0% / 6.0% (rate change in 11/98) |
| 4Q98 | 5.0% | 4.1% | 6.0% |
| 1Q99 | 5.0% | 4.1% | 6.0% |
| 2Q99 | 5.0% | 4.1% | 6.0% |
| 3Q99 | 6.5% | 4.5% | 7.2% |
| 4Q99 | 6.5% | 4.5% / 5.95% (rate change in 11/99) | 7.2% |
| 1Q00 | 6.5% | 5.95% | 7.2% |
| 2Q00 | 6.5% | 5.95% | 8.3% |
| 3Q00 | 6.5% | 5.95% | 8.3% |
| 4Q00 | 6.5% | 7.5% | 8.3% |
| 1Q01 | 6.5% / 8.2% (rate change in 2/01) | 7.5% | 8.3% / 9.9% (rate change in 2/01) |
| 2Q01 | 9.3% | 7.5% | 12.0% |
| 3Q01 | 9.3% | 7.5% | 12.0% / 9.9% (rate change on 9/1/01) |
| 4Q01 | 9.3% | 7.5% | 9.9% |
| 1Q02 | 9.3% | 7.5% / 9.1% (rate change in 2/02) | 9.9% |
| 2Q02 | 9.3% | 9.1% | 9.9% |
| 3Q02 | 9.3% | 9.1% | 9.9% |
| 4Q02 | 9.3% | 9.1% | 9.9% |

17

| 1Q03 | 9.3% | 9.1% | 10.5% |

### C.      August 2001: Detariffing

Prior to August 2001, long distance carriers were required to set forth the charges and other terms and conditions of their service in public filings known as tariffs. The tariffs specified the carrier's charges relating to the Universal Service Fund. Effective August 1, 2001, the FCC eliminated the tariffing requirements for long distance carriers. For certain services the FCC continued to require that carriers post their rates, including USF charges, on their Internet web sites. Effective August 1, 2001, AT&T, MCI, and Sprint were required to cancel their tariffs. The terms and conditions of service were thereupon governed by agreements with customers.

### D.      Efforts to Revamp the USF System

A number of carriers, including AT&T, MCI, and Sprint, participated in various efforts to urge the FCC to modify the USF assessment system. In 1999, a proposal for regulatory action was developed by an ad hoc lobbying group known as the Coalition for Affordable Local and Long-Distance Service (CALLS). Its members were AT&T, Bell Atlantic, Bell South, GTE, SBC, Sprint, and MCI (from March 1999 until approximately May 1999). CALLS submitted to the FCC a proposal for regulatory action on July 29, 1999, which (in a modified form) the FCC adopted effective May 31, 2000. Some of the participants in CALLS (Bell Atlantic, Bell South, GTE, and SBC) were local exchange carriers (LECs). On May 8, 2001, the FCC issued a Notice of Proposed Rulemaking seeking

18

comment on "[h]ow to streamline and reform both the manner in which the Commission assesses carrier contributions to the Universal Service Fund and the manner in which carriers may recover those costs from their customers."

Following the issuance of this Notice of Proposed Rulemaking, the Coalition for Sustainable Universal Service (CoSUS) was formed.  Its membership consisted of three carriers – AT&T, Level 3 Communications, and WorldCom – and two groups of business customer users – the e-Commerce and Telecommunications Users Group and the Ad Hoc Telecommunications Users Committee. The CoSUS proposal called for the FCC to abrogate the use of a revenue-based assessment system, and instead to require each customer to contribute a set amount for each of its "connections" to the telecommunications network.

On December 13, 2001, AT&T filed a petition with the FCC in which it argued that the lag-based contribution mechanism was having a negative impact on its competitive position, and asked the FCC to grant it a waiver to permit it to contribute to the USF program on the basis of *projected* revenues, rather than historical, lagged revenues.  AT&T explained that such a waiver would permit it to *lower* its USF rate.  Sprint, MCI, and other carriers opposed the petition.  In June 2002, the FCC denied AT&T's Waiver Petition, noting that it was already contemplating changes to the contribution mechanism, and that AT&T should not be permitted a waiver in those circumstances.

Until the third quarter of 2002, the FCC contribution factor was applied to prior period revenues *including* USF charges, while AT&T's percentage UCC rate was applied to current period revenues *excluding* the USF charge.  The FCC eliminated this "circularity" from its

19

assessment methodology effective in third quarter of 2002 by ordering that carriers could exclude the portion of their revenue attributable to its USF recovery line item when reporting revenue to USAC.

On December 12, 2002, the FCC issued its Interim Modification Order, which made "several interim modifications to the existing federal universal service contribution system." The changes took effect as of April 1, 2003. The Interim Modification Order pointed out that under the existing system, in which USF contributions were based on revenues in earlier periods, carriers such as AT&T, MCI, and Sprint were "particularly disadvantaged . . . because they have experienced sharp declines in their interstate revenues" over time and, thus, were "recover[ing] their contributions from a revenue base smaller than the one assessed." Under the Interim Modification Order, the USF tax imposed on a carrier for each upcoming quarter was equal to the contribution rate multiplied by the carrier's forecast of projected revenues during the upcoming quarter. The contribution rate was determined by aggregating the projected revenues of all reporting carriers. The FCC indicated that it had initiated a proceeding in 2002 to determine "whether to continue allowing carriers to mark up their universal service line items" above the federal factor "to account for uncollectibles and administrative costs." The FCC sought "to address consumer concerns regarding disparate contributor recovery practices" by permitting carriers to include a separate charge on their bills attributable to the Universal Service Fund, but ordering that this separate charge could not exceed the contribution factor rate. Carriers also were permitted to include a separate line item charge for administrative expenses. The FCC determined that this

approach promoted billing transparency and provided carriers flexibility to recover legitimate administrative costs.

Effective April 1, 2003, after the method of calculating the contribution factor had changed, the FCC raised the contribution factor from 7.5% to 9.1%. From April 2003 onward, virtually all long-distance carriers, including AT&T, Sprint, and MCI, had a separate line-item charge for USF equal to the contribution rate set by the FCC.

### E.    Impact of Competition on Prices for Long-Distance Service

After the incumbent local exchange carriers began entering the long-distance markets in 1999-2000, there were "significant decreases in per minute prices of long distance services." Average per-minute prices for AT&Ts long distance residential service dropped from 20.43¢ in 1999 to 10.96¢ in 2004, while long distance voice revenues for residential service dropped from approximately $18.97 billion in 1999 to $4.81 billion in 2004. Average per-minute prices for AT&T's long distance service for business customers dropped from 9.5¢ in 1999 to 3.4¢ in 2004, while long distance voice revenues dropped from approximately $15.06 billion in 1999 to $8.12 billion in 2004. Discount residential prices of AT&T, MCI, and Sprint fell from approximately 12¢ per minute in 1998 to approximately 8¢ in 2001. The prices of AT&T's "All-in-One" plan for business customers fell from approximately 12¢ per minute in 1999 to about 7¢ in 2004.

AT&T also periodically tracked the "net prices" available under its customized offerings to medium and larger-sized business customers. These data show that the fully discounted net rate available to middle market business customers for switched outbound

21

long distance service decreased from 5.88¢ per minute in January 2001 to 4.55¢ in September 2004, a total decline of 23%. The fully discounted net rate available to large, global scale customers fell from 5.78¢ per minute to 4.03¢ per minute over the same period, a decline of 25%.

### F.   **AT&T's Contracts with Its Customers**

#### 1.   *Residential Customers*

After detariffing, AT&T's relationship with its residential customers was governed by the Consumer Services Agreement (CSA). The CSA provided that "You [the customer] agree to pay us [AT&T] for the Services at the prices and charges listed in the AT&T Service Guides." It explained that the AT&T Service Guides "contain the specific prices and charges, service descriptions and other terms and conditions not set forth here that apply to each of your Services." The CSA advised that this Service Guide (the "Consumer Service Guide") was available on AT&T's website. The Consumer Service Guide contained a section entitled "Miscellaneous Charges and Taxes" and, among other things, that section listed the UCC rates. Under a subsection entitled "Rates and Charges," the Consumer Service Guide disclosed the UCC rate.

During the period from August 1, 2001, until March 31, 2003, the Consumer Service Guide provided as follows with respect to the UCC: "The Universal Connectivity Charge is equal to [X]% of your total billed state-to-state and international charges (excluding taxes)." Whenever AT&T increased its UCC charge to residential customers, it substituted the new percentage in this provision. For example, as of July 1, 2002, when AT&T's UCC charge

22

to residential customers was 11%, the above provision stated: "The Universal Connectivity Charge is equal to 11% of your total billed state-to-state and international charges."  It is undisputed that AT&T charged its residential customers precisely the percentage listed in the Consumer Service Guide.

### 2.    Business Customers

After detariffing, AT&T's relationship with its small business customers was governed by the AT&T Business Services Agreement (BSA).  The BSA provided that "[y]ou [the customer] agree to pay AT&T for you or your Users' use of the Services at the charges specified in the AT&T Service Guide, as amended from time to time."  It also advised that this Service Guide (the "Business Service Guide") was available on AT&T's website.  A provision of the Business Service Guide states that the UCC recovers not only the amounts that AT&T pays to the FCC "directly," but also amounts paid "indirectly" as well as "administrative costs."

AT&T's relationship with its medium and large business customers was typically governed by signed contracts.  They were typically the result of the customer's Requests for Proposal in which AT&T competed with other carriers for the customer's business.  The signed contracts with medium and large business customers all incorporated the terms of the Business Service Guide.

Thus, all of AT&T contracts with business customers – small, medium, and large business customers alike – incorporated the terms of the Business Service Guide.  The Business Service Guide contains a section entitled "General Terms and Conditions" and,

among other things, that section disclosed the UCC rate applicable to all business customers.

Under a subsection entitled "Payments and Charges," the Business Service Guide disclosed

the precise rate that business customers would pay for UCC.  This disclosure varied by date.

Between August 1, 2001, and March 31, 2003, the relevant portion of the Business Service

Guide provided as follows:

> Services provided pursuant to this Service Guide (not including exempt
> Services listed below) are subject to an undiscountable monthly Universal
> Connectivity Charge.  The Universal Connectivity Charge is [X]% of the
> Customer's total net interstate and international charges, after application of
> all applicable discounts and credits with respect to charges billed on or after
> [DATE].

Whenever AT&T increased its UCC charge to business customers, it substituted the new

percentage in the above provision.  For example, as of July 1, 2002, when AT&T's UCC

charge to small business customers was 9.6%, the quote above said that the "Universal

Connectivity Charge is 9.6% of the Customer's total net interstate and international charges

. . . billed on or after July 1, 2002."  It is undisputed that from August 1, 2001, to March 31,

2003, AT&T charged its business customers precisely the percentage listed in the Business

Service Guide.

### III.   Plaintiffs' Statement of Facts

Following are the facts that plaintiffs rely on to withstand AT&T's motion for

summary judgment.  Consistent with the well established standard for evaluating a motion

for summary judgment, these facts are either uncontroverted or stated in the light most

favorable to plaintiffs, the nonmoving parties.

24

A.      **Overview of the Telecommunications Market**

1.      *Market Concentration*

During the time in which the carriers made their initial decisions with regard to USF recovery fees, the relevant telephone long distance markets were characterized by a small number of firms that together accounted for a large majority of long distance service revenues.  Between 1998 and 2004, AT&T, MCI, and Sprint together accounted for at least 61%, and as much as 74%, of long distance toll revenues nationwide.  The year 2004 is the most recent date for which the FCC has made the toll service revenue information available.  A majority of total toll service revenues has been concentrated in the hands of the carriers as shown in the following table.

PERCENTAGE SHARES OF TOTAL TOLL SERVICE REVENUES
(ALL LONG DISTANCE PROVIDERS,
EXCLUDING LOCAL TOLL OPERATIONS OF INCUMBENT LECs)

| Year | AT&T | Sprint | MCI | World-Com | Bell-South | Qwest | SBC | Verizon | Others |
|------|------|--------|-----|-----------|-----------|-------|-----|---------|--------|
| 1984 | 90.8 | 2.7 | 4.8 | 0.6 | | | | | 1.1 |
| 1985 | 86.9 | 3.5 | 5.9 | 0.8 | | | | | 2.9 |
| 1986 | 82.5 | 4.8 | 8.2 | 0.9 | | | | | 3.6 |
| 1987 | 79.2 | 5.8 | 9.7 | 1.0 | | | | | 4.3 |
| 1988 | 75.1 | 7.2 | 11.4 | 1.2 | | | | | 5.1 |
| 1989 | 68.0 | 8.4 | 13.4 | 2.5 | | | | | 7.6 |
| 1990 | 65.5 | 9.7 | 14.2 | 2.7 | | | | | 8.0 |
| 1991 | 63.8 | 9.9 | 15.2 | 2.8 | | | | | 8.4 |
| 1992 | 57.7 | 9.1 | 15.6 | 2.9 | | | | | 14.7 |
| 1993 | 52.4 | 8.9 | 15.9 | 3.2 | | | | | 19.5 |
| 1994 | 52.7 | 9.6 | 16.5 | 3.1 | | | | | 18.1 |

| 1995 | 49.0 | 9.3 | 18.7 | 4.6 | | | | | 18.4 |
|------|------|-----|------|-----|-----|-----|-----|-----|------|
| 1996 | 44.5 | 9.0 | 18.5 | 5.1 | | | | | 22.9 |
| 1997 | 43.7 | 9.5 | 18.9 | 6.5 | | | | | 21.4 |
| 1998 | 42.5 | 8.4 | 23.2 | | | | | | 25.9 |
| 1999 | 39.9 | 9.7 | 23.4 | | | | | | 27.0 |
| 2000 | 37.0 | 8.8 | 21.9 | | | 3.0 | 0.2 | 1.1 | 28.1 |
| 2001 | 36.3 | 9.0 | 22.7 | | 0.3 | 3.4 | 0.7 | 1.5 | 26.1 |
| 2002 | 34.9 | 9.0 | 22.4 | | 0.6 | 4.1 | 1.1 | 1.8 | 26.1 |
| 2003 | 30.7 | 8.5 | 21.6 | | 1.2 | 3.8 | 2.3 | 3.2 | 28.7 |
| 2004 | 34.9 | 8.7 | 17.2 | | 2.2 | 5.9 | 4.5 | 4.1 | 22.5 |

The FCC has delineated (1) interstate calls sold to residential and small business customers ("mass markets"), and (2) interstate calls to larger business customers ("larger business market") as relevant antitrust product markets. The FCC has delineated the U.S. nationwide market as a relevant antitrust geographic market for mass markets and the larger business market.

### 2. *Structural Conditions*

During the relevant time period, there was substantial excess capacity in the long distance industry.

### 3. *Barriers to Entry*

Long distance services are provided using extensive fiber optic networks and other equipment. These networks have substantial economies of scale and significant fixed costs. Firms competing in these markets also spend significant resources on advertising.

### 4. *Observable Prices*

Prior to August 2001, the major interexchange carriers submitted tariff transmittals to the FCC. The tariff transmittals detailed the terms and prices for their various interstate and international telecommunications services, and also included discrete sections indicating the particular USF recovery rate currently charged by the carriers. These tariff documents were publicly available, and they provided viewers with timely information concerning the specific USF percentages levied by AT&T, MCI, and Sprint on their residential and business long distance offerings. The major interexchange carriers' tariffs publicly disclosed the rate schedules for interstate and international telecommunications services. AT&T's Ellen Reid would monitor Sprint and MCI's changes to USF through tariff filings or through service guides.

**B.     Access Reform**

The Telecommunications Act of 1996 (the "1996 Act") led the FCC to issue the 1997 Access Charge Reform Order. In that Order, the FCC developed a plan that "phase[d] out significant implicit subsidies in the access charge rate structure, while taking into account universal service concerns of affordability and access." AT&T "pledged" to pass these savings "from lowered access charges . . . along to [its] customers." The Universal Service Fund was designed to ensure access to affordable telecommunications for consumers who live in areas where the cost of providing service is prohibitive, to low-income consumers, to eligible schools and libraries, and to rural health care providers. The USF and other programs were "implemented in order to offset the subsidies lost as access charges" were

reduced.  Owing to the size of the USF contribution, the decision to recover USF "was a straightforward decision in most people's minds based on the order of magnitude."

Before the FCC's 1997 Access Reform order, AT&T asked the FCC to adopt a USF mandatory end-user surcharge.  In May 1996, Sprint agreed with and adopted AT&T's position that contributions to the fund should be through an explicit end-user surcharge. WorldCom "assert[ed] that anything other than a line item on a customer bill . . . does not conform with the Act."  Sprint argued to the FCC that USF charges "differ from other costs of doing business because universal service costs cannot be competed away through greater efficiency."  MCI told the FCC that it would not assume the expense of USF, but that it would instead pass through the USF charge to its customers.  MCI advocated that "'Competitive neutrality' should be added as a universal service principle" and "should apply to the collection and distribution of funds."

In August 1997, an AT&T employee from a project team stated in an interoffice memorandum that "[t]he intent is to retain as much of the savings from the reductions occurring in the per minute access charges as possible . . . .  Also, we have assumed that with respect to this action, our competitors will follow our lead."  In another internal document from 1997, another AT&T employee stated that "as long as all IXC's are passing on the charges, no single IXC would find this to be a competitive differentiator."[7]  In March 1998, Thomas Dagger of AT&T Legal and Government Affairs stated that "[a]bsent extraordinary

---

[7] AT&T points out that this document relates to 900 Services only, which are not at issue in this case.

circumstances (and business unit concurrence), AT&T will not agree to flow through 100% of the access reductions in the form of pure rate reductions measured against prior period volumes." In an April 1998 internal AT&T Proprietary Question and Answer document, AT&T stated that federal USF costs "cannot be competed away, and any expectation to the contrary would belie a fundamental misunderstanding of competitive markets." AT&T further stated that "it would be counterproductive" to include USF in a competitive price. Later, in a January 2002 email from Joel Lubin of AT&T Legal and Governmental Affairs, he stated that "if I remember correctly . . . we said that we wouldn't flow thru any of the access reductions for the first half of the year [referring to 1998] to mitigate the fact that we didn't put a line item in place for consumer."

### C. USF Pass Through

In May 1997, the FCC explicitly rejected the carriers' positions and stated: "[W]e . . . reject commenters' suggestions that the commission mandate that carriers recover contribution through an end-user surcharge." The FCC imposed the USF charges on the carriers and specifically declined to impose it on consumers. The FCC concluded that dictating a manner and method of recovery of the USF contribution would run counter to Congress's mandate to deregulate the telecommunications industry. The FCC stated that the carriers "will be permitted, but not required, to pass through their contributions." The FCC noted that if carriers "decide to recover their contribution costs from their customers, the carriers may not shift more than an equitable share of their contributions to any customer or group of customers." The FCC further stated that if the carriers "choose to pass through part

of their contributions and to specify that fact on customers' bills," they "must be careful to convey information in a manner that does not mislead by omitting important information that indicates that the contributor has chosen to pass through the contribution" and they must convey information that "accurately describes the nature of the charge." The FCC stated that "the universal service contribution is not a federally mandated direct end-user surcharge" and that it "believ[ed] that it would be misleading for a carrier to characterize its contribution as a surcharge." The FCC recognized that "[a]s competition intensifies in the markets for local and interexchange services in the wake of the 1996 Act, it will likely lessen the ability of carriers and other providers of telecommunications to pass through to customers some or all of the former's contribution to the universal service mechanisms."

Neither the Act nor the FCC imposed a mandate on telecommunications carriers to recover any or all of their USF expenses by passing on the USF to customers. The Act also did not establish a timetable for accomplishing any recovery. AT&T recognized that "[t]he amount of the USF is regulated, but recovery is not" and that "AT&T is mandated to pay these charges, however, decision and method of recovery is left up to individual interexchange carriers." MCI also admitted that "there was no legal requirement to pass [USF] through."

The carriers could have included USF recovery in the prices for the long distance services upon which USF is assessed by increasing per-minute rates. Before 1998, USF used to be a part of "access revenues that were collected from the ILEC, and it was part of the per-minute rate that IXCs paid the ILEC for access." When Randy Wright with Sprint was asked

if there were discussions to increase the per-minute rate to recover the cost of the USF contribution, he responded that "we were trying to evaluate all of our options, and I think it's fair to say that raising per-minute rates to respond may have – may have been discussed."

**D.    USF Implementation**[8]

In January 1998, AT&T, Sprint, and MCI each filed tariffs for their Business MTS and large business customers containing USF surcharges at rates above the FCC's contribution factor.  MCI and Sprint set their initial surcharges for both business and residential customers at rates above the FCC's contribution factor.  For its business customers, AT&T set its initial USF surcharges at rates above the FCC's contribution factor.  AT&T used a tax-like, line item surcharge called the "Universal Connectivity Charge" on its bills to recover USF.  Sprint used a tax-like, line item surcharge called the "Carrier Universal Service Charge" on its bills to recover USF.  MCI used a tax-like, line-item surcharge called the "Federal Universal Service Fee" on its bills to recover USF.

AT&T's Director of Strategic Planning, Ellen Reid, testified that AT&T set its residential per-line rates as follows: First, AT&T calculated the number of residential "lines" or "accounts [AT&T] had."  Then AT&T "took [its USF] expense" and "divided [that USF

---

[8] Plaintiffs also rely on what they contend is evidence that establishes that component price-fixing can result in an antitrust violation.  The type of evidence advanced by plaintiffs on this point is not really appropriate for a summary judgment record and therefore the court does not consider it here.  Nonetheless, the court wishes to note that plaintiffs' argument on this point does not impact the court's resolution of AT&T's motion because plaintiffs raised this argument in response to AT&T's argument that plaintiffs have not demonstrated that each class member was injured by the alleged agreement.  As explained below, the court finds that AT&T is not entitled to summary judgment on this issue in any event.

expense] by lines" for the amount of USF AT&T would have to collect to recover an amount equal to the contribution factor. AT&T then "marked it up for our collectables." AT&T's initial per-line rate thus was effectively equal to the contribution factor plus a "markup for uncollectibles."

According to an AT&T memorandum from 1998, "AT&T's intent is to pass both these charges on to customers, so that they are recognized as 'tax-like' assessments required by the FCC. In this way, the customers will not perceive that these are fees developed by AT&T or the other IXC's to generate revenue." AT&T's Stephanie D'Argenzio stated in 1998 that the "rationale for [AT&T] going to a percentage fee for USF was . . . . Going from a flat fee to percentage is more 'hidden' than if we just increase the flat fees."

Sprint executives never viewed the USF as something to use as a competitive factor. In 2000, Sprint explained that its "past strategy has been one not based on competition, its helpful to know that information when other executives ask." Sprint's view was that the "USF is basically a tax [and thus] an industry standard should not be considered price fixing and is probably appropriate." Sprint recognized that the USF "charge is positioned as a tax to [the] consumer . . . ."

MCI issued a Customer Notification that stated:

NOTICE IN CHANGE IN TAX PRESENTATION: It is the responsibility of WorldCom to collect taxes, on behalf of thousands of governmental units, on services we provide to our customers. In an effort to ensure that taxes are calculated and displayed as clearly as possible, effective March 1, 2001, we will implement enhancements to our software that manages taxation and application of various other charges including, without limitation, Universal Service Fund (USF) charges.

1.      _Limitation of Liability Provisions_

On August 1, 2001, AT&T, Sprint, and MCI each implemented remedy and liability limiting provisions on their respective customers.  These provisions generally required mandatory arbitration, banned class actions, limited damages, banned punitive damages, and contained other similar terms and conditions.  These provisions are discussed in more detail in the court's order dated December 1, 2003.  *See generally In re Universal Serv. Fund Tele. Billing Practices Litig.*, 300 F. Supp. 2d 1107 (D. Kan. 2003).  The provisions were not identical, but they were similar in many key respects.

2.      _Contribution and USF Recovery Rates for the Carriers_

USAC regularly collects data from carriers regarding the expected funding required to meet universal service obligations.  Carriers also are required to submit information regarding their eligible quarterly and annual interstate and international service revenues. From this information, USAC submits to the FCC its projections of the funding required for the USF program in the upcoming quarter.  The FCC calculates the required funding as a percentage of the carriers' eligible revenue, which it then communicates to the industry as the "contribution factor."  For example, the contribution factor adopted by the Commission for the fourth quarter of 2006 was 9.1%.  Thus, carriers were expected to remit 9.1% of their eligible interstate and international revenues to USAC, which then oversaw the distribution of funds to promote universal service.  Since the USF program went into effect in January 1998, revenue contributions to it have been made by telecommunications carriers in the United States that provide interstate service (including the defendants here) and by certain

33

carriers providing international service (again including the defendants here).  At a rate deemed necessary by USAC, each carrier's required contribution to the USF is "based on the ratio of projected quarterly expenses of the universal support mechanisms to the" total relevant revenues.

The USF recovery rates on residential message toll services ("MTS") charged by AT&T, MCI, and Sprint from August 1998 to March 2003 and the Contribution Factor were as follows:

QUARTERLY USF CONTRIBUTION FACTORS RELEASED BY THE FCC

| Period | Contribution Factor(s) (Percent) | Date Released by FCC |
|---|---|---|
| 1Q 1998 | 3.19 / 0.72 | December 16, 1997 |
| 2Q 1998 | 3.14 / 0.76 | February 27, 1998 |
| 3Q 1998 | 3.14 / 0.75 | June 12, 1998 |
| 4Q 1998 | 3.18 / 0.75 | August 18, 1998 |
| 1Q 1999 | 3.18 / 0.58 | December 4, 1998 |
| 2Q 1999 | 3.05 / 0.57 | March 4, 1999 |
| 3Q 1999 | 2.94 / 0.99 | June 4, 1999 |
| 4Q 1999 | 5.8995 | October 8, 1999 |
| 1Q 2000 | 5.8770 | December 10, 1999 |
| 2Q 2000 | 5.7101 | March 7, 2000 |
| 3Q 2000 | 5.5360 | June 9, 2000 |
| 4Q 2000 | 5.6688 | September 8, 2000 |
| 1Q 2001 | 6.6827 | December 8, 2000 |
| 2Q 2001 | 6.8823 | March 9, 2001 |
| 3Q 2001 | 6.8941 | June 8, 2001 |
| 4Q 2001 | 6.9187 | September 12, 2001 |
| 1Q 2002 | 6.8086 | December 7, 2001 |

| 2Q 2002 | 7.2805 | March 8, 2002 |
| 3Q 2002 | 7.2805 | June 13, 2002 |
| 4Q 2002 | 7.2805 | September 10, 2002 |
| 1Q 2003 | 7.2805 | December 9, 2002 |
| 2Q 2003 | 9.1 | March 21, 2003 |
| 3Q 2003 | 9.5 | June 6, 2003 |
| 4Q 2003 | 9.2 | September 5, 2003 |
| 1Q 2004 | 8.7 | December 4, 2003 |
| 2Q 2004 | 8.7 | March 5, 2004 |
| 3Q 2004 | 8.9 | June 7, 2004 |
| 4Q 2004 | 8.9 | September 16, 2004 |
| 1Q 2005 | 10.7 | December 13, 2004 |
| 2Q 2005 | 11.1 | March 10, 2005 |
| 3Q 2005 | 10.2 | June 14, 2005 |
| 4Q 2005 | 10.2 | September 15, 2005 |
| 1Q 2006 | 10.2 | December 15, 2005 |
| 2Q 2006 | 10.9 | March 13, 2006 |
| 3Q 2006 | 10.5 | June 9, 2006 |
| 4Q 2006 | 9.1 | September 11, 2006 |

USF SURCHARGES BY CARRIER - RESIDENTIAL MTS

| Quarter | AT&T | MCI | Sprint | FCC Contribution Factor |
|---|---|---|---|---|
| 3Q 1998 | $0.93 | 5.0 / 6.0 (rate change 11/98) | 4.5 | 3.89 |
| 4Q 1998 | $0.93 | 6.0 | 4.5 / 5.8 (rate change 12/98) | 3.93 |
| 1Q 1999 | $0.93 | 6.0 | 5.8 | 3.76 |
| 2Q 1999 | $0.93 | 6.0 | 5.8 | 3.62 |
| 3Q 1999 | $0.99 | 7.2 | 6.3 / 7.1 (rate change 9/99) | 3.93 |

35

| 4Q 1999 | $0.99/$1.38 (rate change 11/99) | 7.2 | 7.1/8.4 (rate change 11/99) | 5.90 |
| 1Q 2000 | $1.38 | 7.2 | 8.4 | 5.88 |
| 2Q 2000 | 8.6 | 8.3 | 8.4 | 5.71 |
| 3Q 2000 | 8.6 | 8.3 | 8.4 / 6.8 (rate change 7/00) | 5.54 |
| 4Q 2000 | 8.6 | 8.3 | 8.6 | 5.67 |
| 1Q 2001 | 9.9 | 8.3 / 9.9 (rate change 2/01) | 9.6 / 9.9 (rate change 2/01) | 6.68 |
| 2Q 2001 | 9.9 | 12.0 | 9.9 | 6.88 |
| 3Q 2001 | 9.9 | 12.0 / 9.9 (rate change 9/01) | 9.9 | 6.89 |
| 4Q 2001 | 9.9 | 9.9 | 9.9 | 6.92 |
| 1Q 2002 | 11.5 | 9.9 | 9.9 | 6.81 |
| 2Q 2002 | 11.5 | 9.9 | 9.9 | 7.28 |
| 3Q 2002 | 11.0 | 9.9 | 9.9 / 9.6 (rate change 7/02) | 7.28 |
| 4Q 2002 | 11.0 | 9.9 | 9.6 | 7.28 |
| 1Q 2003 | 11.0 | 10.5 | 9.6 | 7.28 |

The USF recovery rates on Business MTS by AT&T, MCI, and Sprint from August 1998 to March 2003 were as follows:

USF SURCHARGES BY CARRIER - BUSINESS MTS

| Quarter | AT&T | MCI | Sprint | FCC Contribution Factor |
|---------|------|-----|--------|-------------------------|
| 1Q 1998 | 4.90 | 5.0 | 4.9 | 3.91 |
| 2Q 1998 | 4.90 | 5.0 | 4.9 | 3.90 |
| 3Q 1998 | 4.1 | 5.0 | 4.9 | 3.89 |
| 4Q 1998 | 4.1 | 5.0 | 4.9 | 3.93 |
| 1Q 1999 | 4.1 | 5.0 | 4.9 | 3.76 |

36

| | | | | |
|---|---|---|---|---|
| 2Q 1999 | 4.9 | 5.0 | 4.9 | 3.62 |
| 3Q 1999 | 4.9 | 6.5 | 4.9 / 4.3 (rate change 8/99) | 3.93 |
| 4Q 1999 | 6.6 | 6.5 | 4.3 / 6.0 (rate change 11/99) | 5.90 |
| 1Q 2000 | 6.6 | 6.5 | 6.0 | 5.88 |
| 2Q 2000 | 6.6 | 6.5 | 6.0 / 6.6 (rate change 5/00) | 5.71 |
| 3Q 2000 | 6.6 | 6.5 | 6.6 | 5.54 |
| 4Q 2000 | 6.6 | 6.5 | 6.6 | 5.67 |
| 1Q 2001 | 8.0 | 6.5 / 8.2 (rate change 2/01) | 7.5 | 6.68 |
| 2Q 2001 | 8.0 | 9.3 | 7.5 / 9.9 | 6.88 |
| 3Q 2001 | 8.0 | 9.3 | 7.5 / 9.9 | 6.89 |
| 4Q 2001 | 8.0 | 9.3 | 7.5 / 9.9 | 6.92 |
| 1Q 2002 | 10.6 | 9.3 | 7.5 / 9.9 / 8.3 (rate change to one rate for all business customers 2/1/02) | 6.81 |
| 2Q 2002 | 10.6 | 9.3 | 8.3 | 7.28 |
| 3Q 2002 | 9.6 | 9.3 | 8.3 | 7.28 |
| 4Q 2002 | 9.6 | 9.3 | 8.3 | 7.28 |
| 1Q 2003 | 9.6 | 9.3 | 8.3 | 7.28 |

The USF recovery rates on Large Business Service by AT&T, MCI, and Sprint from August 1998 to March 2003 were as follows:

USF SURCHARGES BY CARRIER - LARGE BUSINESS SERVICES

| Quarter | AT&T | MCI | Sprint | FCC Contribution Factor |
|---|---|---|---|---|
| 1Q 1998 | 4.9 | 4.4 | 4.9 | 3.91 |
| 2Q 1998 | 4.9 | 4.4 | 4.9 | 3.90 |

37

| 3Q 1998 | 4.1 | 4.1 | 4.9 | 3.89 |
|---|---|---|---|---|
| 4Q 1998 | 4.1 | 4.1 | 4.9 | 3.93 |
| 1Q 1999 | 4.1 | 4.1 | 4.9 | 3.76 |
| 2Q 1999 | 4.9 | 4.1 | 4.9 | 3.62 |
| 3Q 1999 | 4.9 | 4.5 | 4.9 / 4.3 (rate change 8/1/99) | 3.93 |
| 4Q 1999 | 6.6 | 4.5 / 5.95 (rate change 11/99) | 4.3 / 6.0 (rate change 11/1/99) | 5.90 |
| 1Q 2000 | 6.6 | 5.95 | 6.0 | 5.88 |
| 2Q 2000 | 6.6 | 5.95 | 6.0 / 6.6 (rate change 5/15/00) | 5.71 |
| 3Q 2000 | 6.6 | 5.95 | 6.6 | 5.54 |
| 4Q 2000 | 6.6 | 7.5 | 6.6 | 5.67 |
| 1Q 2001 | 8.0 | 7.5 | 7.5 | 6.68 |
| 2Q 2001 | 8.0 | 7.5 | 7.5 / 9.9 | 6.88 |
| 3Q 2001 | 8.0 | 7.5 | 7.5 / 9.9 | 6.89 |
| 4Q 2001 | 8.0 | 7.5 | 7.5 / 9.9 | 6.92 |
| 1Q 2002 | 10.6 | 7.5 / 9.1 (rate change 2/02) | 7.5 / 9.9 / 8.3 (rate changed to one rate for all business customers 2/1/02) | 6.81 |
| 2Q 2002 | 10.6 | 9.1 | 8.3 | 7.28 |
| 3Q 2002 | 9.6 | 9.1 | 8.3 | 7.28 |
| 4Q 2002 | 9.6 | 9.1 | 8.3 | 7.28 |
| 1Q 2003 | 9.6 | 9.1 | 8.3 | 7.28 |

Beginning in April 2000 and until April 2003, AT&T charged a residential UCC that exceeded the federal USF contribution factor by 2.9% to 4.7%.  The maximum difference occurred in the first quarter of 2002, when the USF contribution factor was 6.8% and AT&T's USF recovery fee was 11.5%, reflecting that AT&T charged customers nearly 70%

more than the USF contribution factor during this time.  Until April 2003, Sprint set its residential USF charge above the FCC's contribution factor, sometimes by as much as 80%. Several times, the carriers increased the residential USF rate when there was no change in the FCC's contribution factor.  The USF recovery rates charged to business customers by AT&T, MCI, and Sprint generally remained in excess of the FCC-defined contribution factor through the first quarter of 2003.

In January 2001, AT&T told customers that "[t]he amount of the percentage charge does not vary significantly among the major carriers."  In a February 2001 AT&T document called "USF Charges – What can we say?" AT&T stated that "[t]here is no difference between AT&T and MCI, and there is a nominal difference with Sprint" with respect to USF rates.  MCI recognized that individual carriers have "unique administrative costs not borne by all members of the industry" and that "the administrative cost associated [with different companies] would necessarily be different."  AT&T commented to the FCC that "because each carrier faces a different risk of non-recovery, their good-faith efforts to fashion recovery mechanisms inevitably result in line-item charges of substantially varying amounts."

MCI "discuss[ed] that the increase in consumer complaints related to the FUSF . . . could pressure the FCC to change its assessment mechanism and mandate a recovery mechanism."  AT&T similarly recognized that passing USF through as a line item resulted in "making sure that the policy decision-makers . . . knew what it was.  And if they were going to increase it, they knew the consequences of that increase.  And we're not saying it

shouldn't be increased, but if they're going to increase it for public policy considerations, the customers are going to know the consequence of that."

### 3.   *Recovery of Sunk Costs*

The carriers' federal USF payment obligations began on January 1, 1998. AT&T, Sprint, and MCI did not begin assessing USF recovery fees on residential customer bills until July 1998. According to AT&T's own estimates, AT&T paid approximately $358 million in USF expenses associated with its residential long-distance service over the first six months of 1998. AT&T chose not to recover these expenses from residential end users through a USF surcharge. Sprint also did not assess USF recovery surcharges on residential customer bills in the first six months of 1998.

In a January 2000 email from AT&T's Ellen Reid, she stated that despite the decrease in the USF contribution factor levied by the federal government, AT&T did not change its UCC rate for residential customers. The email explained that "[t]he collection of the past deficiencies (under recovery) or true-up sounds like a gray area." Thus, not changing from "the existing [1998] rate would help AT&T offset under recovery from 1998." In a December 1997 email, AT&T staff stated: "For some billers (e.g., SDN, OneNet, Data), the first bill with Universal Connectivity Charges will be in May, 1998. The May bill will include Universal Connectivity Charges accrued since January usage (*i.e., back-billing*)." With respect to AT&T's data services, in a July 1998 email, AT&T stated that AT&T planned to "back bill" UCC. AT&T recognized at that time that "Regardless of when it is first billed, however, the Universal Service Charge will be calculated looking back to January

40

26, 1998.  In response to a February 1998 request for "detailed information on AT&T's determination of the UCC," AT&T stated as follows in May 1998:

> Due to the lateness of the FCC's first assessment order (12/16/97) we were only able to bill customers for 5 months in the first half of 1998 and hence adjusted our % accordingly (roughly a 20% increase).

In April 1999, AT&T estimated that it had an over-recovery of $28 million on residential customers for the first half of 1999.[9]  In February of 2000, an AT&T employee stated that "[t]he collection of the past deficiencies (under recovery) or true-up sounds like a gray area" and inquired: "How do we collect this (increase recovery rates in the SG&A portion or uncollectibles)?  Can we support this position if the FCC were to audit?"

The FCC audited AT&T.  Contemporaneous internal AT&T documents state that AT&T was "informed that the recently conducted audit showed a $100M over-recovery for 1999 and the first 8 months of 2000."  An internal AT&T PowerPoint states "The FCC has conducted a series of audits of the major IXCs and have determined that . . . the major IXCs are adding an unreasonable level of overheads in their calculations thus inflating the collection rates further . . . ."[10]

Sprint also maintained USF recovery rates at levels higher than the USF assessment on it by the federal government in order to recoup the sunk costs of the foregone residential

_____

[9] AT&T points out that this same email indicates an under-recovery of $24 million for the second half of 1998.

[10] AT&T points out that Mr. Trevithick, the author of the PowerPoint document, testified that the quoted passage reflected his understanding of FCC audits of Qwest, Sprint, and MCI, and did not concern AT&T.

collections in the first half of 1998: "beginning in 4th Quarter 1999 and going forward,
[Sprint] will make an adjustment . . . on a quarterly basis to true up USF to billings . . . . Any
risk resulting from January - August 1999 will be offset against opportunity existing from
prior to 1999. A true-up for September - November 1999 will be made in December 1999."
In October of 2000, Randy Wright, Sprint's manager for its National Consumer Services
Organization observed that, "[h]istorically, we have tied our USF recovery rate to recover
current USF liabilities only (we have not recovered past shortfalls or managed the rate to
cover future needs)." Mr. Wright stated that the USF recovery rate charged to consumers
was not to be tied to, or determined by, the USF expenses faced by Sprint in the current
period. According to his memorandum, the increase in Sprint's USF recovery rate could "be
supported from two different perspectives" – specifically, "recovery of past deficiencies" and
"managing future needs." Mr. Wright included so-called "implicit USF" expenses already
paid by local exchange carriers but recovered in part through their network access charges
within the "recovery of past deficiencies." Mr. Wright also stated that "[i]f we increase our
USF rate on November 1 we have the opportunity to address deficiencies in our past USF
collections by about $2.3M per month."

In March of 2001, Mr. Wright stated that "Sprint and [its] direct competitors have
landed at a rate of 9.9% for USF recovery (against interstate and international revenue). We
are assuming that like Sprint, our competitors are recovering currently for current and past
USF liabilities." Mr. Wright then stated that as of March 2001, "[b]ased on our latest view
of recoveries compared to liabilities inception to date, we are not expected to be caught up

42

until some time next year." In March 2001, Sprint concluded that, including past "implicit USF expenses," Sprint had under-recovered since January 1998 a total of $88.4 million. Sprint noted that "[a]s of July 1, 2000, competitor recovery rates began to exceed current liabilities to recover previously uncollected USF contributions. Sprint began this practice in November 2000." Mr. Wright acknowledged that the recovery of past deficiencies and the creation of a reserve through over-collection to manage future USF requirements were "the only two rationale [sic] used for supporting increase in the rate at this time." According to Mr. Wright, "increasing the recovery rate can be supported by two different perspectives, recovery for past deficiencies and the fact that if the rate were to go higher, we could be building some reserve for those higher rates and we wouldn't have as much volatility in our recovery rate."

Later in December of 2000, Mr. Wright proposed another increase in the residential USF rate charged by Sprint, justifying the increase by stating:

> Our current recovery rate is 8.6%. Our current "CALCULATED" recovery rate is 6.8%. The difference in the current rate and calculated rate is the result of past USF collection deficiencies for NCO and is consistent with direct competitors in the industry. The dollar impact of the difference is approximately $2.5M per month.

Mr. Wright stated that the rates then being charged by AT&T and MCI (then WorldCom) were "not directly supported by current cost recovery calculations," which, he said, was "similar to Sprint." While the Sprint manager noted that there were "obvious risks associated with the increase," he "believe[d] the risks are outweighed by the opportunity we have to fully recover for all USF liabilities." Thus, in order "to continue to fully recover our

43

current direct costs and recover for past deficiencies at the current pace." In a March 27, 2001, email, Mr. Wright noted: "Recently, MCI/Worldcom indicated (per tariff) that they will be increasing their residential recovery rate to 12% effective April 1. We are speculating that they are increasing their rate in an attempt to speed the process of obtaining full recovery for past USF recovery deficiencies anticipating that they will be forced to lower their rate closer to the actual current liability (6.9%) in the near future."

In a January 2003 email from AT&T's Dale Lifson, he stated that "the recent FCC ruling on USF assessment and recovery will have a slight negative impact on the 2003 ACS plan -- about $35M to $45M in revenue and $10M in EBIT." Mr. Lifson stated that the FCC ruling prohibiting carriers from marking up their collection rate for "unbillables" would leave ACS lacking by approximately $27M, but he believed that AT&T "believ[ed] that [it] can find ways of collecting $17M of the $27M*, leaving an EBIT hit of $10M . . . . Depending on how 2003 results materialize vs. plan, we might decide to take this step as a means of gap closure, thereby recovering the remaining unbillables as well as additional regulatory and other costs (MCI and Sprint do this today)."

### 4.   *Prepaid Calling Card Business*

For several years, AT&T contended that revenues associated with calls made using its so-called "enhanced" prepaid calling cards when the calling card platform is located outside the state in which either the calling or the called party is located should not be included in the pool of revenues upon which USAC calculated the carrier's USF payment obligation. AT&T neither paid nor recovered its USF obligations with respect to these

prepaid calling cards prior to February 2005.  AT&T represented in its SEC filings that "by unilaterally deciding to treat 'enhanced' prepaid calling cards [as it did], it has 'saved' $160 million in universal service contributions since the beginning of 1999."  AT&T did not make USF payments to USAC on these revenues.  Neither did AT&T collect USF recovery fees from consumers purchasing the prepaid cards.

In February of 2005, the FCC determined that AT&T had not "properly reported prepaid calling card revenue."  The FCC "direct[ed] AT&T to file with USAC revised Forms 499-A" and to "pay any past due universal service amounts . . . ."  In June of 2005, AT&T prepared spreadsheets summarizing its monthly consumer unit USF revenues and expenses from January 1998 through December 2004.  In those spreadsheets, AT&T retroactively allocated to previous years these additional contributions, totaling approximately $160 million it now had to pay but for which it had foregone the opportunity to collect USF recovery fees.

5.    *Alleged Over-Recovery of USF*

AT&T claims as a USF expense for its business unit a line item called "TCG Adjustments."  According to AT&T, Teleport Communications Group ("TCG") is a local exchange company owned by AT&T.  In AT&T's accounting of USF expenses for its Business Services division, "TCG Adjustments" are "adjustments for the differences between what TCG was able to recover and what they were billed by USAC, because TCG is a separate legal entity, and so there was a separate 499 filing for them."  AT&T claims these TCG Adjustments as USF expenses beginning in 2000 and continuing through 2004.

45

AT&T overcollected USF at times between mid-1998 until April 2003.  Specifically, AT&T's expert, David L. Kaserman testified in his deposition that he believed AT&T over-recovered in 2002.  Plaintiffs also have directed the court's attention to evidence from which a rational trier of fact could find that AT&T was generally aware that Sprint and MCI were over-recovering at times up to the spring of 2001, but plaintiffs have not pointed to any specific evidence that Sprint or MCI over-recovered during the relevant time period, i.e., between August 2001 and April 2003.  Beginning in April 2003, the FCC prohibited the carriers from charging USF recovery rates in excess of the federally mandated USF contribution factor.

### E.   Meetings

AT&T, Sprint, MCI, and others participated in the Competitive Long Distance Coalition ("CLDC"), which lobbied Congress over pending telecommunications reform legislation in the mid-1990s.  AT&T, Sprint, and MCI were also members of the Coalition for Affordable Local and Long Distance Service ("CALLS"), which lobbied the FCC for USF and access reform commencing in 1999.  AT&T, Sprint, and MCI participated in additional coalitions and joint projects, including: the Local Telephone Competition Coalition (1996), the Competitive Telecommunications Association (1997), the Local Competition Users Group (1997), and the Coalition for Competitive Local Phone Service (1997).

Plaintiffs rely on a variety of random evidence to support an inference of conspiracy.  Most of this evidence, however, pre-dates the alleged conspiracy.  As this court explained

46

in ruling on the defendants' original motions to dismiss in this MDL proceeding, plaintiffs' pre-detariffing antitrust claims are barred by the filed-rate doctrine. *See In re Universal Serv. Fund Tele. Billing Practices Litig.*, 300 F. Supp. 2d 1107, 1142-43 (D. Kan. 2003). Any arguably collusive conduct that occurred prior to detariffing on August 1, 2001, then, is not actionable except insofar as a rational trier of fact could conclude that the conduct is probative of collusion after that date. Accordingly, the court discounts the vast majority of this evidence relied on by plaintiff. This includes plaintiffs' Statements of Facts paragraphs 130-133, 136, 137, 140, 142-143, 145, 150-152, 153, 155-157, 159-168, 171-172, and 179-81. The court does note, however, that a rational trier of fact could infer from this evidence that the three carriers generally monitored the behavior of one another with respect to recovery of USF contributions and, additionally, discussed the need for reform to the USF recovery mechanism.

Turning to events which are arguably relevant to the time period in question, AT&T, Sprint, and MCI were involved in the Coalition for Sustainable Universal Service ("CoSUS"), which advocated before the FCC for further access reform relating to USF, starting in about 2000. They met and frequently communicated through CoSUS about USF matters such as regulatory reform.

An AT&T strategy document dated June 7, 2001, reported: "One of our L&GA associates talked to Sprint and Worldcom today. Both of these companies are leaning towards a per line methodology. While both have recognized the inherent issues with implementation on the business side, they both feel the advantages out weigh [sic] the short

term costs.  Worldcom is greatly concerned the RBOCs will pressure the FCC to assess USF on all revenues included in any bundled offer, and thus create a competitive disadvantage for bundles -- this is their stated rationale for advocating a per line methodology."[11]

Later that year, AT&T employees within its Alascom subsidiary discussed the activity of the three major interexchange carriers before the FCC.  An August 2001 email states that the "carriers and the FCC have been having meetings to see if we can do this another way." While the FCC apparently was "pushing" for USF recovery charges to be calculated as a percentage of customer revenue, "Sprint/MCI and AT&T have all agreed that they would prefer a per line charge instead of a percentage."[12]

On August 29, 2001, an AT&T internal document discussing public comments filed with the FCC in response to an FCC Notice of Proposed Rulemaking noted as follows: "The comments cycle is completed for all carrier input with the FCC. – AT&T, Sprint & Worldcom all agreed to assess the [USF] fee as a per line charge."  In 2002, AT&T's Joel Lubin informed MCI that certain markups of the USF recovery rate "might be hard to swallow."  Randy Whitt, an MCI attorney, testified that in the context of joint lobbying efforts in front of the FCC, he met with Sprint's Dick Juhnke and Norina Moy to "compare notes."  Mr. Whitt also met with AT&T's Joel Lubin and Mark Lemler.

---

[11] AT&T notes that this language refers to a conversation regarding proposed regulatory changes at the FCC level, which AT&T claims is a constitutionally protected activity.

[12] Again, AT&T points out that this document refers to lobbying efforts at the FCC to try to reform the USF assessment mechanism.

Plaintiffs also point out that former Sprint executives assumed leadership roles at AT&T.  During periods relevant to this dispute, the following former Sprint executives assumed positions at AT&T.  These include Dave Dorman, AT&T Chairman; Chris Roomey, AT&T CFO; John Palumbo, AT&T President; and Bill Hanning, AT&T ABS President.

### F.      Monitoring of Tariffs

The carriers have used tariffs to monitor the activities of each other.  Tariff transmittals could indicate an upcoming change to a carrier's prevailing USF recovery rate before the change was effectuated.  With the impending detariffing, in 2000 an AT&T employee stated in an email that "the good news is that we no longer need to file tariffs with the FCC for new offers/promos/price changes.  The not so good news is while tariffs are going away, all of the information previously included in the tariffs will now be in service guides.  Service guides will be posted for public reference on the Web."  These service guides contain all information which had previously been shared through the filed tariffs. AT&T, MCI, and Sprint are still required to file tariffs on certain services.  As such, they continue to file tariff transmittals with the FCC that provide information regarding general terms of USF surcharges.

### G.      Implementation of Dispute Resolution Provisions

In early 2001, AT&T's Wesley Dvorak wrote to others at AT&T including Ellen Reid, that "it would help to know . . . [w]hat our friends at MCI and Sprint are planning" in response to detariffing."  Prior to this time frame, AT&T's Louis Delery "was under the impression that there was informal discussions with some of the attorneys from MCI and

49

Sprint, so [he] had an idea as to what [he] thought they were going to do."  In approximately April 2001, Mike DelCasino of AT&T called Marybeth Banks of Sprint Legal and stated that "AT&T had included or was going to include an arbitration provision in the terms and conditions that [AT&T] w[as] sending to consumers."  AT&T's James Cicconi stated that AT&T did not "consider[] placing arbitration provisions in the contract" until detariffing.

### H.   The FCC's December 2002 Order

On December 13, 2002, the FCC ordered that carriers that elect to recover their USF contribution through a separate line item on their customers' bills not mark up their charge above the relevant USF contribution factor.  The FCC stated its concern that "the flexibility provided under our current rules may have enabled some companies to include other completely unrelated costs in their federal universal service line items."  The FCC concluded that, on a prospective basis, "it is unreasonable to describe an amount as a universal service regulatory fee when that amount varies from the contribution factor mandated by the regulator."  The Order specifically stated that carriers "have the same flexibility that exists today to recover legitimate administrative and other related costs" through a line item.  The Order became effective on April 1, 2003.

AT&T and Sprint complied with the FCCs Order, and they chose to institute new separate line-item charges on their bills for administrative expenses.  AT&T imposed a USF-related "Administrative Expense Fee" of 0.74% on April 1, 2003.  As of April 1, 2004, the Administrative Expense Fee was 0.88%.   In August of 2003, Sprint imposed an administrative fee of 0.03%.  Sprint stated that it imposed the USF Administrative Fee "to

50

recover internal administrative costs incurred by Sprint in conjunction with its universal

service contribution."

## I.        The Relevant Contract Provisions

The General Terms and Conditions of AT&T's Business Service Guide effective July

31, 2001, provide in relevant part as follows:

> AT&T may adjust its rates and charges or impose additional rates and
> charges on its Customers in order to recover amounts that it, either directly or
> indirectly, pays to or is required by governmental or quasi-governmental
> authorities to collect from others to support statutory or regulatory programs,
> plus associated administrative costs.  Examples of such programs include, but
> are not limited to, the Universal Service Fund.

Section 1.e. of AT&T's Consumer Services Agreement effective August 1, 2001,

provides in relevant part as follows:

> Taxes and Other Charges.  You must pay all taxes, fees, surcharges and
> other charges that we bill you for the Services, unless you can show with
> documentation satisfactory to us that you are exempt.  Taxes and surcharges
> will be in the amounts that federal, state and local authorities require us to bill
> you.  We will not provide advance notice of changes to taxes and surcharges,
> except as required by applicable law.

AT&T and any other firm contributing USF revenues to USAC will bear certain

administrative costs associated with the program.  In addition, firms such as AT&T that

attempt to recover USF expenses from end users will also bear certain administrative costs

associated with billing end users for USF fees and with collecting those fees as revenue.

AT&T has calculated estimates of its own under- or over-recovery on USF fees, and these

estimates take into consideration certain "overhead" administrative costs claimed by the

carrier.  According to AT&T's worksheets, "overhead" administrative costs associated with

USF among business customers ranged between 9.97% and 10.97% of billed revenue from 1998 to the first quarter of 2003.

### J.   **Plaintiffs' Experts' Opinions**[13]

Plaintiffs' experts Michael Williams and Simon Wilkie have opined that estimated business damages for the three carriers equal approximately $860.7 million, while estimated damages associated with AT&T's residential customers in California are approximately $30.1 million.  Thus, the economic damages attributable to claims in the MDL action total $890.8 million.

Professors Williams and Wilkie identified five independent bases for their conclusion that defendants' actions with respect to recovery of USF charges were contrary to their unilateral self-interests absent the existence of an agreement.  They note that the existence

---

[13] In AT&T's reply brief it has set forth pages of arguments seeking to undermine the opinions of Professors Williams and Wilkie largely based on their own deposition testimony as well as AT&T's experts' criticism of their opinions.  Because AT&T waited until its reply brief to raise these issues, however, plaintiff has not had an opportunity to respond to these arguments that AT&T raised for the first time in its reply brief.  Thus, for summary judgment purposes, AT&T has waived these arguments.  *See Green v. New Mexico*, 420 F.3d 1189, 1196-97 (10th Cir. 2005) ("Generally, the nonmoving party should be given an opportunity to respond to new material raised for the first time in the movant's reply."); *Minshall v. McGraw Hill Broadcasting Co.*, 323 F.3d 1273, 1288 (10th Cir. 2003) (argument raised for the first time in reply brief is waived).  The appropriate course of action if AT&T believed that the court should not consider their opinions for summary judgment purposes would have been to file a motion to exclude their opinions.  That way, plaintiffs would have had an opportunity to respond to AT&T's arguments.  AT&T may have valid arguments as to why plaintiffs' experts' opinions are not persuasive, but at this procedural juncture the appropriate forum for AT&T to launch that attack is cross-examination at trial.  Consistent with the well established standard for evaluating the summary judgment record, the court must view their opinions in the light most favorable to plaintiffs.

of an agreement to fix prices is indicated by observations of actions that are inconsistent with what economists understand as a Nash, non-cooperative equilibrium in a single-period oligopoly model. The two primary such models are the well-known Bertrand and Cournot models. These models are used by economists to analyze and characterize the competitive behavior of firms by analyzing empirical characteristics of the firms' conduct. Professors Williams and Wilkie estimated conduct parameters for AT&T, MCI, and Sprint, and determined that those parameters were inconsistent with Bertrand and Cournot outcomes, i.e., the companies' actions were contrary to their unilateral self-interests absent the existence of an agreement. They concluded that AT&T, Sprint, and MCI's actions are better explained by the existence of a price-fixing agreement than by the existence of Bertrand or Cournot outcomes. Although they concluded that there was no necessity to examine "all-in" prices, they nevertheless conducted two economic analyses of the carriers' underlying service prices in order to determine whether those prices declined sufficiently to offset the effects of the alleged USF price-fixing agreement. The carriers' underlying service prices did not decline sufficiently to offset the effects of the alleged USF price-fixing agreement.

Given the characteristics of the long-distance telecommunications industry, standard and well accepted economic theory predicts that a charge like the USF contribution (which is equivalent to an ad valorem tax) should not have been over-recovered by long-distance carriers in the absence of an agreement among the carriers (including AT&T and Sprint) to fix those charges. Professors Wilkie and Williams concluded that AT&T, MCI, and Sprint's over-recovery of USF charges was contrary to the firms' unilateral self-interests absent the

53

existence of an agreement. They determined on the basis of evidence discovered in this case that the major interexchange carriers sought to, and did in fact, recover past USF obligations (i.e., sunk costs) from their customers at later points in time. A basic proposition accepted in economics is that the economic decisions of firms should be based on the concept of economic cost, which excludes sunk costs. AT&T, MCI, and Sprint's actions in recovering sunk costs are contrary to the firms' unilateral self-interests absent the existence of an agreement. They analyzed price-cost margins for the major interexchange carriers' telecommunications services on which the USF charges were assessed. Ordinarily, in a market like that existing in the telecommunications industry characterized by declining market concentration, economists would expect to see price-cost margins decrease. AT&T, Sprint, and MCI's price-cost margins increased or remained constant throughout the relevant period. These trends in the price-cost margins of AT&T, MCI and Sprint are inconsistent with Bertrand or Cournot outcomes and are, therefore, contrary to the companies' unilateral self-interests absent the existence of an agreement.

They concluded that AT&T, MCI, and Sprint's near-uniform behavior in implementing and assessing their USF surcharges was contrary to the carriers' unilateral self-interests absent the existence of an agreement. Even though the USF program went into effect in January 1998, AT&T, Sprint, and MCI did not impose USF surcharges on their residential customers at that time. Instead, the carriers all instituted their USF surcharges in July 1998 for residential customers at effective rates that exceeded the FCC's contribution factor. For business customers, the carriers all instituted their surcharges in January 1998 at

rates that exceeded the FCC's contribution factor. Professors Wilkie and Williams concluded that in a competitive market, individual carriers would delay the implementation of a USF surcharge or undercut the pricing of competitors' surcharges in an attempt to attract customers.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1119 (10th Cir. 2008) (citing *Scott v. Harris*, 17 S. Ct. 1769, 1774 (2007)). An issue of fact is "genuine" if "the evidence allows a reasonable jury to resolve the issue either way." *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006). A fact is "material" when "it is essential to the proper disposition of the claim." *Id.*

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Libertarian Party v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the

movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant may not simply rest upon his or her pleadings but must "bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which he or she carries the burden of proof." *Garrison v. Gambro*, Inc., 428 F.3d 933, 935 (10th Cir. 2005). To accomplish this, sufficient evidence pertinent to the material issue "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## ANALYSIS

As explained below, the court finds that plaintiffs have raised genuine issues of material fact sufficient to withstand summary judgment on their antitrust claims against AT&T for the time period between August 1, 2001, and March 30, 2003, because the record viewed as a whole contains circumstantial evidence that tends to exclude the possibility that the alleged conspirators were acting independently with respect to their USF surcharge rates during that time period. No such evidence of a conspiracy exists, however, with respect to

56

the time period after August 1, 2003, and for that reason AT&T's motion for summary judgment on that aspect of plaintiffs' antitrust claim is granted.  As to plaintiffs' breach of contract claims, AT&T's motion is denied with respect to the AT&T subclass residential customers' claims because the court needs to evaluate the entire contract (which has not been submitted by the parties) before the court can construe its provisions.  AT&T's motion is granted with respect to the AT&T subclass business customers' claims because plaintiffs have not directed the court's attention to any evidence in the record indicating that AT&T's customers paid more to AT&T in USF recovery fees than AT&T paid in USF contributions plus administrative costs.

## I.      Antitrust Price-Fixing Claim by the Conspiracy Class

The Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce."  15 U.S.C. § 1.  Section 1 does not reach unilateral action of individuals, and requires an actual concert of action between separate entities.  *Fisher v. City of Berkeley*, 475 U.S. 260, 266-67 (1986).  A conspiracy, by definition, involves "two or more entities that previously pursued their own interests separately . . . combining to act as one for their common benefit."  *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 769 (1984).  A plaintiff must show "a conscious commitment to a common scheme designed to achieve an unlawful objective."  *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (internal quotation omitted).  The essence of such a claim "is the agreement itself.  Only after an agreement is established will a court consider whether the agreement constituted an unreasonable restraint of trade."

*Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1082 (10th Cir. 2006) (internal

citations and quotations omitted).

The Supreme Court recently summarized how parallel behavior may be considered

in a Sherman Act § 1 claim:

> Because § 1 of the Sherman Act does not prohibit all unreasonable restraints
> of trade but only restraints effected by a contract, combination or conspiracy,
> the crucial question is whether the challenged anticompetitive conduct stems
> from independent decision or from an agreement, tacit or express.  While a
> showing of parallel business behavior is admissible circumstantial evidence
> from which the fact finder may infer an agreement, it falls short of
> conclusively establishing agreement or itself constituting a Sherman Act
> offense.  Even conscious parallelism, a common reaction of firms in a
> concentrated market that recognize their shared economic interests and their
> interdependence with respect to price and output decisions is not in itself
> unlawful.
>     The inadequacy of showing parallel conduct or interdependence,
> without more, mirrors the ambiguity of the behavior: consistent with
> conspiracy, but just as much in line with a wide swath of rational and
> competitive business strategy unilaterally prompted by common perceptions
> of the market.

*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007) (internal citations, quotations, and

alterations omitted).  The challenged agreement giving rise to a conspiracy need not be in

writing or be explicit, and may be established by direct or circumstantial evidence.  *Id.*;

*Mitchael v. Intracorp. Inc.*, 179 F.3d 847, 856-57 (10th Cir. 1999).

**A.    Direct Evidence**

Plaintiffs argue that there is direct evidence that the carriers participated in the

agreement to set their USF surcharges to recover an amount of money at least equal to the

amount of money they were obligated to pay USAC.  They contend that proceedings before

the FCC (relating to what culminated in the 1997 Universal Service Order) "provided the backdrop, occasion, and cover for the carriers' pact to coordinate their responses to the impending change in the universal service assessment and contribution mechanism." According to plaintiffs, various internal documents from the carriers show numerous communications between AT&T and the other long distance carriers concerning the timing and level of recovery of USF. Plaintiffs also point to evidence of the uniformity in delay in charging USF fees during the first six months of 1998 and the carriers' subsequent over-recovery to make up for the shortfall created by that delay.

After careful consideration of the summary judgment record, the court finds that a rational trier of fact could not conclude that any of the evidence relied on by plaintiffs constitutes direct evidence that AT&T, Sprint, and MCI engaged in a conspiracy with respect to their USF charges during the relevant time period, which is after August 1, 2001.  As explained previously, the court granted AT&T's (and, at the time, Sprint's) motion to dismiss this claim insofar as it is based on alleged anti-competitive behavior prior to detariffing because up until that time the carriers were shielded from antitrust liability under the filed-rate doctrine. *See In re Universal Serv. Fund Tele. Billing Practices Litig.*, 300 F. Supp. 2d 1107, 1142-43 (D. Kan. 2003); *see Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 417 (1986) (holding the filed-rate doctrine bars antitrust damage claims even if the carriers colluded to set artificially high rates); *Keogh v. Chicago & Nw. Ry. Co.*, 260 U.S. 156, 163 (1922) (holding the filed-rate doctrine bars antitrust damage claims).  Thus, the fact that AT&T, Sprint, and MCI may have tacitly agreed that they would all implement

their USF charges by way of tax-like line item charges or that they may have agreed to act with some degree of uniformity during the early years of their USF charges prior to detariffing is not direct evidence of a conspiracy post-detariffing. "Direct evidence in a Section 1 conspiracy case must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted." *Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1083 (10th Cir. 2006) ("With direct evidence the fact finder is not required to make inferences to establish facts."). Here, a fact finder considering the so-called "direct evidence" relied on by plaintiffs of alleged conspiratorial behavior prior to August 1, 2001, would be required to make inferences to establish that any such conspiracy existed after that date. Thus, plaintiffs' antitrust claim cannot rest on direct evidence of alleged conspiratorial behavior prior to August 1, 2001. That is not to say that this evidence is necessarily irrelevant. But, it is relevant only to the extent that a fact finder might infer from this evidence that it is probative that a price-fixing agreement existed between the carriers after August 1, 2001. Accordingly, the court rejects plaintiffs' arguments based on a direct evidence theory.

> ### B. <u>Circumstantial Evidence</u>

The traditional summary judgment analysis is altered somewhat when the plaintiff in a Sherman Act § 1 case relies solely on circumstantial evidence to prove concerted action. *Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1257 (10th Cir. 2006). "In that case, 'antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

588 (1986)).   Conduct that is as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy.   *Id.* Consequently, an antitrust plaintiff relying solely on circumstantial evidence must come forward with "evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently."   *Matsushita*, 475 U.S. at 588 (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)); *accord Abraham*, 461 F.3d at 1257.   The Tenth Circuit has explained:

> *Matsushita*, then, establishes a two-part inquiry for evaluating the propriety of summary judgment in an antitrust conspiracy case: (1) is the plaintiff's evidence of conspiracy ambiguous, i.e., is it as consistent with the defendants' permissible independent interests as with an illegal conspiracy; and, if so, (2) is there any evidence that tends to exclude the possibility that the defendants were pursuing these independent interests.

*Gibson v. Greater Park City Co.*, 818 F.2d 722, 723-24 (10th Cir. 1987).   "In other words, if the evidence is as consistent with permissible independent business interests as with an illegal conspiracy, then the plaintiff fails to create a fact issue on the existence of a section one conspiracy *unless* the ambiguity is negated by evidence tending to exclude the possibility that the defendants were pursuing independent interests."   *Key Fin. Planning Corp. v. ITT Life Ins. Corp.*, 828 F.2d 635, 639 (10th Cir. 1987).   "That is, the antitrust plaintiff must present evidence that the alleged conspirators 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.'"   *Abraham*, 461 F.3d at 1257 (quoting *Monsanto*, 465 U.S. at 764).   The acceptable inferences the court can draw from circumstantial evidence vary with the plausibility of the plaintiffs' theory and the danger

associated with such inferences. *Mitchael*, 179 F.3d at 858; *see also Abraham*, 461 F.3d at 1257 (noting "the plausibility of an antitrust plaintiff's claim is important").

In this case, plaintiffs advance a variety of circumstantial evidence from which they contend that a rational jury could infer that the carriers had a price-fixing agreement with respect to their USF charges. They contend, for example, that the carriers engaged in parallel business behavior with respect to passing through USF surcharges as separate line items, charging the same or similar rates above the USF contribution factor, engaging in *ex post* efforts to recover their sunk USF expenses, over-recovering USF expenses, and simultaneously imposing similar arbitration and liability limiting provisions. Additionally, plaintiffs rely on their experts' opinions (which, according to plaintiffs, are based on well established economic theory) that the carriers' conduct parameters indicated collusion, that a charge like the USF contribution should not have been over-recovered in the absence of an agreement among the carriers to fix those charges, that a firm engaged in independent pricing decisions will not price with reference to past (sunk) costs but rather only with reference to forward-looking costs, that the carriers would not have found it profit-maximizing to have over-recovered USF contributions absent an agreement among them regarding their USF surcharges, and that the fact that their price-cost margins for the underlying services increased during the relevant time period is inconsistent with economic models and demonstrates that their actions were contrary to their unilateral self-interests absent the existence of an agreement. Plaintiffs also argue that the carriers had a rational motive to collude, that their meetings provided an opportunity to conspire, and that they signaled and

monitored through tariffs.  AT&T, of course, seeks to discount all of this evidence because, according to AT&T, the evidence relied on by plaintiffs does not tend to rule out the possibility that the defendants were acting independently.

The court begins with the evidence concerning the early years of implementing the USF charges.  Once again, evidence of the carriers' collusive behavior during that time period is, standing alone, not actionable as an antitrust violation.  They were free to collectively decide to bill customers by way of a separate USF line-item charge.  Indeed, given the history of the proceedings before the FCC when it revamped the USF contribution system, it is no wonder that the carriers all chose that recovery mechanism.  The carriers advocated to the FCC for such a recovery method and it made imminent sense, from a business standpoint, given their need to recover their USF contributions while trying to keep advertised per-minute rates to a minimum in light of increasing competition in the industry. That way, they could "blame" the government for that portion of customers' bills.  Therefore, when the FCC said that it would permit (but not require) carriers to recover their USF contributions by way of a line item, it was a good business decision for the entire industry to do so.  Even FCC Chairman Kennard indicated that was the best recovery mechanism. Similarly, it was an imminently reasonable business decision for the carriers to seek to recover the full amount of their USF contributions.

The court discounts plaintiffs' reliance on the carriers' implementation of similar liability limiting provisions on August 1, 2001, as suggesting a conspiracy among them with respect to their USF recovery fees.  This evidence is ambiguous in the sense that it is as

consistent with the defendants' permissible independent interests as it is with an illegal conspiracy. It made perfect business sense for carriers to include these clauses in their customer contracts upon mandatory detariffing. At that point in time, they ceased being shielded from liability – as they had always been previously – under the filed-rate doctrine. Thus, by implementing these types of provisions the carriers sought to reduce the inevitable burdens of litigation. Plaintiff has not negated the ambiguity of this evidence with additional evidence tending to exclude the possibility that AT&T, Sprint, and MCI were pursuing their independent interests by including these provisions in their customer contracts.

AT&T raises similar arguably valid arguments with a myriad of other factual theories insofar as those facts could be viewed as just as consistent with permissible independent business interests as they are with an illegal conspiracy. Indeed, AT&T may ultimately persuade a jury that plaintiffs' evidence does not establish conspiratorial behavior. But, the overriding problem with AT&T's arguments at this procedural juncture is that AT&T seeks to discount each of plaintiffs' various factual theories in isolation from each other. The Supreme Court has admonished lower courts to give price-fixing plaintiffs "the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean of scrutiny of each." *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962); *accord Aspen Highlands Skiing Corp. v. Aspen Skiing Co.*, 738 F.2d 1509, 1522 n.18 (10th Cir. 1984). "The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore Co.*, 370 U.S. at 699; *see also Aspen Highlands Skiing Corp.*, 738

F.2d at 1522 n.18 ("Plaintiff's evidence should be viewed as a whole."). In this case, when the summary judgment record is considered in its entirety, plaintiffs have come forward with sufficient "evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently," *Matsushita*, 475 U.S. at 588, that the trier of fact must resolve the issue of whether a price-fixing conspiracy existed.

Much of the conduct relied on by plaintiffs pre-dates detariffing (August 1, 2001) and, as such, it does not by itself establish the existence of conspiratorial behavior during the relevant time period. Although it does not establish an antitrust violation prior to that time, it nevertheless establishes that the carriers agreed – early on – to recover their USF contributions in a manner that would largely remove the USF charges from the ambit of competition between them. Thus, when the conspiracy class period began on August 1, 2001, the carriers had already put in place USF recovery mechanisms that were purposely designed to allow the carriers to avoid competing on USF charges. Although this is consistent with independent business interests, it shows that defendants wanted to immunize their USF surcharges from the scrutiny of customers so that they could compete on per-minute rates. It is against this historical background that the alleged conspiracy period begins.

AT&T seeks to discount plaintiffs' allegations of parallel behavior by pointing out that AT&T, Sprint, and MCI did not engage in parallel pricing. This is not surprising, of course, given that the record viewed in the light most favorable to plaintiffs demonstrates that the carriers sought to insulate themselves from competition on pricing their USF rates. Even

so, a trier of fact examining the USF surcharge tables set forth previously could find some evidence of parallel pricing behavior from August 2001 through April 2003. For example, on August 1, 2001, AT&T and Sprint both had residential USF charge rates of 9.9%. MCI's was 12%, but MCI lowered its rate the following month to 9.9%, which then matched AT&T and Sprint's rates. All of the rates were then 9.9% through the end of that year. The USF surcharge rates for business customers were never the same. But, the carriers' business USF fluctuations correspond more closely with each other than they do with fluctuations in the USF contribution factor. And, notably, these rates were always above the USF contribution factor, and at times significantly above it. Tellingly, the FCC later prohibited carriers from marking up their line-item USF charges above the relevant USF contribution factor, stating its concern that on a prospective basis "it is unreasonable to describe an amount as a universal regulatory fee when that amount varies from the contribution factor mandated by the regulator." This combination of evidence – the carriers' initial desire to remove USF surcharges from the ambit of competition along with the fact that they then uniformly charged USF surcharge rates higher than the UCC contribution factor – demonstrates the type of conscious parallelism that gives rise to a distinct plausibility that a conspiracy existed. *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993) (defining conscious parallelism as "a process, not in itself unlawful, by which firms in a concentrated market might in effect share monopoly power, setting their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions").

This plausibility of noncompetitive behavior combined with the opinions of plaintiffs' experts is sufficient for plaintiffs to withstand summary judgment. The expert reports of Professors Williams and Wilkie are thorough and comprehensive, spanning more than three hundred pages total. Although AT&T vigorously debates the efficacy of their opinions, AT&T has not moved to exclude them. As such, viewing those opinions in the light most favorable to plaintiffs, a rational trier of fact could find that their in-depth evaluation of the market and the conclusions that they derived based on econometric models and theories are valid opinions. A jury that is persuaded by and accepts their opinions could find that the actions of AT&T, Sprint, and MCI were contrary to their unilateral self interests absent the existence of an agreement and that their actions are better explained by the existence of a price-fixing agreement. Indeed, their opinions and their explanations for those opinions would be particularly helpful and informative in a case such as this where a thorough understanding of the alleged price-fixing conspiracy is laden with complex calculations. Thus, the summary judgment record, when viewed in its entirety and in the light most favorable to plaintiffs, contains evidence that tends to exclude the possibility that AT&T, Sprint, and MCI acted independently. Because the record supports an inference of concerted action, then, the issue of whether they agreed to act for their common benefit by the way they imposed USF rates on their customers is for the jury. *See, e.g.*, *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 660-61 (7th Cir. 2002) (on summary judgment the court must accept statistical evidence from the plaintiffs' economic expert as evidence of higher prices during the alleged conspiracy period); *City of Tuscaloosa v. Harcros Chems., Inc.*, 158

F.3d 548, 569-73 (11th Cir. 1998) (evidence of conscious parallelism combined with testimony of expert statistician was sufficient circumstantial evidence to survive summary judgment); *Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 790-91 (9th Cir. 1996) (expert economist opinion was sufficient to create fact issue regarding the issue of actual anti-competitive effects within the relevant market).

### C.   Injury as to Each Class Member

AT&T also seeks summary judgment on the grounds that plaintiffs cannot satisfy the impact requirement by demonstrating that each member of the class was injured by the alleged price-fixing conspiracy. An antitrust plaintiff seeking to recover under the Clayton Act must demonstrate "antitrust injury." *Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1267 (10th Cir. 2006). An antitrust injury is an "'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" *Tal v. Hogan*, 453 F.3d 1244, 1253 (10th Cir. 2006) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)); *accord B-S Steel of Kan., Inc. v. Texas Indus. Inc.*, 439 F.3d 653, 667 (10th Cir. 2006). The Sherman Act was designed to protect market participants from anticompetitive behavior in the marketplace. *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1124 (10th Cir. 2005). Thus, "[t]he antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of defendant's behavior." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990) (emphasis in original); *accord Elliott Indus.*, 407 F.3d at 1124-25.

Plaintiffs' experts have opined that under the model of perfect competition, carriers would have passed through only 95% of the USF tax and absorbed the other 5%. AT&T argues that this is insufficient because plaintiffs must show that the carriers' *total* prices would have been lower if they had not agreed to insulate this one small component from competition. The court rejects AT&T's argument that it is entitled to summary judgment on this basis. AT&T chose to pass through its USF contributions by way of a tax-like surcharge set forth as a separate line item, and it did so to avoid competing with other carriers as to that line item. Plaintiffs have adduced evidence that this surcharge was set at supra-competitive levels because of the price-fixing conspiracy. Furthermore, Professors Williams and Wilkie examined the "all-in" price and found that "the carriers' margins show they did not fall fast enough to offset the carriers' recovery in excess of 95 percent of their USF expenses." Thus, despite AT&T's arguments to the contrary, a rational trier of fact viewing the record in the light most favorable to plaintiffs could find that the carriers did not drop their prices sufficiently to offset the over-recovery of their USF obligations. Given that this is a disputed issue of fact, then, summary judgment on this basis is not warranted.

### D. Partial Summary Judgment

AT&T argues that it is entitled to partial summary judgment with respect to the period beginning on April 1, 2003, when the FCC changed the USF program by establishing a forward-looking contribution factor and ruling that no carrier could exceed the new contribution factor in its separate line-item charge. At that point in time, all of the carriers imposed line-item charges equal to the FCC contribution factor and, therefore, according to

69

AT&T, "plaintiffs can hardly claim that AT&T's decision to charge the new FCC contribution factor was contrary to its own economic interests, given this industry-wide uniformity in USF line-item rates."  AT&T further points out that plaintiffs do not have any evidence of communications about USF recovery strategy after April 2003.

In response to this argument, plaintiffs rely on this court's class certification order, where the court rejected AT&T's suggestion that the definition of the conspiracy class should be so limited temporally.  *See In re Universal Serv. Fund. Tele. Billing Practices Litig.*, 219 F.R.D. 611, 680-81 n.11 (D. Kan. 2004).  But, of course, the court was confronted with different legal standards and considerations at the class certification stage than it is faced with now on summary judgment.  The court therefore gives little weight to its prior reasoning with respect to defining the scope of the class.

Plaintiffs further argue that AT&T bears the burden of demonstrating that it affirmatively withdrew from the conspiracy.  AT&T denies that it must prove that it affirmatively withdrew from the conspiracy, and insists that plaintiffs must demonstrate that the conspiracy continued notwithstanding the new regulatory regime.  Plaintiffs are correct that, generally, to terminate one's liability for the continuing illegal acts of conspiracy that one has joined, a withdrawing member must either report the conspiracy to the authorities or announce its withdrawal to its coconspirators.  *See In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 616 (7th Cir. 1997).  But, the acceptable inferences the court can draw from circumstantial evidence vary with the plausibility of the plaintiffs' theory and the danger associated with such inferences.  *Mitchael v. Intracorp. Inc.*, 179 F.3d 847, 858

70

(10th Cir. 1999); *see also Abraham v. Intermountain Health Care, Inc.*, 461 F.3d 1249, 1257 (10th Cir. 2006) (noting "the plausibility of an antitrust plaintiff's claim is important"). In this case, as of April 2003 the regulatory regime had changed such that a price-fixing agreement was no longer plausible. Once the FCC dictated that carriers recovering their USF contributions by way of line-item surcharges could do so only by way of USF rates that did not exceed the contribution factor, all of the carriers uniformly followed this course of action. Critically, the alleged former parallel behavior of setting USF recovery rates above the UCC contribution factor no longer existed. Furthermore, plaintiffs have not directed the court's attention to anything in the record which would suggest that the carriers over-recovered at any point in time after they reduced their USF surcharges to the UCC contribution factor. Thus, the fact that carriers uniformly charged the same USF rate thereafter is consistent with permissible independent business interests, not an illegal conspiracy. Plaintiffs have directed the court's attention to no evidence tending to exclude the possibility that AT&T, Sprint, MCI, and the other non-conspirator carriers were doing anything other than pursuing their own independent interests by implementing the FCC's suggestion after this point in time. As plaintiffs have not raised a genuine issue of material fact that the alleged price-fixing conspiracy on USF surcharge rates among AT&T, Sprint, and MCI continued under the new regulatory regime in effect as of April 1, 2003, then, AT&T is entitled to summary judgment on this aspect of plaintiffs' antitrust claim.[14]

---

[14] AT&T also argues that it is entitled to summary judgment on plaintiffs' claims of over-recovery of damages, and it urges the court to distinguish between over-recoveries that

## II.   Breach of Contract Claims by AT&T Subclass

The AT&T Subclass plaintiffs also claim that the UCC charge that AT&T charged its customers constituted a breach of its contracts with them.  AT&T now contends that it is entitled to summary judgment on these breach of contract claims on two grounds.  First, AT&T argues that there is no disputed issue of fact that it complied with its customer contracts because at all relevant times it charged the UCC charge that it said it would charge them.  Second, AT&T argues that plaintiffs' breach of contract claims are barred by the voluntary payment doctrine.  The parties agree that these contract claims are governed by New York law.

### A.   Breach of Contract Claims by California Residential Customers

AT&T's relationship with its customers was governed by the Consumer Services Agreement (CSA).  The CSA provides as follows: "You [meaning the customer] agree to pay us [meaning AT&T] for the Services at the prices and charges listed in the AT&T Service Guides."  It explains that the AT&T Service Guides "contain the specific prices and charges, service descriptions and other terms and conditions not set forth here that apply to each of your Services."  The CSA stated that the Service Guide was available on AT&T's website.  The Consumer Service Guide on AT&T's website contains a section entitled "Miscellaneous Charges and Taxes" that pertains to AT&T's Universal Connectivity Charge.  It describes

_____

were unintentional (due to forecasting errors) and those that were deliberate attempts by carriers to collect more than it paid in USF taxes.  This argument clearly is not a valid ground for granting summary judgment and, in fact, AT&T does not even cite any legal authority in support of this theory.

the nature of the charge and specifically provides as follows: "The Universal Connectivity Charge is equal to [X]% of your total billed state-to-state and international charges (excluding taxes).  From time-to-time, AT&T will revise the Universal Connectivity Charge if the method and/or amount of its required contribution to the federal Universal Service Fund changes."  During the AT&T Subclass period, this provision of the Consumer Service Guide was revised so that the X% always reflected AT&T's current UCC rate for residential customers.  It is undisputed that AT&T at all times charged its residential customers precisely the UCC percentage listed in the Consumer Service Guide.  AT&T contends that, for these reasons, it is entitled to summary judgment on the residential plaintiffs' breach of contract claims.

In response, plaintiffs rely on a separate provision of the CSA entitled "Taxes and Other Charges" that provides as follows: "You must pay all taxes, fees, surcharges and other charges that we bill you for the Services . . . .  Taxes and surcharges will be in the amounts that federal, state and local authorities **require us to bill you**."  (Emphasis added.)  Plaintiffs contend that the UCC was a surcharge, and they point out that the FCC did not "require" AT&T to bill customers for its USF contributions; AT&T simply chose to do so.  In other words, the residential plaintiffs' theory is that because the CSA did not permit AT&T to bill for taxes and surcharges other than those that governmental authorities "require[d]" AT&T to bill its customers, charging the UCC percentage set forth in the Consumer Service Guide on AT&T's website was in breach of the agreement.

73

AT&T disputes plaintiffs' attempt to characterize the UCC as a "surcharge."  AT&T contends that the USF line item was a "fee," not a tax or surcharge.  In support of this argument, AT&T points out that the charge was not listed in the "Taxes and Surcharges" portions of customer bills, but rather in the "Other Charges and Credits" portion.  AT&T further points out that in the FCC's USF order, the FCC specifically stated that it believed "that it would be misleading for a carrier to characterize its contribution as a surcharge." Thus, the crux of the parties' dispute on this matter is whether the UCC is properly characterized as a "surcharge" that, under the terms of the CSA, AT&T was not permitted to separately bill its residential customers.

Under New York law, summary judgment is appropriate in a contract dispute only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning. *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008); *Compagnie Financiere de CIT et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157-58 (2d Cir. 2000). Determining whether the language of a contract is clear or unambiguous is a question of law to be decided by the court. *Compagnie Financiere*, 232 F.3d at 158.  Ambiguous language is "that which is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 191 (2d Cir. 2006). Where the moving party's case hinges on ambiguous contract language, summary judgment

may be granted "only if the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case." *Topps Co.*, 526 F.3d at 68.

The fundamental principle of contract interpretation is that agreements must be construed according to the parties' intent. *Innophos, Inc. v. Rhodia, S.A.*, 882 N.E.2d 389, 391-92 (N.Y. 2008). "The best evidence of what parties to a written agreement intend is what they say in their writing." *Greenfield v. Philles Records*, 780 N.E.2d 166, 170 (N.Y. 2002) (quotation omitted). The words and phrases are to be given their plain meaning, and the contract is to be construed so as to give full meaning and effect to all of its provisions. *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005).

Here, the provision relied on by plaintiffs states that the customer must pay "all taxes, fees, surcharges and other charges." The limitation relied on by plaintiffs – that AT&T could only bill its customers in the amount that governmental authorities "require us to bill you" – only applies to "[t]axes and surcharges." It does not apply to "fees" and "other charges." The plain meaning of the words "surcharge," "charge," and "fee" does not provide much assistance in attempting to decide how to distinguish between them. "Surcharge" is "[a]n additional sum added to the usual amount or cost." American Heritage Dictionary of the English Language (4th ed. 2006). A "charge" means an expense or cost, the price asked for something. *Id.* And, a "fee" is a "fixed sum charged . . . for a privilege" such as a license fee or tuition fees. *Id.* Because the plain meaning of the words does not resolve the question

of whether to characterize the UCC as a surcharge, fee, or other charge, the court must look to the entire integrated agreement (including the entire Consumer Service Guide) in an attempt to determine this issue.  The court needs to be able to examine these terms in the context of the entire instrument in order to be able to determine how a reasonably intelligent person would characterize the UCC.  The record contains the entire CSA, but it only contains the portion of the Consumer Service Guide relating to the UCC.  This small excerpt from the Consumer Service Guide does not allow the court to determine how the parties regarded the UCC by, for example, comparing it to other portions of the Consumer Service Guide relating to other types of charges.  Instead of focusing on the plain language of the parties' entire agreement, AT&T has relied on extrinsic evidence – customer bills and the FCC's ruling – in an effort to establish that the UCC was not a surcharge.  That evidence may be helpful at trial if the court finds as a matter of law that the agreement is ambiguous.  *See Innophos, Inc.*, 882 N.E.2d at 392 (court may consider extrinsic evidence in construing a contract only if the court finds that the agreement is ambiguous).  But, it is premature to consider it because AT&T has not satisfied its summary judgment burden of providing the court with the information necessary to ascertain whether or not the agreement is ambiguous as a matter of law.  As a result, because AT&T has not shown itself to be entitled to judgment as a matter of law on this issue, this aspect of its summary judgment motion is denied.[15]

### B.   Breach of Contract Claim by Business Customers

---

[15] The court does not exclude the possibility that this issue could be resolved on a Rule 50 motion at trial, of course.

AT&T seeks summary judgment on the business customers' claims on essentially similar grounds. AT&T's contracts with its business customers all incorporated the terms of the Business Service Guide posted on AT&T's website. This Business Service Guide, like the Consumer Service Guide discussed above, contained a section entitled "General Terms and Conditions" that disclosed the UCC rate that applied to small business customers. The X% figure was changed to reflect AT&T's current UCC rate for business customers as well as the effective date of the new rate. And, it is undisputed that AT&T charged its business customers precisely the UCC percentage listed in the Business Service Guide. Thus, AT&T contends that it fully complied with the language from the Business Service Guide.

In plaintiffs' response, they rely on other language from the Business Service Guide. The "General Terms and Conditions" portion of the Business Service Guide contains a section entitled "Payments and Charges" and a subsection entitled "Regulatory Surcharges and Miscellaneous Charges." This subsection provides as follows:

> AT&T may adjust its rates and charges or impose additional rates and charges on its Customers **in order to recover amounts that it**, either directly or indirectly, **pays to** or is required by governmental or quasi-governmental authorities to collect from others to support statutory or regulatory programs, plus associated administrative costs. Examples of such programs include, but are not limited to, the Universal Service Fund, the Primary Interexchange Carrier Charge, and compensation to payphone service providers for the use of their payphones to access AT&T Service.

(Emphasis added.) Immediately after that paragraph is a more specific subheading for the "Universal Connectivity Charge" where the Business Service Guide sets forth the X% UCC. Plaintiffs' theory is that because this provision only authorizes AT&T to impose charges for

77

amounts that it "pays to" the Universal Service Fund, the percentage number listed in the next paragraph cannot exceed the amount that AT&T actually pays to the Universal Service Fund.

In response to plaintiffs' argument, AT&T contends, first, that plaintiffs did not preserve this theory in the pretrial order. Specifically, plaintiffs claim that the customer contracts "limit any such pass-through to the USF contribution factor imposed on defendant. Defendant breached these contracts by billing its . . . customers at rates far exceeding defendant's actual USF contribution factor." Pretrial Order (doc. 822) ¶ 5(a), at 8. Defendants contend that this is a different breach of contract theory than the one now articulated by plaintiffs. The court agrees that the argument plaintiffs now advance is not the precise theory set forth in the pretrial order. But, the pretrial order is to "be liberally construed to cover any of the legal or factual theories that might be embraced by their language." *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1220 (10th Cir. 2000); *see also Whalley v. Sakura*, 804 F.2d 580, 582-83 (10th Cir. 1986) (pretrial order is to be liberally construed to include all legal and factual theories inherent in the issues defined therein). Liberally construed, the court believes that plaintiffs' argument is embraced by the overriding concept set forth in the pretrial order – which is that AT&T's customer contracts did not permit AT&T to use the Universal Connectivity Charge to recover more than AT&T's required participation in the USF program cost AT&T. The court will therefore consider this theory on its merits.

78

In seeking to ascertain the parties' intent, the court must construe the contract so as to give full meaning and effect to all of its provisions. *LaSalle Bank Nat'l Ass'n*, 424 F.3d at 206. AT&T relies heavily on the principle that the provision of the Business Service Guide containing the X% specifically pertains to the UCC and, as such, AT&T contends that the more specific provision should govern the more general introductory paragraph relied on by plaintiffs. Although a specific provision will govern over a more general provision of a contract, that is the case only if there is an inconsistency between the two provisions. *DBT Gmbh v. J.L. Mining Co.*, 544 F. Supp. 2d 364, 377-78 (S.D.N.Y. 2008). The court must adopt an interpretation that gives meaning to every provision or, stated otherwise, no provision should be left without force and effect. *Id.* Thus, a reasonable effort must be made to harmonize all of the contract terms. *India.Com, Inc. v. Dalal*, 412 F.3d 315, 323 (2d Cir. 2005); *Bombay Realty Corp. v. Magna Carta, Inc.*, 790 N.E.2d 1163, 1165 (N.Y. 2003) ("All parts of a contract must be read in harmony to determine its meaning.").

Here, the relevant contract terms are not inconsistent and, instead, they are readily susceptible to an interpretation that gives force and effect to them all. The plain meaning of the introductory paragraph is that AT&T is entitled to charge its customers for amounts that it "pays to" the Universal Service Fund – directly and/or indirectly – plus administrative costs. AT&T, of course, would possess the necessary information to calculate these amounts. Consequently, the percentage figure set forth in the next paragraph (adjusted periodically), then, should reflect the amounts that AT&T has calculated it "pays to" the Universal Service Fund plus administrative costs.

Under this interpretation of the contract, the court finds that AT&T is entitled to summary judgment on this claim because plaintiffs have not raised a disputed issue of fact that the UCC percentage amounts that AT&T charged its business customers resulted in AT&T recovering any amounts other than what AT&T paid to the USF program plus administrative costs. Plaintiffs' primary argument in this regard is that the contract limits AT&T's USF recovery to the amount paid to the USF fund. To this extent, plaintiffs ignore the plain language of the contract that the percentage amount set for the UCC can include amounts AT&T "pays to" USF "plus associated administrative costs." Despite years of discovery and a voluminous summary judgment record, plaintiffs have not directed the court's attention to any specific evidence in the record indicating that AT&T's UCC percentage charges included administrative costs **not** associated with USF. Plaintiffs also make a brief suggestion that assessments for uncollectible accounts are not administrative costs. Regardless of whether assessments for uncollectible accounts are properly characterized as administrative costs, the contract nonetheless permitted AT&T to assess UCC at a percentage rate to "recover amounts that it . . . pays to" USF. This contract language does not distinguish between collectible or uncollectible accounts. The plain language of the contract permitted AT&T to assess rates and charges to recover any amounts that it pays to USF plus associated administrative costs and plaintiffs have not presented an issue of fact that the UCC percentage rate allowed AT&T to do anything other than recover those amounts. Having failed to raise a genuine issue of material fact on this breach of contract claim, then, this aspect of AT&T's motion for summary judgment is granted.

80

C.      **Voluntary Payment Doctrine**

Under New York law, the voluntary payment doctrine bars recovery of payments voluntarily made with full knowledge of the facts, and in the absence of fraud or mistake of material fact or law. *Dillon v. U-A Columbia Cablevision of Westchester, Inc.*, 790 N.E.2d 1155, 1156 (N.Y. 2003). AT&T contends that plaintiffs' breach of contract claims are barred by the voluntary payment doctrine. The only aspect of plaintiffs' breach of contract claim to survive summary judgment is the residential customers' claims. As discussed above, those claims survive summary judgment insofar as they are predicated on the notion that the UCC is in fact a surcharge and, as such, it was improper because governmental authorities did not "require" AT&T to bill its residential customers for that surcharge. The very nature of this claim is that customers who paid the bills did so while operating under a mistake of fact that the UCC was a tax-like surcharge that AT&T was required to bill its customers. Thus, this is not a situation where the residential customer plaintiffs made payments to AT&T having had full disclosure of the nature of the UCC charges on their bills. *See, e.g.*, *Kirby McInerney & Squire, LLP v. Hall Charne Burce & Olson, S.C.*, 790 N.Y.S.2d 84, 85 (N.Y. App. Div. 2005) (holding voluntary payment doctrine did not apply where "the overpayments were clearly made to defendants based on a mistake of fact, namely, the amount of fees actually owed by plaintiff to defendants"). Accordingly, the court finds AT&T's reliance on the voluntary payment doctrine to be without merit at this procedural juncture.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant AT&T Corp.'s

Motion for Summary Judgment (doc. #827) is granted in part and denied in part as set forth

above.

**IT IS SO ORDERED** this 30th day of June, 2008.

                            __s/ John W. Lungstrum _____
                            John W. Lungstrum
                            United States District Judge