**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

IN RE: UNIVERSAL SERVICE FUND
TELEPHONE BILLING PRACTICES
LITIGATION                                                          Case No. 02-MD-1468-JWL

This Order Relates to All Cases

_____

**MEMORANDUM AND ORDER**

This multidistrict litigation proceeding involves class actions alleging a price fixing antitrust conspiracy in connection with Universal Service Fund (USF) fees in which the only remaining defendant is AT&T Corporation.[1] Plaintiffs also assert breach of contract claims under New York state law relating to USF fees that AT&T's charged its customers. On June 30, 2008, the court issued a Memorandum and Order granting in part and denying in part AT&T's initial motion for summary judgment. *See* Mem. & Order (doc. 887). Specifically, the court granted summary judgment in part and denied it in part with respect to the antitrust claim, granted summary judgment with respect to the AT&T subclass business customers' breach of contract claims, and denied summary judgment with respect to the AT&T subclass residential customers' breach of contract claims. Shortly after the court issued that order, the court granted AT&T's request for leave to file a renewed motion for summary judgment on the AT&T subclass residential customers' breach of contract claims. This matter is now

---

[1] Plaintiffs' claims against MCI WORLDCOM Network Services, Inc. were automatically stayed when MCI filed for bankruptcy relief, and plaintiffs have settled their claims against Sprint Communications Company, LLP.

before the court on AT&T's renewed motion for summary judgment on those claims (doc. 897). For the reasons explained below, AT&T's motion is denied because the residential plaintiffs have raised a disputed issue of fact as to whether the UCC charges collected by AT&T resulted in AT&T recovering amounts more than it was required to pay into the USF program.

**STATEMENT OF MATERIAL FACTS**

Consistent with the well established standard for evaluating a motion for summary judgment, the following facts are either uncontroverted or stated in the light most favorable to plaintiffs, the nonmoving parties. The court will also consider the relevant facts from the parties' prior round of summary judgment briefing. The court will presume familiarity with those facts and will reiterate them only insofar as they are helpful to understanding the parties' dispute.

During the relevant time period, AT&T's relationship with its residential customers was governed by the Consumer Services Agreement (CSA). The CSA provides as follows: "You [meaning the customer] agree to pay us [meaning AT&T] for the Services at the prices and charges listed in the AT&T Service Guides." It explains that the AT&T Service Guides "contain the specific prices and charges, service descriptions and other terms and conditions not set forth here that apply to each of your Services." The CSA states that the Service Guide (the "Consumer Service Guide," or CSG) is available on AT&T's website. The CSG on AT&T's website contains a section entitled "Miscellaneous Charges and Taxes" that

pertains to AT&T's Universal Connectivity Charge (UCC). It describes the nature of the charge and specifically provides as follows: "The Universal Connectivity Charge is equal to [X]% of your total billed state-to-state and international charges (excluding taxes)." Whenever AT&T increased its UCC charge to residential customers, it substituted the new percentage in this provision. For example, as of July 1, 2002, when AT&T's UCC charge to residential customers was 11%, the provision stated as follows: "The Universal Connectivity Charge is equal to 11% of your total billed state-to-state and international charges." AT&T's original motion for summary judgment was premised on the fact that it is undisputed that AT&T at all times charged its residential customers precisely the UCC percentage listed in the CSG. Thus, according to AT&T, it did not breach its residential customer contracts.

In plaintiffs' prior response to AT&T's original summary judgment motion, plaintiffs relied on a separate provision of the CSA. That provision, located at § 1(e) of the CSA and entitled "Taxes and Other Charges," provides as follows: "You must pay all taxes, fees, surcharges and other charges that we bill you for the Services . . . . **Taxes and surcharges will be in the amounts that federal, state and local authorities require us to bill you.**" (Emphasis added.) Plaintiffs argued that the UCC is a tax-like surcharge, and they pointed out that the FCC did not "require" AT&T to bill customers for its USF contributions; AT&T simply chose to do so. In other words, their theory is that because the CSA did not permit AT&T to bill for taxes and surcharges other than those that governmental authorities

3

"require[d]" AT&T to bill its customers, charging a Universal Connectivity Charge at all was in breach of the parties' contract.

The court denied AT&T's original summary judgment motion because the court needed to examine the entire integrated agreement – including the entire Consumer Service Guide available on the website – in order to be able to determine whether to characterize the UCC as a surcharge, fee, or other charge. The factual record at that time contained only a small excerpt of the CSG relating to the UCC. This did not allow the court to examine the terms in the context of the entire instrument in order to be able to determine how a reasonably intelligent person would characterize the UCC. Consequently, the court was unable to determine whether the parties' written agreement itself is ambiguous as a matter of law. AT&T has now renewed its motion for summary judgment based on a factual record containing a complete set of CSGs, the relevant provisions of which will be discussed in the court's analysis below.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist.*, 511 F.3d 1114, 1119 (10th Cir. 2008) (citing *Scott v. Harris*, 17 S. Ct. 1769, 1774 (2007)). An issue of fact is "genuine" if "the evidence

allows a reasonable jury to resolve the issue either way." *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006). A fact is "material" when "it is essential to the proper disposition of the claim." *Id*.

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Libertarian Party v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)). In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* (citing *Celotex*, 477 U.S. at 325).

If the movant carries this initial burden, the nonmovant may not simply rest upon his or her pleadings but must "bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which he or she carries the burden of proof." *Garrison v. Gambro*, Inc., 428 F.3d 933, 935 (10th Cir. 2005). To accomplish this, sufficient evidence pertinent to the material issue "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein." *Diaz v. Paul J. Kennedy Law Firm*, 289 F.3d 671, 675 (10th Cir. 2002).

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

## ANALYSIS

Under New York law,[2] summary judgment is appropriate in a contract dispute only when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning. *Topps Co. v. Cadbury Stani S.A.I.C.*, 526 F.3d 63, 68 (2d Cir. 2008); *Compagnie Financiere de CIT et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 232 F.3d 153, 157-58 (2d Cir. 2000). Determining whether the language of a contract is clear or unambiguous is a question of law to be decided by the court. *Compagnie Financiere*, 232 F.3d at 158. Ambiguous language is "that which is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Palmieri v. Allstate Ins. Co.*, 445 F.3d 179, 191 (2d Cir. 2006). Where the moving party's case hinges on ambiguous contract language, summary judgment may be granted "only if the ambiguities may be resolved through extrinsic evidence that is itself capable of only one interpretation, or where there is no extrinsic evidence that would support a resolution of these ambiguities in favor of the nonmoving party's case." *Topps Co.*, 526 F.3d at 68.

The fundamental principle of contract interpretation is that agreements must be construed according to the parties' intent. *Innophos, Inc. v. Rhodia, S.A.*, 882 N.E.2d 389,

---

[2] The CSA contains a New York choice-of-law provision and the parties agree that this claim is governed by New York law.

6

391-92 (N.Y. 2008). "The best evidence of what parties to a written agreement intend is what they say in their writing." *Greenfield v. Philles Records*, 780 N.E.2d 166, 170 (N.Y. 2002) (quotation omitted). The words and phrases are to be given their plain meaning, and the contract is to be construed so as to give full meaning and effect to all of its provisions. *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 206 (2d Cir. 2005).

### A.    Whether the UCC is a Surcharge Subject to the Limitation in § 1(e) of the CSA

Plaintiffs' predominant argument in seeking to withstand summary judgment is based on § 1(e) of the CSA. That provision states as follows:

> **Taxes and Other Charges.** You must pay all taxes, fees, surcharges, and other charges that we bill you for the Services, unless you can show documentation satisfactory to us that you are exempt. **Taxes and surcharges will be in the amounts that federal, state, and local authorities require us to bill you.** We will not provide advance notice of changes to taxes and surcharges, except as required by applicable law.

(Emphasis added.) Plaintiffs rely on the second sentence of this section, which is emphasized in bold-faced type. By its plain terms, this limitation only applies to "[t]axes and surcharges," not the "fees" and "other charges" listed in the previous sentence. Plaintiffs seek to characterize the UCC as a "surcharge" whereas AT&T contends that it is not a surcharge that is subject to this limitation. The court has examined the CSA along with the full set of CSGs that AT&T has now submitted to the court. For the reasons explained below, the court rejects plaintiffs' argument and finds that the contract is unambiguous that this limitation does not apply to the UCC.

7

AT&T's CSGs are organized into separate categories that describe the type of service. The main two relevant categories are (1) "Domestic Service Guides," a category which contains the CSGs for each of AT&T's interstate long distance plans (i.e., calling plans), and (2) "Miscellaneous Charges and Taxes," a category which contains the CSGs related to taxes and other separate charges that may apply to specific services on a customer's bill, such as the UCC. During the relevant time period, a particular California residential customer's contract with AT&T would be governed by (1) an offering-specific CSG from the Domestic Service Guides category that contained the description, terms and conditions, and rates and charges of the offering the customer had selected, and (2) the non-offering-specific CSGs from the Miscellaneous Charges and Taxes category. The CSGs in the Miscellaneous Charges and Taxes category were incorporated into every CSG in the Domestic Service Guides category.

The website identified in the CSA contained a link to a web page listing each item in the Miscellaneous Charges and Taxes category. That list, in turn, linked to the then-current CSGs for each of the items listed as Miscellaneous Charges and Taxes. Most of the items listed are named some type of "fee," "charge," or "surcharge." AT&T has submitted a complete set of the CSGs for one of its long distance product offerings – the AT&T One Rate® 5¢ offer. The first CSG for this offer contains the prices and terms for the long distance service itself, and the remainder consists of the various CSGs from the

Miscellaneous Charges and Taxes category.[3]  Within the Miscellaneous Charges and Taxes category, the UCC is and has always been listed as a Universal Connectivity *Charge*.  Other items in this category include the AT&T Bill Statement *Fee*; the AT&T International Mobile Termination *Charge*; AT&T Operator Dialed *Surcharge* - International Calls; Billing, Collection and Credit *Allowances*; Minimum Monthly Usage *Charge*; Non-Subscriber *Charges*; Operator Transfer Service *Fee*; Public Payphone *Surcharge*; State Universal Service Fund *Charge*; and Tax-Related *Surcharges*.  Clearly, then, three different types of charges are specifically called "Surcharges" (the AT&T Operator Dialed Surcharge - International Calls, the Public Payphone Surcharge, and the Tax-Related Surcharge) while the UCC is called the Universal Connectivity *Charge*, not "Surcharge."  Thus, as it relates to the language in § 1(e) of the CSA, the UCC is in the same category of "other charges" as the AT&T International Mobile Termination Charge, Minimum Monthly Usage Charge, Non-Subscriber Charges, and State Universal Service Fund Charge.  This language indicates that the UCC is not properly characterized as a surcharge that is subject to the limitation relied on by plaintiffs.

Plaintiffs' argument to the contrary is that the contractual language does not preclude a "surcharge" from being a "charge" nor does it preclude a "charge" from being a "surcharge."  Their theory is that the CSGs use the word "charge" to refer to anything for which AT&T billed customers, including "taxes," "fees," and "surcharges."  They point out

---

[3] All of AT&T's other interstate long distance offerings during the subclass period referenced the same set of CSGs in the Miscellaneous Charges and Taxes category.

that the Miscellaneous *Charges* and Taxes categories include items labeled "Charge," "Fee," "Allowance," and "Surcharge."  Similarly, § 1(e) of the CSA refers to "taxes, fees, surcharges, and *other* charges," thereby including "taxes, fees, and surcharges" as types of "charges."  Plaintiffs' logic is partly correct inasmuch as the category title ("Miscellaneous Charges and Taxes") and the "taxes, fees, surcharges, and other charges" language suggests that the parties used the term "charge" to broadly encompass a variety of items for which AT&T billed customers, including those labeled as charges, fees, allowances, and surcharges. Thus, a surcharge is a type of charge.  The flaw in plaintiffs' logic is that § 1(e) of the CSA (the provision they rely on) distinguishes between "taxes, fees, surcharges, and *other* charges."  In this provision, the term "other charges" refers collectively to any types of charges that are not taxes, fees, or surcharges.  In other words, "other charges" means everything else.  The CSGs list various items as surcharges, but notably the UCC is not one of them.  Consequently, this language does not transform the UCC into a surcharge that is subject to the limitation relied on by plaintiffs.

Plaintiffs also argue that inconsistent use of the term "surcharge" undermines AT&T's argument that only those items that the CSGs call "surcharges" can constitute "surcharges" within the meaning of the sentence in § 1(e) of the CSA.  In support of this argument, plaintiffs point out that the CSGs refer to two surcharges – the Public Payphone Surcharge and the AT&T Operator Dialed Surcharge - International Calls – neither of which federal, state, or local authorities require AT&T to bill customers.  Thus, according to plaintiffs, a reasonably intelligent person could not have determined the billing items to which § 1(e) of

10

the CSA referred solely by looking for the term "Surcharge" in the CSGs. The court disagrees with this characterization because, first, there is nothing in the summary judgment record to support plaintiffs' factual assertion that authorities do not require AT&T to bill its customers for these charges. More importantly, however, the CSGs do not describe the various types of surcharges in such a way that they would inform a customer of the extent to which those surcharges are required by law. Thus, the mere fact that AT&T may or may not have been required to bill customers for those particular surcharges does not transform a separate charge (the UCC) into a surcharge.

Plaintiffs further argue that the CSG for "Tax-Related Surcharges" confuses the issue. That CSG first describes Tax-Related Surcharges as percentage charges applied to customer bills to recover (1) AT&T's payments of taxes and fees to certain state and local jurisdictions, and (2) AT&T's payments to local telephone companies, which have passed on certain taxes and fees to AT&T. The CSG then contains the following parenthetical statement:

> (Under Section 1(e) of the AT&T Consumer Services Agreement, there are also taxes and *charges* that AT&T assesses directly to customers in the amounts that *federal*, state, and local authorities require AT&T to bill you. These *charges* are defined by federal, state, and local authorities and *are not addressed* in this Service Guide.)

(Emphasis supplied by plaintiffs.) Plaintiffs contend that this parenthetical would lead a reasonable customer to two conclusions: first, that the "[t]axes and surcharges" referred to in § 1(e) of the CSA covers an indeterminate group of "taxes and *charges*" and, second, that the "*charges*" extend beyond the Tax-Related Surcharges attributable to "state and local

11

jurisdictions" (per the CSG) to "*charges*" attributable to "*federal . . .* authorities" (per the CSG). Plaintiffs, then, argue that a reasonably intelligent person would conclude that the UCC (which is not included in the CSG definition of Tax-Related Surcharges) was a "*charge*" that AT&T was required to bill its customers.

This argument is without merit because it ignores the clear intent reflected by examining the four corners of the contract as a whole. The first sentence of § 1(e) states that the customer "must pay all . . . other charges that we bill you for the Services." Again, the UCC is one such "other charge" and, as such, the CSA clearly requires the customer to pay that charge. The UCC does not even purport to be a surcharge. Additionally, the first CSG that describes the calling plan itself states that the "AT&T Universal Connectivity Charge applies." And, the CSG for the UCC itself specifically requires the customer to pay the UCC. All of this language so clearly requires the customer to pay the UCC that a reasonably intelligent person certainly would not believe that the parties' clear intent in that regard can be trumped by a rather tortured reading of an isolated parenthetical comment in an unrelated CSG governing Tax-Related Surcharges. Accordingly, the court finds as a matter of law that the parties' contract is unambiguous that the UCC is not a "surcharge" that is subject to the limitation set forth in the second sentence of § 1(e) of the CSA.

**B.      Charge to Recover Amounts AT&T Must Pay Into the USF Program**

Plaintiffs' final argument relies on the first sentence of the CSG for the UCC. That sentence describes the UCC as a "monthly charge to Customers to recover amounts AT&T must pay into a federal program called the Universal Service Fund (USF)." Based on this

12

sentence, plaintiffs contend that AT&T's recovery of more than it paid into the USF program constituted a breach. In response, AT&T argues that plaintiffs' attempt to recast their claim in this manner should be rejected because they offer no evidentiary support for their statement. AT&T further argues that the summary judgment record does not show that AT&T intentionally overrecovered its USF expenses from residential customers during the subclass period and that the sporadic periods where it collected more than it paid arose from forecasting errors.

The court disagrees at the outset with AT&T's suggestion that plaintiffs' articulation of their theory in this way is an attempt to "recast" their breach of contract claim. In the Final Pretrial Order, plaintiffs allege that the customer contracts "limit any such pass-through to the USF contribution factor imposed on defendant. Defendant breached these contracts by billing its . . . customers at rates far exceeding defendant's actual USF contribution factor." Pretrial Order (doc. 822) ¶ 5(a), at 8. In substance, billing a monthly charge which recovers more than amounts AT&T was required to pay into the USF is tantamount to billing customers at rates exceeding AT&T's actual contribution factor. The overriding thrust of the theory plaintiffs have always advanced is that AT&T generated revenue through the Universal Connectivity Charges that exceeded the amount AT&T contributed to the USF program. AT&T has had ample notice since the inception of this litigation that this is the nature of plaintiffs' claim. *See, e.g.*, *In re Universal Service Fund Tele. Billing Practices Litig.*, 300 F. Supp. 2d 1107, 1114 (D. Kan. 2003) (ruling on defendants' motions to dismiss; explaining that plaintiffs alleged that the long distance carriers used their USF fund pass-

through charges to create a secret profit center); *In re Universal Service Fund Tele. Billing Practices Litig.*, 247 F. Supp. 2d 1215, 1222 (D. Kan. 2002) (ruling on motions to remand; explaining that the California customer complaints against Sprint alleged that the USF charge is a secret profit center and that the California customer complaint against AT&T made similar allegations). Indeed, AT&T does not even suggest that it is prejudiced by plaintiffs' slight twist on this theory. Thus, the court believes that the pretrial order sufficiently includes this theory, and AT&T's suggestion that it does not is based on a hypertechnical reading of the pretrial order.

Turning to the language of the CSG for the UCC, then, the court finds as a matter of law that the contract unambiguously provides that AT&T could "recover amounts AT&T must pay" into the USF program, and no more. This is specifically set forth in the first sentence that describes the Universal Connectivity Charge. The fact that AT&T's UCC recovery is tied to the amounts it has paid to the USF program is further evidenced by the last sentence of that paragraph, which provides that "AT&T will revise the Universal Connectivity Charge if the method and/or amount of its required contribution to the USF changes." This language can be harmonized with the final sentence of the CSG for the UCC relied on by AT&T in which the CSG sets forth the specific UCC percentage charge. AT&T would, of course, possess the necessary information to calculate the UCC percentage. Thus, the percentage figure used by AT&T should be that necessary for AT&T to "recover amounts AT&T must pay" into the USF program. To this extent, the contract is unambiguous.

14

Based on this unambiguous contract language, the California residential plaintiffs have raised issues of fact sufficient to withstand summary judgment on their breach of contract claim. In plaintiffs' response to AT&T's original motion for summary judgment, Plaintiffs' Statement of Genuine Issue No. 105 addressed the carriers' over-recovery of USF fees. In support of this paragraph, plaintiffs relied on a portion of AT&T's expert reports which pointed out that plaintiffs' experts calculations showed net over-recoveries during the years 2002, 2003, and 2004. Although AT&T argued that plaintiffs' experts' calculations were based on adjustments to collections and expenses that had the effect of overstating the USF pass-through rate, whether plaintiffs' experts used correct accounting methods raises a disputed issue of fact. Additionally, AT&T's own expert admitted in his deposition that AT&T over-recovered in 2002. The relevant time period for the California residential customers' breach of contract claim is August 1, 2001, to March 31, 2003. Consequently, a rational trier of fact viewing the summary judgment record in the light most favorable to plaintiffs could find that the UCC charges AT&T imposed on its customers resulted in AT&T recovering amounts that equaled more than it paid into the USF program. The court wishes to clarify that it is not ruling that the contract requires AT&T's collection of UCC charges to correlate with its payments to the federal USF program during any particular time period. Rather, the court's denial of AT&T's motion for summary judgment rests on the court's finding that whether AT&T's imposition of UCC charges resulted in AT&T recovering amounts more than it was required to pay into the USF program is a disputed issue of fact. Furthermore, AT&T's attempt to distinguish between intentional versus

15

unintentional over-recovery is without merit, as the contract language from the CSG for the UCC makes no such distinction. Moreover, it is not a defense to a breach of contract claim in general that the party did not intend to breach by its conduct if, in fact, that conduct violated the terms of the parties' agreement. Accordingly, AT&T's renewed motion for summary judgment is denied.

**IT IS THEREFORE ORDERED BY THE COURT** that Defendant AT&T Corp.'s Renewed Motion for Summary Judgment as to the Breach of Contract Claim of the California Sub-Class (doc. 897) is denied.

**IT IS SO ORDERED** this 15th day of August, 2008.

s/ John W. Lungstrum            
John W. Lungstrum
United States District Judge
