IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

IN RE: UNIVERSAL SERVICE FUND )
TELEPHONE BILLING PRACTICES )
LITIGATION )          Case No. 02-MD-1468-JWL
                                              )
This Order Relates to All Cases )
_____)

## MEMORANDUM AND ORDER

This multidistrict litigation proceeding involves class actions against defendant AT&T

Corporation ("AT&T") alleging a price-fixing antitrust conspiracy in connection with

Universal Service Fund ("USF") fees, occurring between August 1, 2001, and March 31,

2003. A subclass of AT&T's California residential customers also maintain a claim for

breach of contract under New York state law relating to USF fees. This matter is now before

the court on AT&T's motions to exclude certain testimony by plaintiff's experts, Simon

Wilkie and Michael Williams, concerning issues of liability (Doc. # 905) and damages (Doc.

# 907). For the reasons set forth below, AT&T's motion concerning these experts' liability

opinions is **denied** in its entirety. AT&T's motion concerning these experts' damages

opinions is **granted in part and denied in part**. Specifically, the court grants the motion

with respect to the experts' opinions regarding damages attributable to MCI's business

customers, but denies the motion in all other respects.

I.    **Governing Standards**

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the Supreme Court instructed that district courts are to perform a "gatekeeping" role concerning the admission of expert scientific testimony. *See id.* at 589-93; *see also Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 147-48 (1999). The governing rule of evidence states as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

In order to determine that an expert's opinions are admissible, this court must undertake a two-part analysis: first, the court must determine that the witness is qualified by "knowledge, skill, experience, training, or education" to render the opinions; and second, the Court must determine "whether the witness' opinions are 'reliable' under the principles set forth" in *Daubert* and *Kumho Tire*. *See Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 969 (10th Cir. 2001). The rejection of expert testimony is the exception rather than the rule. *See* Fed. R. Evid. 702 advisory committee notes.

In its present motions, AT&T does not challenge the qualifications of Drs. Wilkie and Williams, but instead focuses on the reliability of their opinions. In determining whether the proffered testimony is reliable, the court assesses whether the reasoning or methodology underlying the testimony is "scientifically" valid and whether that reasoning or methodology

2

can be properly applied to the facts in issue. *See Daubert*, 509 U.S. at 592-93. The *Daubert* Court listed four factors relevant to assessing reliability: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error associated with the theory; and (4) whether the theory has attained widespread or general acceptance. *Id.* at 592-94. In *Kumho Tire*, however, the Supreme Court emphasized that these four factors are not a "definitive checklist or test" and that a court's inquiry into reliability must be "tied to the facts of a particular case." *Kumho Tire*, 526 U.S. at 150. In some cases, "the relevant reliability concerns may focus upon personal knowledge or experience," rather than the *Daubert* factors and scientific foundations. *Id.* (quoted in *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1235 (10th Cir. 2004)). The district court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152.

## II.  Motion to Exclude Expert Liability Opinions (Doc. # 905)

### A.  *Analyses of Conduct Parameters and Price-Cost Margins*

AT&T first seeks to exclude testimony by Drs. Wilkie and Williams (who jointly authored expert reports) concerning their analyses of the allegedly conspiring carriers' conduct parameters and price-cost margins. In their initial report, the experts cited those analyses as "independent bases" for their conclusion that the carriers' actions were contrary to their self-interests absent an agreement and were best explained by the existence of a price-fixing agreement. AT&T argues that those analyses lack the necessary "fit" or

3

relevance to the antitrust claim in this case—that a price-fixing agreement existed with respect to USF charges—because the analyses were based on data that excluded USF figures. AT&T thus argues that such analyses cannot reliably demonstrate the existence of an agreement, in part because the results of the analyses would be the same whether or not an agreement actually existed.

The court rejects AT&T's challenge to the experts' testimony based on these analyses. Since their initial report, the experts have made clear that they do not hold the opinion that the studies, in and of themselves, demonstrate the existence of a price-fixing agreement; rather, their opinion is that those analyses are factors that contribute to their overall opinion that an agreement likely existed, based on the totality of all of the economic evidence.[1] Specifically, the experts conclude that the analyses demonstrate conduct by the carriers concerning long-distance rates that was contrary to their self-interests absent an agreement. It is true that the alleged conspiracy involves USF charges and not long-distance rates; nevertheless, the experts opine that the analyses demonstrate conditions in the underlying market that would facilitate successful implementation of a price-fixing agreement concerning USF charges. Thus, the two analyses may be relevant to the ultimate question of whether the carriers' conduct concerning USF charges resulted from a price-fixing agreement.

---

[1]The court therefore rejects AT&T's alternative request to bar the experts from testifying that the analyses show conduct regarding USF charges contrary to the carriers' self-interest absent an agreement.

4

Moreover, plaintiffs have submitted credible evidence, in the form of affidavits from Drs. Wilkie and Williams and from two additional expert economists, that such a method is generally accepted in the field as material to a determination concerning price-fixing. The court rejects AT&T's argument that this method is not sufficiently "falsifiable". As one of the additional experts points out, the method is falsifiable, as that term is understood in this field, because different results in the two analyses (showing an underlying market that was *not* conducive to implementation of a USF price-fixing agreement) would weigh differently in determining ultimately whether an agreement likely existed. Accordingly, the court denies AT&T's motion to exclude as unreliable the opinions of Drs. Wilkie and Williams concerning the carriers' conduct paramaters and price-cost margins.

The court also denies AT&T's request to exclude this evidence under Fed. R. Evid. 403. Plaintiffs' experts relied on these analyses as bases for their ultimate opinion concerning whether a price-fixing agreement existed. Thus, the probative value of the evidence is significant, and that value is not substantially outweighed by any danger of unfair prejudice, confusion, or delay demonstrated by AT&T. *See id.*

B. *Over-Recovery*

Drs. Wilkie and Williams also opined that the carriers' over-recovery of USF charges from their customers, in excess of the carriers' USF obligations to the government, was contrary to their self-interests absent an agreement, and that such conduct therefore weighed in favor of finding a price-fixing agreement. AT&T challenges the admissibility of that opinion on three grounds.

5

First, AT&T argues that the opinion is not "based upon sufficient facts or data," as required by Rule 702, because the experts did not rely on empirical studies showing that, in the absence of an agreement, companies actually do compete with each other by passing through less than 100 percent of a tax to their customers.  The court rejects this argument.  The experts based this opinion on a substantial "pass-through" analysis, which was based on data concerning the market, prices, costs, and other factors, as well as on data from which they conclude that AT&T actually did over-recover USF charges from customers.  Thus, the opinion satisfies this requirement of the rule.  AT&T has not provided any authority requiring a reliance on "empirical" studies.  AT&T's argument concerning the bases for the experts' opinion goes to the weight of the opinion, and not to its admissibility.

Second, AT&T argues that the experts' pass-through analysis is not a reliable method for detecting conduct contrary to self-interest or the existence of a price-fixing agreement. AT&T relies primarily on the classic *Daubert* factors, arguing that the method of using a pass-through analysis to detect a price-fixing agreement has not been tested, published, or peer-reviewed, and that the experts have not cited an error rate or confidence interval or controlling standards.

Again, the court concludes that the experts' opinion is sufficiently based in principles generally-accepted in the field of economics.  Plaintiffs' experts and the additional experts retained for purposes of this motion confirm that the underlying pass-through analysis is non-controversial and based on a number of sources and authorities.  Drs. Wilkie and Williams employed that method to conclude that, under the specific conditions found in the

6

telecommunications industry, in a competitive market an item which they deem to be equivalent to an ad valorem tax, such as the USF, would be expected to be under-recovered by the carriers.  Based on their conclusion that the carriers actually over-recovered USF charges from their customers, they further concluded that a price-fixing agreement was indicated.  Those conclusions were not dependent upon the type of precision concerning variables and error rates that AT&T urges.  AT&T's arguments—including those based on the presence of variables and studies that allegedly show over-recovery of taxes in other industries—are better reserved for the jury and go to weight instead of admissibility.

Third, AT&T argues that the experts' method was not reliably applied in this case, as required under Rule 702.  Specifically, AT&T argues that in determining whether the carriers actually exceeded the expected pass-through rate for the USF charges, the experts erroneously looked only at the line-item USF charges collected from customers, instead of properly looking at the carriers' "all-in" total prices for the customers.  The court rejects this argument as well.  Plaintiffs' experts did analyze the carriers all-in prices, and they also have provided a number of reasons why consideration of the all-in prices are unnecessary for this purpose.  Again, AT&T's challenges to the manner in which the experts applied their opinion to the facts of this case may be presented to the jury, but they do not affect the admissibility of the experts' opinion.

Accordingly, the court denies AT&T's motion to exclude this expert opinion.

C.      *Fact Testimony – Sunk Costs and Opportunities to Communicate*

7

As a further basis for their ultimate opinion concerning a price-fixing agreement, Drs. Wilkie and Williams rely on evidence that the carriers attempted to charge USF fees to their customers in amounts high enough to offset prior under-recoveries.  In the experts' opinion, in trying to recover such "sunk costs", the carriers acted contrary to their self-interests absent an agreement.  In support of this opinion, the experts cited various documents as evidence that the carriers did in fact attempt to recover sunk costs in this way.  As a separate basis for their ultimate price-fixing opinion, the experts have also stated that their review of various documents show that the carriers had opportunities to communicate concerning their USF charges to customers and did in fact engage in such communications.

AT&T seeks to exclude any "fact testimony" by the experts in support of these opinions.  AT&T disputes these facts regarding whether the carriers did attempt to recover sunk costs and whether they did engage in such communications, and it argues that the determination of such facts from the evidence is not properly within the experts' province. AT&T also argues that an expert is not needed to make the point to the jury that it is easier to conspire if you communicate.

The court denies AT&T's motion at this time.  In their testimony, the experts may properly identify the documentary evidence on which they base their economic opinions. For instance, the experts may properly testify that, assuming that the carriers did in fact try to recover sunk costs concerning USF charges, such conduct would be contrary to self-interest absent an agreement, which supports the existence of an agreement under economic principles.  It is true that the experts may not merely parrot or recite factual evidence, without

8

offering a valid expert opinion based on such evidence; nor may they attempt to lend credibility, as experts, to certain evidence relevant to disputed issues of fact. *See Ash Grove Cement Co. v. Employers Ins. of Wausau*, 246 F.R.D. 656, 661, 663 n.5 (D. Kan. 2007). They may, however, identify the factual bases for the assumptions concerning sunk costs and communications on which they rely, in the context of rendering economic opinions based on those assumptions.

Moreover, with respect to communications, the court agrees that the experts may not opine that any particular documents reflect collusion by the carriers. *See City of Tuscaloosa v. Harcros Chems.*, 158 F.3d 548, 565 (11th Cir. 1998). They may, however, testify that, assuming that the carriers did have communications and opportunities to communicate regarding the setting of USF charges (as suggested by documents reviewed by the experts), such conduct would weigh in favor of finding a price-fixing agreement under the relevant economic inquiry.

Accordingly, the propriety of the experts' "factual" testimony depends on the actual testimony given, and the court therefore denies the motion to exclude at this time, without prejudice to AT&T's raising the issue at trial as appropriate.

D.      *Ultimate Opinion Regarding Existence of Price-Fixing Agreement*

AT&T seeks to exclude the ultimate opinion of Drs. Wilkie and Williams that, based on various analyses and considering the totality of the economic evidence, the existence of a price-fixing agreement is "more likely than not," or is "indicated", or is supported by the "weight of the evidence," or "better explain[s]" the carriers' conduct. AT&T argues that the

experts have not identified an objective, reliable method by which they combined all of their underlying analyses and contributing factors to reach their ultimate opinion.  AT&T argues that the experts' actual method of merely weighing the underlying factors without use of an objective system of combining those factors is improperly subjective and untested (constituting mere "*ipse dixit*"), and is therefore unreliable.

The court rejects AT&T's argument that the experts were, in essence, required to use some sort of mathematical formula or weighting system in order to render their opinion that, based on the totality of the economic evidence, a price-fixing agreement is indicated.  AT&T has not provided any authority in the caselaw for its position that an economist may not weigh underlying factors and analyses in this way.[2]  The experts' opinion here is not simply "subjective" in the sense that it is without basis; rather, their opinion is based on specific economic factors and analyses.  Thus, the opinion does not represent the type of mere intuition or unscientific speculation or mere hunch that the courts decried in the cases cited by AT&T.  *See Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 419 (7th Cir. 2005); *Rosen v. Ciba-Geigy Corp.*, 78 F.3d 316, 318-19 (7th Cir. 1996).  Plaintiffs

---

[2]The opinion at issue in this case is easily distinguished from the expert opinion ruled inadmissible in *Elcock v. Kmart Corp.*, 233 F.3d 734 (3d Cir. 2000), which AT&T cites.  In *Elcock*, the court rejected an expert's novel synthesis of two discrete methods to reach a particular disability rating percentage.  *See id.* at 748-49.  In the present case, the experts have not combined their underlying analyses to attempt to reach a particular mathematical figure or range, as in *Elcock*.  Rather, the experts have weighed analyses and factors to determine whether a particular fact is indicated or not, in the context of their expertise as economists.  Thus, the experts' "method" of considering the totality of the economic circumstances is more akin to the cross-checking of multiple methods sanctioned by the *Elcock* court.  *See id.* at 748 n.6.

have sufficiently established that their experts' ultimate opinion involves "real science". *Cf.*
*Rosen*, 78 F.3d at 318.

AT&T's reliance on the case of *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d
1287 (11th Cir. 2003), is similarly misplaced.  In that case, the court upheld the exclusion of
an expert's opinion that certain facts raised an inference of collusion, on the basis that the
opinion was not helpful to the jury because it did not distinguish between lawful conscious
parallelism and unlawful price-fixing.  *See id.* at 1323.  In this case, however, the experts
have specifically opined that the factors and analyses that they considered lead to a
conclusion of price-fixing.  Thus, the opinion goes to the same question at issue in the case,
and would therefore be helpful to the jury.

The court also rejects AT&T's argument that the experts' method is unreliable
because there is no means by which another expert could reproduce the weighing and get the
same results.  Certainly, in almost every contested case, the parties' opposing experts
disagree with respect to their ultimate opinions; that fact does not make one expert's
methodology inadmissible.  Moreover, this type of expert opinion, involving the weighing
of factors to reach the most reasonable explanation, does not lend itself to the type of
"objective" mathematical approach upon which AT&T insists.

Finally, the only evidence supplied by the parties on this question of the experts'
method comes from plaintiffs, who submitted affidavits from these and other experts.  Those
experts state that the method of weighing the relevant economic evidence to reach a
conclusion concerning the existence of a price-fixing agreement is generally accepted and

11

proper within the field of economics.  AT&T has not rebutted that evidence.  For all these

reasons, the court concludes that the ultimate opinion by Drs. Wilkie and Williams, as set

forth above, is sufficiently reliable and helpful to the jury to be admissible, and that AT&T's

arguments concerning the method in which that opinion was reached go only to the weight

of that opinion before the jury.  Accordingly, the court denies the motion to exclude this

opinion.

> E.    *Offset of Alleged USF Over-Recovery*

AT&T has taken the position that plaintiffs cannot demonstrate the requisite injury

to each class member unless they show that the carriers' total "all-in" prices charged to

customers were higher than they would have been absent the alleged price-fixing agreement

concerning USF charges.  In that regard, AT&T notes that Drs. Wilkie and Williams have

focused on the carriers' line-item USF charges to customers in forming their opinion that the

carriers over-recovered USF charges from customers, in excess of the pass-through rate

expected in the absence of an agreement.  This argument by AT&T is relevant because the

carriers might actually have competed concerning the pass-through of the USF charges by

lowering their all-in prices in such amount as to offset completely any over-recovery in the

line-item USF charges; thus, the actual pass-through of the USF charge to customers might

not have exceeded the pass-through rate expected in the absence of an agreement, and no

price-fixing agreement would then be indicated.

In response, plaintiffs' experts have opined that the customers did suffer injury and

the carriers did over-recover, based on an analysis of the line-item charges, because the all-in

prices did not decline over time in an amount sufficient to offset the carriers' actual over-recovery with respect to the USF charges alone.[3]  AT&T now seeks to exclude that opinion, arguing that the experts did not identify a reliable basis for that opinion.

The court rejects this argument for exclusion of the experts' testimony.  The experts have clearly explained that this opinion was based on multiple analyses of the carriers' all-in prices.  The fact that those analyses were independent of USF charges (and would have come out the same way whether or not a conspiracy existed) would not appear to be relevant to this specific determination of whether the all-in price (exclusive of the USF line-item charge) was purposefully reduced enough to offset over-recoveries in the separate USF line-item charge.  Therefore, the court denies AT&T's motion to exclude this expert testimony, and AT&T's motion is denied in its entirety.

### III.   Motion to Exclude Expert Damages Opinions (Doc. # 906)

By separate motion, AT&T seeks to exclude certain expert damages opinions by Drs. Wilkie and Williams relating to plaintiffs' antitrust claim.[4]

---

[3]In rejecting AT&T's absence-of-injury argument on summary judgment, the court relied not only on this opinion by Drs. Wilkie and Williams, but also on the existence of evidence that AT&T in fact chose to pass through its USF obligations as a separate line-item, instead of choosing to under-recover in order to compete with other carriers.  *See* Memorandum and Order of June 30, 2008 (Doc. # 887) at 69.

[4]In addition to the two arguments addressed below, AT&T argues in this motion that the experts' antitrust damages opinions should be excluded in their entirety on the basis that the experts failed to establish an effect on the all-in prices, and therefore that the plaintiff
(continued...)

A.      *Damages Attributable to MCI's Business Customers*

AT&T first seeks to exclude the calculations by Drs. Wilkie and Williams of the damages suffered by MCI's business customers during the relevant period from August 2001 through March 2003.   The only basis for those calculations identified by the experts is a spreadsheet produced by MCI in discovery that appears to contain USF data for a prior time period.  The spreadsheet was not identified by any witness in discovery, however, and there is no evidence by which a foundation for the document could be established.  AT&T argues that the experts' calculations cannot be based solely on a document that completely lacks foundation.

Plaintiffs respond that the evidence underlying an expert's opinion need not be admissible, and that AT&T's concerns about the reliability of the underlying information go merely to the weight to be afforded the opinion.[5]  The applicable rule provides, however, that the underlying facts or data need not be admissible if they are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed. R. Evid. 703.  Thus, AT&T's objection does not merely go to the weight of the opinion.

---

[4](...continued)
customers did not suffer injury or damages, for the reasons set forth in AT&T's motion to exclude the experts' liability opinions.  For the same reasons set forth above, the court also rejects this argument in the context of damages.  *See supra* Part II.E.

[5]Plaintiffs also suggest that the wrongdoer should bear any risk of uncertainty regarding the underlying data if that party caused the lack of evidence; however, plaintiffs have not explained how AT&T could be responsible for plaintiffs' failure to obtain additional evidence or discovery from MCI, including basic foundational evidence.

14

Rather, the relevant inquiry is whether expert economists, in performing damage calculations, reasonably rely on a spreadsheet in instances in which they do not know how or when or why or by whom the spreadsheet was created, or anything else about the reliability of the figures contained therein.

Plaintiffs have not directly addressed this question. Although they have submitted affidavits by Drs. Wilkie and Williams and by two additional experts as well, which were created solely for the purpose of responding to AT&T's motions, none of those affiants indicates or suggests that experts in their field would reasonably rely on such a spreadsheet as the sole basis for a damage calculation. Nor have plaintiffs, in their response brief, even attempted to argue that expert economists reasonably rely on documents without any foundation. Accordingly, the court concludes that expert economists do not reasonably rely on such spreadsheets, and the resulting damage calculations must therefore be excluded.

This conclusion is supported by the Tenth Circuit's opinion in *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722 (10th Cir. 1993). In that case, the court held that an expert's opinion based on conclusions reached in an inadmissible study authored by someone else did not provide sufficient evidence in support of a claim for lost future profits. *See id.* at 731-34. First, the court noted that, although an expert may base an opinion on underlying factual assumptions, there must be admissible evidence supporting those assumptions. *See id.* at 731-32. In the present case, plaintiffs cannot cast this damage calculation as one based on the assumption of particular figures from the prior years because they have failed to identify any admissible evidence relating to those prior-year figures.

15

The Tenth Circuit next concluded in *TK-7* that the expert there did not reasonably rely on the study under Rule 703 because there was no indication that he had any familiarity with the methods or reasoning used by the study's author in reaching the pertinent conclusions, or that he  knew much of anything at all about the author.  *See id.* at 732.  That lack of knowledge precluded any assessment of the validity of the underlying basis through cross-examination of the expert.  *See id.*  Similarly here, Drs. Wilkie and Williams have not shown that they know anything at all about the spreadsheet on which they rely, and therefore the reliability of the data on that spreadsheet cannot be assessed at trial by AT&T.  Simply put, there is no reliable or admissible evidence supporting these damage calculations by Drs. Wilkie and Williams.  Plaintiffs cannot cure the lack of foundation for the spreadsheet simply by making that spreadsheet a basis for an expert's opinion.

Accordingly, the court grants AT&T's motion to exclude this opinion, and Drs. Wilkie and Williams will not be permitted to testify concerning their calculation of antitrust damages relating to MCI's business customers.[6]

B.    *Over-Recovery Damages*

Finally, AT&T seeks to exclude the damages calculations of Drs. Wilkie and Williams relating to the carriers' "over-recovery" of more than 100 percent of their USF obligations from their customers.  In this case, plaintiffs have alleged that the carriers unlawfully

---

[6]In light of this ruling, the court need not address AT&T's alternative argument that the experts' method of extrapolating damages for the relevant claims period from prior-year figures is unreliable.

conspired to collect from their customers at least 100 percent of their USF obligations. AT&T has argued that because the alleged conspiracy does not extend to an agreement to *over-recover* those obligations, there can be no causal relationship between the alleged conspiracy and any damages for amounts recovered in excess of 100 percent (over-recoveries). In denying AT&T's motion for reconsideration of the court's summary judgment order, the court rejected this argument, ruling that "a trier of fact could conclude that any over-recovery by the carriers (just like full recovery) was the result of the conspiracy." Memorandum and Order of July 17, 2008 (Doc. # 892) at 5.

AT&T again revives this argument in an attempt to knock out any claim for over-recovery damages, this time under the guise of an attack on the experts' damages calculations. AT&T points out that Drs. Wilkie and Williams have concluded that the carriers likely entered into a price-fixing agreement to recover at least 100 percent of their USF obligations, while disclaiming any opinion that the carriers unlawfully agreed to recover *in excess of* 100 percent of those obligations. Thus, AT&T argues that the experts' calculations relating to over-recovery damages do not "fit" with their liability opinion, and should therefore be excluded. AT&T argues that the experts have no basis for concluding that all over-recoveries resulted from the alleged conspiracy, and that they improperly failed to consider alternative explanations for over-recovery, such as forecasting errors.

The court once again rejects this attack. The experts' damages calculations that include over-recoveries do not lack an underlying basis. The experts have concluded that the carriers would not have passed through more than 95 percent (using the most conservative

figure) of their USF obligations absent an agreement, and that any recovery over that level (including over-recoveries in excess of 100 percent of their obligations) was therefore caused by the conspiracy.  AT&T's expert has opined that forecasting errors could explain some over-recoveries, but Drs. Wilkie and Williams have rebutted that opinion.  This dispute among the experts concerning whether other events caused over-recoveries of USF charges must be left for the jury.  *See, e.g.*, *McCoy v. Whirlpool Corp.*, 258 Fed. App'x 189, 196 (10th Cir. Dec. 5, 2007) (expert testimony should not have been excluded for failure to address alternative arguments adequately; resolution of dispute between experts was properly within the province of the jury).  The court denies AT&T's motion to exclude this testimony.

IT IS THEREFORE ORDERED BY THE COURT THAT AT&T Corp's Motion to Exclude the Liability Opinions of Plaintiffs' Experts (Doc. # 905) is **denied**.

IT IS FURTHER ORDERED BY THE COURT THAT AT&T Corp.'s Motion to Exclude the Damages Opinions of Plaintiffs' Experts (Doc. # 907) is **granted in part and denied in part**, as set forth herein.

IT IS SO ORDERED.

18

Dated this 26th day of September, 2008.

_s/ John W. Lungstrum_____
John W. Lungstrum
United States District Judge