IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

IN RE: UNIVERSAL SERVICE FUND )
TELEPHONE BILLING PRACTICES )
LITIGATION ) Case No. 02-MD-1468-JWL
 )
This Order Relates to All Cases )
_____)

## MEMORANDUM AND ORDER

In this class action, two claims were tried to a jury in October and November 2008. First, a class of plaintiffs[1] alleged that defendant AT&T entered into a price-fixing conspiracy with Sprint or MCI in which the carriers agreed to recover from customers at least 100 percent of the carriers' own required payments to the federal Universal Service Fund (USF) program, in violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1. The jury found in favor of AT&T on that claim, judgment was entered accordingly, and the parties have not raised any post-trial issues relating to that claim.

Second, a subclass of plaintiffs[2] brought a claim against AT&T for breach of contract under New York law, alleging that AT&T breached its long-distance agreements by assessing those plaintiffs more in USF charges than necessary to recover AT&T's own USF

_____

[1]For this antitrust claim, the plaintiff class consisted of (a) all business long-distance customers of AT&T, Sprint, or MCI in the United States, and (b) all residential long-distance customers of AT&T in California, who paid a Universal Service Fund charge on or between August 1, 2001, and March 31, 2003.

[2]For this breach of contract claim, the plaintiff subclass consisted of all residential long-distance customers of AT&T in California who paid a USF charge on or between August 1, 2001, and March 31, 2003.

payments into the federal program.  The jury found in favor of the plaintiff subclass on that claim, and awarded damages in the amount of $16,881,000.00.  Judgment was entered to that effect on November 19, 2008.

This matter now comes before the court on the parties' post-trial motions relating to the breach of contract claim.  AT&T moves for judgment as a matter of law, pursuant to Fed. R. Civ. P. 50(b); for a new trial, pursuant to Fed. R. Civ. P. 59(a); and for amendment of the judgment to effect a remittitur, pursuant to Fed. R. Civ. P. 59(e) (Doc. # 1055).  For the reasons set forth below, the court **denies** AT&T's motion for judgment as a matter of law and its motion for a new trial.  The court **grants in part and denies in part** AT&T's motion for remittitur, and orders that the amount of the verdict should be reduced to $10,931,000.00 to remove damages based on USF charges that were billed to but not collected from customers. If plaintiffs[3] choose to accept such a remittitur, they shall file, on or before **March 4, 2009**, a written notice to that effect; otherwise, AT&T shall be entitled to a new trial on the issue of damages on plaintiffs' claim for breach of contract.

Plaintiffs move to amend the judgment, pursuant to Fed. R. Civ. P. 59(e), to include prejudgment interest (Doc. # 1053).  The court **grants in part and denies in part** that motion.  The court concludes that plaintiffs should be awarded prejudgment interest from March 31, 2003, at the New York statutory rate of nine percent (9%).  Therefore, if plaintiffs

---

[3]Because the parties' post-trial motions involve only issues relating to the contract claim, the court refers to the members of the contract claim subclass generally as "plaintiffs".

accept the court's remittitur of their award of damages, the judgment shall be amended to include such interest in the amount of $5,546,958.41, for a total judgment of $16,477,958.41.

## I.    **AT&T's Motion for Judgment as a Matter of Law**

### A.    *Governing Standard*

Judgment as a matter of law under Rule 50(b) is improper "unless the proof is all one way or so overwhelmingly preponderant in favor of the movant as to permit no other rational conclusion." *Crumpacker v. Kansas Dept. of Human Resources*, 474 F.3d 747, 751 (10th Cir. 2007).  In determining whether judgment as a matter of law is proper, the court may not weigh the evidence, consider the credibility of witnesses, or substitute its judgment for that of the jury.  *Sims v. Great American Life Ins. Co.,* 469 F.3d 870, 891 (10th Cir. 2006).

In essence, the court must affirm the jury verdict if, viewing the record in the light most favorable to the nonmoving party, it contains evidence upon which the jury could properly return a verdict for the nonmoving party.  *See Bartee v. Michelin North America, Inc.*, 374 F.3d 906, 914 (10th Cir. 2004).  Conversely, the court must enter judgment as a matter of law in favor of the moving party only if "there is no legally sufficient evidentiary basis for a reasonable jury to find for the issue against that party." *Sims*, 469 F.3d at 891.

B.      _Analysis_

The contract between AT&T and plaintiffs consisted of a Customer Services Agreement (CSA) and several Customer Service Guides (CSGs) relating to various subjects. Plaintiffs claimed that AT&T breached a provision of the CSG relating to the Universal Connectivity Charge (UCC) that AT&T charged its customers. The first paragraph of this CSG, under the heading of "Description", provided as follows:

> *The AT&T Universal Connectivity Charge is a monthly charge to Customers to recover amounts AT&T must pay into a federal program called the Universal Service Fund (USF).* The USF helps provide affordable telecommunications services for low-income customers and customers in rural areas. It also provides discounts on Internet access for eligible schools, libraries and rural health care providers. AT&T will revise the Universal Connectivity Charge if the method and/or amount of its required contribution to the USF changes.

(Emphasis added.) At the summary judgment stage, the court construed the first sentence of this paragraph in the CSG (italicized above), on which plaintiffs based their claim, as follows:

> [T]he court finds as a matter of law that the contract unambiguously provides that AT&T could "recover amounts AT&T must pay" into the USF program, and no more. This is specifically set forth in the first sentence that describes the Universal Connectivity Charge. The fact that AT&T's UCC recovery is tied to amounts it has paid to the USF program is further evidenced by the last sentence of that paragraph, which provides that "AT&T will revise the Universal Connectivity Charge if the method and/or amount of its required contribution to the USF changes." This language can be harmonized with the final sentence of the CSG for the UCC relied on by AT&T in which the CSG sets forth the specific UCC percentage charge. AT&T would, of course, possess the necessary information to calculate the UCC percentage. Thus, the percentage figure used by AT&T should be that necessary for AT&T to "recover amounts AT&T must pay" into the USF program. To this extent, the contract is unambiguous.

4

*See* Memorandum and Order of Aug. 15, 2008 (Doc. # 914), *In re Univeral Serv. Fund Tel. Billing Practices Litig.*, 2008 WL 3850695, at *7 (D. Kan. Aug. 15, 2008).[4]  At trial, the court instructed the jury based on this interpretation of the contract, and the jury found a breach.

AT&T now renews the motion for judgment as a matter of law on this claim that it made at trial under Fed. R. Civ. P. 50(a).  AT&T again argues that the court erred in its interpretation; that the contract required only that AT&T charge the specific UCC percentage rate provided at the end of the CSG; that the only other possible obligation was that it try in good faith to recover only the amount of its USF payments to the federal program; and that the undisputed evidence at trial (contained in the testimony of Ellen Reid) demonstrated that it met those specific obligations.  The court rejects this argument and reaffirms its prior ruling that the contract unambiguously required that AT&T impose UCC charges only at a rate necessary to recover amounts AT&T was required to pay into the federal USF program.

AT&T argues first that while the CSA incorporated the second and third sections of the CSGs, which bore the headings "Terms and Conditions" and "Rates and Charges", it did

---

[4]In denying summary judgment, the court also stated as follows: "The court wishes to clarify that it is not ruling that the contract requires AT&T's collection of UCC charges to correlate with its payments to the federal USF program during any particular time period.  Rather the court's denial of AT&T's motion for summary judgment rests on the court's finding that whether AT&T's imposition of UCC charges resulted in AT&T recovering amounts more than it was required to pay into the USF program is a disputed issue of fact." *In re Univeral Serv. Fund*, 2008 WL 3850695, at *8.

not incorporate the initial "Description" section of the CSGs.  For that argument, AT&T

relies on the last sentence of the following paragraph from the CSA:

> "AT&T Service Guides" [the CSGs] contain the specific prices and charges,
> service descriptions and other terms and conditions not set forth here that
> apply to each of your Services.  . . .  THIS AGREEMENT INCORPORATES
> BY REFERENCE THE PRICES, CHARGES, TERMS AND CONDITIONS
> INCLUDED IN THE AT&T SERVICE GUIDES.

(Emphasis in original.)  The court cannot agree, however, that the capitalized sentence

somehow carves out only the second and third sections of the CSGs for incorporation.  First,

the sentence does not refer to the sections by their headings ("Terms and Conditions" and

"Rates and Charges"), but instead speaks generically of "prices, charges, terms and

conditions" found in the CSGs.  AT&T is forced to argue that a "description" is not a "term"

or "condition" that is incorporated by the sentence; however, the first sentence of the same

paragraph in the CSA refers to "prices and charges, service descriptions and other terms and

conditions," and the use of the word "other" indicates that service descriptions are in fact

considered part of the terms and conditions that govern the contractual relationship.

Moreover, all such parsing aside, that first sentence of the cited paragraph explicitly

incorporates "service descriptions" into the CSA.  The CSA's separate merger clause also

states that the CSA "incorporates by reference the AT&T Service Guides," without excepting

any particular portions of the CSGs.  Finally, a particular CSG must be read and interpreted

as a whole, as specific terms or rates can only be understood in their context, which must

include the way those terms or rates are defined or described.  In the case of the CSG

concerning UCC charges, the rate provision can only be fully understood by reference to the

definition or description of the charge, which contains a promise to set the rate by reference to AT&T's own USF payments (as well as a separate obligation to revise the rate if its own USF obligation changes).

In summary, AT&T has not persuaded the court that an ambiguity exists concerning whether the particular promise at issue (contained in the first sentence of the CSG concerning UCC charges) is in fact part of AT&T's contract with plaintiffs. The court concludes that the CSA unambiguously incorporates the entirety of the CSGs. Accordingly, the court rejects AT&T's interpretation that relies on excepting the "Description" section of the CSGs from incorporation into the CSA.

Because the contract is unambiguous in this respect, the court does not consider extrinsic evidence on this question, such as the testimony of Ellen Reid cited by AT&T. The court notes, however, that Ms. Reid did *not* testify that AT&T intended that the CSA incorporate only certain portions of the CSG. To the contrary, Ms. Reid testified that the CSA incorporates the CSGs (without noting any exceptions); that CSGs "*describe* the rates and terms and conditions" that apply (emphasis added); and that the contract between AT&T and plaintiffs consists of the CSA and the applicable CSGs. Similarly, in support of its motion for summary judgment, AT&T stated as "undisputed facts" that the CSA "incorporates the terms of all of the CSGs;" that both categories of CSGs "are incorporated into the terms of the CSA;" and that customers were subject to the terms of one type of CSG "that contained the *description*, terms and conditions, and rates and charges" of a type of service plan (emphasis added). These facts were based on the sworn declaration of Ms. Reid,

7

which stated flatly that "[t]he CSA incorporates the terms of the AT&T CSGs" and that both categories of CSGs "are incorporated into the terms of the CSA."  Thus, AT&T's own statement of undisputed facts and Ms. Reid's testimony, both in and out of court, indicate that the CSA incorporated the entirety of the CSGs.  AT&T has not cited to any extrinsic evidence of an intent to incorporate only particular sections of the CSGs.  Accordingly, even if the contract could be said to be ambiguous on the issue of the scope of the incorporation of the CSGs, the lack of any extrinsic evidence on that question leaves the issue to the court as a question of law.  *See Williams & Sons Erectors, Inc. v. South Carolina Steel Corp.*, 983 F.2d 1176, 1184 (2d Cir. 1993) (applying New York law) ("Ambiguity without the existence of extrinsic evidence of intent presents not an issue of fact, but an issue of law for the court to rule on.").  Thus, in the alternative, even if the contract could be said to be ambiguous regarding incorporation (the court does not believe it is), the court would still interpret the contract to include both the CSA and the CSGs in their entirety, including the "Description" sections.

The court also rejects AT&T's argument that enforcing the promise at issue would be unreasonable or yield absurd results.  Citing the general canon of construction that a specific contractual provision prevails over a general provision, AT&T argues that its obligation (at the end of the CSG) to charge a stated percentage UCC rate should trump the USF recovery promise at issue, instead of the other way around.  There is no trumping of provisions either way here, however, as the two promises impose separate obligations—AT&T may only charge the UCC rate stated in the CSG, and it also must set that rate to collect only the

8

amounts of its own USF payments.  Both obligations may easily and reasonably be given effect, and the latter obligation does not render the former obligation superfluous.  AT&T's argument in this regard is further undermined by the fact that it undertook a separate obligation (stated in the final sentence of the CSG's "Description" section) to revise its UCC rate if its USF contributions changed.  Again, it is perfectly reasonable for the contract to include an  obligation regarding how the rate is set separate from the obligation to charge the stated rate.

Similarly, the court does not agree that its interpretation unreasonably assures that a breach will always occur.  It may well have been impossible for AT&T to calculate the necessary rate, to the penny, that would yield a collection of UCC charges exactly equal to AT&T's contemporaneous USF payments, given that those payments were determined in relation to past revenues only.  That fact does not mean that AT&T could not nonetheless comply with its contractual promise, either by making sure that it erred on the side of undercollection from its customers, continually adjusting its rates, or refunding excess UCC collections.

Finally, AT&T argues that the lack of specific terms regarding how the USF promise was to be enforced—with respect to the time period over which the UCC charges and the AT&T's USF payments must match up, or whether only AT&T's USF payments for residential customers, as opposed to business customers, should be considered—makes the contractual provision too indefinite to be enforced as a matter of law.  The court rejects this argument.

9

"Of course, not all terms of a contract need be fixed with absolute certainty." *Express Indus. & Terminal Corp. v. New York State Dept. of Transp.*, 715 N.E.2d 1050, 1053 (N.Y. 1999).

> [A]t some point virtually every agreement can be said to have a degree of indefiniteness, and if the doctrine is applied with a heavy hand it may defeat the reasonable expectations of the parties in entering into the contract. While there must be a manifestation of mutual assent to essential terms, parties also should be held to their promises and courts should not be pedantic or meticulous in interpreting contract expressions. Before rejecting an agreement as indefinite, a court must be satisfied that the agreement cannot be rendered reasonably certain by reference to an extrinsic standard that makes its meaning clear. The conclusion that a party's promise should be ignored as meaningless is at best a last resort.

*Cobble Hill Nursing Home, Inc. v. Henry and Warren Corp.*, 548 N.E.2d 203, 206 (N.Y. 1989) (citations and internal quotations omitted).

> When a contract does not specify a time of performance, the law implies a reasonable time. What constitutes a reasonable time for performance depends upon the facts and circumstances of the particular case.

*Savasta v. 470 Newport Assocs.*, 623 N.E.2d 1171, 1172 (N.Y. 1993) (citations omitted); *see also Reiss v. Financial Performance Corp.*, 715 N.Y.S.2d 29, 34 (N.Y. App. Div. 2000) (following Restatement (Second) of Contracts § 204, which provides that the court may supply a contractual term that is reasonable in the circumstances), *aff'd*, 764 N.E.2d 958 (N.Y. 2001).

The court concludes that the contract is sufficiently definite concerning AT&T's obligation to impose UCC charges only in the amount necessary to recover its own USF payments. First, with respect to the timing issue, this obligation may be interpreted to require

AT&T to match up its UCC collections and its USF payments over a reasonable period of time. Thus, if AT&T continued to overcollect UCC charges over a period of many billing cycles without issuing refunds or revising its rate to compensate (as plaintiffs' evidence showed at trial), it would have breached the contract. Second, the contract may reasonably be interpreted to require that AT&T's UCC collections from residential long-distance customers match up with its USF payments for that group of customers. Such a term may properly be supplied by reference to evidence of AT&T's understanding of the provision, particularly the evidence that AT&T had separate UCC rates for its business and residential long-distance customers and that AT&T attempted to set each rate by reference to its USF payments for that particular group. The interpretation of this contractual obligation is also informed by the FCC's order, introduced at trial, that mandated that carriers not shift more than an equitable share of USF contributions to any customer or group of customers.[5]

Accordingly, the court reiterates and reaffirms its previous interpretation of the contract as a matter of law. Because the court rejects AT&T's alternative interpretation, it must conclude that AT&T is not entitled to judgment as a matter of law on this claim, and the motion is denied.[6]

---

[5]At trial, neither party introduced evidence of intent regarding such details of the USF promise; nor did either party request a particular instruction regarding any such omitted contractual term.

[6]Even if the contract could reasonably be interpreted to ignore the USF obligation stated in the first sentence of the CSG concerning the UCC charge (the court does not believe that it can), such interpretation would not be the only reasonable one; thus, the issue would
(continued...)

## II.    AT&T's Motion for a New Trial

AT&T also moves for a new trial pursuant to Fed. R. Civ. P. 59(a).  First, AT&T argues that the court erred in using jury instructions consistent with the court's interpretation of the contract as a matter of law.  For the same reasons argued in support of its motion for judgment as a matter law, AT&T argues that the contract was at least ambiguous.  For the reasons set forth above, the court concludes that its interpretation of the contract as a matter of law was correct, that it therefore properly instructed the jury, and that AT&T is not entitled to a new trial on this basis.

Second, AT&T argues that the court erred in refusing to include the following language in its instructions to the jury concerning the contract claim:

> In determining whether AT&T recovered more than it paid to the FCC, you should be aware that AT&T's collection of USF charges does not have to match its payments to the USF program during any particular period of time.

AT&T argues that such an instruction was appropriate in light of the following statement by the court in its summary judgment ruling:

---

[6](...continued)
be one for the jury, and AT&T would not be entitled to judgment as a matter law at any rate. AT&T cites Ms. Reid's testimony as the only evidence at trial concerning the parties' contractual intent, and it argues that its interpretation must therefore prevail as a matter of law.  Of course, plaintiffs reasonably refrained from putting on any such evidence in light of the court's summary judgment ruling.  Moreover, while Ms. Reid stated that AT&T's "intent" was to try to collect in UCC charges only what it paid to the USF program, she did *not* actually testify concerning AT&T's intent in drafting the contract or its intent with respect to the first sentence of the CSG.  For these reasons, even if AT&T prevailed on its argument concerning the proper interpretation of the contract, it would nonetheless not be entitled to judgment as a matter of law on the contract claim.

> The court wishes to clarify that it is not ruling that the contract requires AT&T's collection of UCC charges to correlate with its payments to the federal USF program during any particular time period. Rather the court's denial of AT&T's motion for summary judgment rests on the court's finding that whether AT&T's imposition of UCC charges resulted in AT&T recovering amounts more than it was required to pay into the USF program is a disputed issue of fact.

*In re Univeral Serv. Fund*, 2008 WL 3850695, at *8.

The court rejects this basis for a new trial. In its summary judgment ruling, the court noted that it was not ruling that the contract required correlation over any particular time period. Thus, the jury would be free to decide the appropriate time period (for instance, a reasonable time period or over several billing cycles) over which AT&T's UCC collections had to match its USF payments. AT&T's proposed language would essentially have instructed the jury that the two figures need not have matched over *any* discrete time period. Such an instruction would have been confusing in light of the instruction that, under the contract, the two figures *did* have to match (obviously, over *some* time period). This difference between the court's ruling and the proposed instruction may be subtle, but it is real. Moreover, in rejecting the proposed addition to the instruction, the court concluded that the timing issue was more appropriately addressed in the parties' arguments to the jury. AT&T has not cited any authority suggesting that the court's refusal to give the proposed instruction constituted error.

Third, AT&T argues that it is entitled to a new trial because the verdict on the contract claim was contrary to the manifest weight of the evidence. A motion for a new trial made on the ground that the jury's verdict is against the weight of the evidence is committed to the

13

sound discretion of the trial court. *Veile v. Martinson*, 258 F.3d 1180, 1188 (10th Cir. 2001) (citing *Getter v. Wal-Mart Stores, Inc.*, 66 F.3d 1119, 1125 (10th Cir. 1995)).  The evidence is viewed in the light most favorable to the plaintiff. *Macsenti v. Becker*, 237 F.3d 1223, 1235 (10th Cir. 2001).  The "inquiry focuses on whether the verdict is clearly, decidedly or overwhelmingly against the weight of the evidence." *Veile*, 258 F.3d at 1188 (citing *Getter*, 66 F.3d at 1125).  In assessing the propriety of granting a new trial, the court must bear in mind that "determining the weight to be given to the testimony, drawing inferences from the facts established, resolving conflicts in the evidence, and reaching ultimate conclusions of fact" are functions within the sole province of the jury. *Id.* at 1190-91 (quoting *Thunder Basin Coal Co. v. Southwestern Pub. Serv. Co.*, 104 F.3d 1205, 1212 (10th Cir. 1997)).

AT&T argues specifically that the verdict cannot stand because the undisputed evidence demonstrated that AT&T undercollected from customers its USF payments viewed over the course of time since the inception of the USF program.  Based on the evidence at trial, however, the jury could reasonably have found that AT&T overcollected its USF payments over the class period or a few billing cycles or a reasonable time or some other duration shorter that the entire life of the USF program.  AT&T has certainly not shown that the contract must be interpreted to measure its compliance solely by reference to the entire history of the program; nor did AT&T request an instruction to that effect.  Accordingly, the court rejects this basis for a new trial.

Fourth, as a catch-all argument, AT&T requests a new trial in the alternative, on the same bases argued in support of its requests for judgment as a matter of law and for

14

remittitur.  The court has already rejected AT&T's request for a new trial based on the interpretation of the contract.  Moreover, AT&T has not cited any particular basis for a new trial or identified any particular trial error relating to its three specific bases for remittitur. The court thus rejects this catch-all basis for a new trial, and it denies AT&T's motion for a new trial in its entirety.

### III.     AT&T's Motion to Amend to Effect a Remittitur

AT&T seeks to amend the judgment, pursuant to Fed. R. Civ. P. 59(e), to effect a remittitur or reduction of the damages awarded to plaintiffs by the jury on the claim for breach of contract.  At trial, the jury accepted the damages figure of plaintiffs' expert, Dr. Simon Wilkie, and awarded plaintiffs $16,881,000 in its verdict.  AT&T argues that the jury failed to follow the court's damages instruction, and that the damages awarded must therefore be reduced, because the figure adopted by the jury did not account for (1) UCC charges billed but not collected by AT&T; (2) UCC charges associated with "refunds" issued by AT&T to customers; and (3) USF payments relating to prepaid calling cards.

#### A.     *Governing Standards*

Because New York law governed plaintiffs' claim for breach of contract, New York law also governs the issue of remittitur in this case.  "[W]hen New York substantive law governs a claim for relief, New York law and decisions guide the allowable damages." *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 437 (1996).  Thus, in a diversity case, "state law provides the appropriate rules of decision for the district court to determine

whether the verdict was excessive." *Century 21 Real Estate Corp. v. Meraj Int'l Inv. Corp.*, 315 F.3d 1271, 1281 (10th Cir. 2003) (applying state law remittitur standards).  New York courts have reduced excessive judgments on contract claims.  *See, e.g.*, *Cohen v. Allied Van Lines*, 2002 WL 221078, at *1 (N.Y. App. Div. Jan. 22, 2002); *Travel Dynamics, Inc. v. Delian Cruises, S.A.*, 498 N.Y.S.2d 138, 139 (N.Y. App. Div. 1986); *Dumane v. Martucci*, 167 N.Y.S.2d 878, 879 (N.Y. App. Div. 1957).[7]

### B.   Consideration of Amounts Billed But Not Collected

AT&T argues that the verdict improperly relied on USF amounts that AT&T billed but did not collect from its customers.  Dr. Wilkie conceded in his testimony that, in calculating damages on the contract claim, he subtracted AT&T's own USF payments from the amounts that AT&T *billed* its customers in UCC charges, instead of using the amounts that AT&T *collected* from those customers.  Thus, the jury, in using Dr. Wilkie's damages figure, also relied on amounts billed instead of amounts collected.  AT&T argues that the court's damages instruction required that the jury consider only amounts collected, and that the verdict must be reduced accordingly.  The court agrees.

At trial, the court instructed the jury that, if it found for plaintiffs on their claim for breach of contract, "the proper measure of damages is the amount by which the USF charges

---

[7]In *Gasperini*, the United States Supreme Court required application of a New York statute that provides that a jury award is excessive "if it deviates materially from what would be reasonable compensation."  *See* 518 U.S. at 423-25 (quoting N.Y. C.P.L.R. 5501(c)). That statute only applies to certain types of claims, not including contract claims, *see* N.Y. C.P.L.R. 5501(c); N.Y. C.P.L.R. Rule 4111, and therefore the statute's standard does not apply here.

collected by AT&T from its California residential customers exceeded the amount AT&T was required to pay into the Universal Service Fund for those customers." Thus, the court had concluded as a matter of law, based on its interpretation of the contract, that damages must be calculated by reference to amounts *collected* by AT&T. By accepting Dr. Wilkie's damages figure, the jury clearly failed to follow the court's instruction, and the verdict was therefore excessive.

Plaintiffs argue that the verdict was permissible because it was based on evidence, namely Dr. Wilkie's testimony. That testimony, however, did not comport with the court's instruction setting forth the law to be applied in determining the proper measure of damages in this case. Moreover, Dr. Wilkie testified that, although he used amounts collected for USF in calculating antitrust damages for this same subclass of plaintiffs, he used amounts billed in calculating contract damages. Dr. Wilkie did not offer any explanation for why he used billings instead of collections for contract damages, however, or why he treated the two claims differently in this respect (although he did testify that plaintiffs' attorneys had instructed him as to the proper formula for contract damages). Regardless, because the instruction required calculation of damages in a certain way, the fact that the expert was permitted to testify to a figure based on a different calculation is irrelevant.

Plaintiffs also argue that the contract did not refer to "uncollectibles" and thus did not permit AT&T to collect UCC charges from some customers to make up for those charges it could not (or chose not to) collect from other customers. As the court concluded, however, the contract unambiguously provides that AT&T may *recover* (not bill) UCC charges only

17

in the amount of its own USF payments, and the court's instruction to the jury was consistent with that interpretation.

Plaintiffs further suggest that it would be unfair to impose on paying customers a higher UCC charge to account for others who did not pay. As AT&T's points out, however, plaintiffs have advocated throughout this litigation for a damages determination for the class on an aggregate basis. The court further notes that Dr. Wilkie did not use exact amounts for these California customers, but instead estimated damages based on national figures. Thus, the court is not persuaded by plaintiffs' insistence that this issue should be decided by reference to what might be fair for individual members of the subclass.

In the end, plaintiffs have no response to the fact that the jury did not comply with the court's damages instruction when it used amounts billed instead of amounts collected for USF. In arguing that the jury should have been allowed to use amounts billed, plaintiffs essentially take issue with the court's instruction. Plaintiffs have waived any such challenge, however—plaintiffs failed to object to the court's damages instruction, and in fact plaintiffs' own proposed instruction also required that the jury calculate damages by reference to the USF charges collected by AT&T.

The court concludes that because the jury improperly awarded damages in a manner contrary to the court's instruction and the unambiguous contract, the verdict was excessive and should be reduced.

At trial, AT&T's expert, Dr. James Langenfeld, testified that Dr. Wilkie's use of amounts billed instead of amounts collected increased Dr. Wilkie's damage calculation by

$5,950,000.00.  Plaintiffs have not disputed this amount.  Accordingly, the court concludes that the jury's verdict should be reduced in the amount of $5,950,000.00, which would leave a total verdict of $10,931,000.00.

C.     *Failure to Account for "Refunds"*

AT&T also seeks to reduce the verdict by $1,650,000, arguing that the jury violated the court's damages instruction by failing to account for USF charges associated with certain "refunds" issued by AT&T to its customers.  When AT&T billed its customers for long-distance service, it also charged a percentage of that amount as the UCC charge.  Thus, AT&T argues that when it paid money to its customers, that "refund" should also be considered to include a portion allocated as UCC charges, at the applicable percentage.  Such allocation would reduce the total amount collected by AT&T for USF, thereby reducing the amount of damages (representing the amount of overcollection).  The court rejects this basis for remittitur.

When Dr. Langenfeld testified about this reduction of $1,650,000, he described it only as relating to "win-back" checks issued by AT&T to customers.  In testimony cited by AT&T, Ellen Reid defined these "win-back" checks as incentive payments made by AT&T to induce consumers to switch their long-distance service to AT&T from other carriers.  Thus, these checks do not represent refunds paid by AT&T for overpayments or disputed amounts.  The jury was free to conclude that such incentive payments did not have a USF component to them, and to accept Dr. Wilkie's testimony that the win-back payments were irrelevant because they did not affect AT&T's UCC charges to the customers or its USF payments to the federal program.  AT&T certainly has not established as a matter of law that the win-back checks included a UCC payment to the customers (thereby creating a negative UCC collection); therefore, the jury did not run afoul of the contract damages instruction.

Ms. Reid also testified that AT&T, in its own calculations, adjusted its figures for UCC collections to subtract out portions of refunds given to customers (resulting from overbilling or billing disputes) to account for UCC charges that would have been a percentage of the refunded amounts when such amounts were first collected from the customers. AT&T has not pointed to evidence, however, that establishes what portion of Dr. Langenfeld's $1,650,000 figures relates to such refunds, as opposed to win-back checks. Moreover, there was no evidence at trial that such refunds included a portion actually described at the time as a refund of UCC charges formerly collected. Accordingly, AT&T has not shown that such refunds included a refund of UCC charges (and thus a negative UCC collection) as a matter of law. The jury was therefore free to accept Dr. Wilkie's testimony rejecting AT&T's adjustment to UCC revenue to account for refunds, and the jury's verdict did not violate the damages instruction as claimed. The court denies this portion of AT&T's request for remittitur.

### D.     *Failure to Account for AT&T's Prepaid Calling Card Obligation*

During the class period, AT&T did not collect UCC charges associated with revenue from prepaid calling cards sold to residential long-distance customers because AT&T did not believe that it needed to make USF payments to the federal program based on that revenue. In 2005, however, the FCC ruled that AT&T did owe USF payments based on that revenue, and AT&T subsequently made those payments based on calling card revenue during the class period. AT&T now argues that its USF payments based on calling cards sold to California residential customers during the class period, totaling $5,190,000, should have been included

21

in the figure for AT&T's USF payments for purpose of the damages calculation under the court's instruction. Thus, AT&T argues that the jury violated the instruction by accepting Dr. Wilkie's damage figure, which did not account for AT&T's belated USF payments relating to calling cards. The court rejects this argument for remittitur.

The jury could properly have rejected AT&T's argument for this adjustment without violating the court's instruction. The jury could have accepted Dr. Wilkie's rationale for rejecting the calling card adjustment—that AT&T incurred this additional USF cost in 2005, and any UCC charges by AT&T to recoup that cost would have been imposed in or after 2005, well outside the class period. The jury could also properly have given weight to the admission by Dr. Langenfeld, AT&T's expert, that he had no problem with Dr. Wilkie's rejection of the calling card adjustment for purposes of antitrust damages, along with the lack of any testimony by Dr. Langenfeld explaining why contract damages should be calculated differently.

Most significantly, AT&T's own witness, Ellen Reid, testified that although the belated USF payments affected the class period, because they were based in part on revenues earned during that period, they actually occurred outside the class period. For that reason, Ms. Reid omitted the calling card adjustment from her exhibit setting forth AT&T's own calculation of its UCC collections and USF payments during the class period. Ms. Reid then conceded in her testimony that that exhibit, without the calling card adjustment, represented the fairest and most accurate way to compare AT&T's UCC collections and its USF payments during the class period. That testimony alone, by an AT&T employee and the only

22

fact witness on this issue, is enough to support the jury's rejection of the calling card adjustment in calculating damages in accordance with the court's instruction.

Thus, although AT&T was required to make this USF payment to the federal program, the jury could have found that the payment was one made after the class period. Because the court did not require the jury to correlate USF collections and payments over any particular time period, the jury could have decided that one or many breaches occurred during the class period, and that those breaches could not be retroactively cured by allocating later USF payments to that period. The court therefore concludes that AT&T has not shown that the jury necessarily violated the court's instruction in rejecting AT&T's calling card adjustment, and the court denies AT&T's request for remittitur on this basis.

### E.   *Remittitur – Plaintiffs' Consent to Amended Verdict*

In summary, the court agrees that the jury violated the court's instruction in part in calculating damages for AT&T's breach of contract, and that the verdict was therefore excessive by $5,950,000.00. Accordingly, as authorized under New York law, the court reduces the jury's damages award to $10,931,000.00.

The court may not simply amend the judgment to reflect this reduced award, however. Under federal law, which governs the court's procedure in this case, plaintiffs must be offered the choice between a new trial and accepting the remittitur, in order to avoid problems under the Seventh Amendment to the United States Constitution. *See O'Gilvie v. International Playtex, Inc.*, 821 F.2d 1438, 1447 (10th Cir. 1987). Thus, the court orders that if plaintiffs choose to accept remittitur of the damages awarded on their claim for breach of

23

contract to $10,931,000.00, they shall file a written notice to that effect on or before **March 4, 2009**.  If plaintiffs do not accept the remittitur, AT&T shall be entitled to a new trial on the issue of plaintiffs' damages for breach of contract.

### IV.    Plaintiffs' Motion to Amend to Add Prejudgment Interest

Plaintiffs move to amend the judgment, pursuant to Fed. R. Civ. P. 59(e), to add prejudgment interest on their award of damages for breach of contract.  Specifically, plaintiffs argue that they are entitled to prejudgment interest as a matter of law under New York state law, N.Y. C.P.L.R. 5001, at the rate of nine percent (9%) per annum; and that such interest should run from June 1, 2002, the midpoint of the class period, until November 19, 2008, the date of the court's original judgment in plaintiffs' favor.

AT&T does not dispute that plaintiffs would be entitled to prejudgment interest in this case.  AT&T argues, however, that plaintiffs have waived any claim for prejudgment interest because they failed to include such a claim in the pretrial order.  AT&T also argues that, if the claim is not waived, interest should be awarded at a lower rate, determined by the court in its discretion under federal law, and that interest should run only from the end of the class period.

The court grants plaintiffs' motion in part and denies it in part.  The court concludes in its discretion that because plaintiffs are absolutely entitled to interest under New York law, AT&T cannot have suffered any prejudice from the omission of the claim from the pretrial order, at least with respect to the issue of plaintiffs' entitlement to interest.  Therefore, the

24

court rules that plaintiffs have not waived their claim for prejudgment interest, and the pretrial order is hereby amended to that effect. The court also concludes that New York state law governs plaintiffs' claim for prejudgment interest, including the applicable interest rate; accordingly, plaintiffs are entitled to interest on their damages award at the New York statutory rate of nine percent (9%) per annum. Finally, the court concludes that AT&T did suffer prejudice from the omission of the claim from the pretrial order to the extent that AT&T was unable to have the jury decide the question of the proper date on which prejudgment interest should commence. Accordingly, the court exercises its discretion to amend the pretrial order only to the extent that plaintiffs may recover prejudgment interest commencing on March 31, 2003, the final day of the class period, and interest is awarded to plaintiffs from that date. If plaintiffs accept the court's remittitur of the jury's award of damages, then the judgment shall be amended to add prejudgment interest in the amount of $5,546,958.41, for a total judgment of $16,477,958.41.

### A. *Issue of Waiver*

AT&T argues that plaintiffs have waived any claim for prejudgment interest as a remedy on their claim for breach of contract because they failed to assert such a claim in the pretrial order. AT&T relies on the general rule that claims not included in the pretrial order are waived. *See, e.g.*, *Wilson v. Muckala*, 303 F.3d 1207, 1215 (10th Cir. 2002) (stating general rule). AT&T also notes that a few courts have applied this rule to claims for prejudgment interest. *See Lindy Invs. v. Shakertown Corp.*, 209 F.3d 802, 804 n.1 (5th Cir. 2000); *Christ v. Beneficial Corp.*, 2006 WL 2385028, at *4-5 (M.D. Fla. Aug. 17, 2006),

*vacated*, 547 F.3d 1292 (11th Cir. 2008); *Innovations, Designs & Interiors, Inc. v. Southern Guaranty Ins. Co.*, 2002 WL 1611498, at *1-2 (N.D. Miss. June 13, 2002); *Byron v. Rajneesh Foundation Int'l*, 634 F. Supp. 489, 496 (D. Or. 1985); *Specialty Woodworks Co. v. Lorea*, 2007 WL 1580898, at *5 (Bankr. D. Mont. May 31, 2007).

In the only reported Tenth Circuit case directly on point, the court, relying on Fed. R. Civ. P. 54(c), rejected the argument that a claim for prejudgment interest had been waived by omission from the pleadings and pretrial order. *See Dalal v. Alliant Techsystems, Inc.*, No. 94-1483, 1995 WL 747442, at *6 (10th Cir. Dec. 18, 1995) (unpub. op.). Rule 54(c) provides that "[e]very other final judgment [other than a default judgment] should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54 (c). In the present case, there is no dispute that plaintiffs are entitled to prejudgment interest on their claim for breach of contract. Thus, under *Dalal*, plaintiffs' judgment should include an award of prejudgment interest, as authorized by Rule 54(c), even if the pretrial order did not include such a claim explicitly.

AT&T points out that *Dalal* was designated as an unpublished opinion by the Tenth Circuit. It is true that *Dalal* does not have precedential value, but the case does have persuasive value, *see* 10th Cir. R. 32.1(a), and it suggests how the Tenth Circuit would rule on the issue. In addition, the Seventh Circuit and the Federal Circuit have also relied on Rule 54(c) in rejecting similar waiver arguments involving claims for prejudgment interest. *See Rocket Jewelry Box, Inc. v. Quality Int'l Packaging, Ltd.*, 90 F. App'x 543, 547 (Fed. Cir. Feb. 12, 2004) (non-precedential op.) (failure to request prejudgment interest in pretrial order

did not constitute a waiver of the claim); *Williamson v. Handy Button Machine Co.*, 817 F.2d 1290, 1298 (7th Cir. 1987) (fact that party did not request prejudgment interest until after trial was not dispositive).  In *Lindy Investments* (cited above), the Fifth Circuit noted in a footnote that a claim for prejudgment interest was not properly before it because it had not been included in the pretrial order; the court did not address Rule 54(c), however.  *See Lindy Invs.*, 209 F.3d at 804 n.1.

Most recently, another judge of this court followed *Dalal* and relied on Rule 54(c) in ruling that a party had not waived a claim for prejudgment interest by failing to include it in the pretrial order.  *See Guang Dong Light Headgear Factory Co. v. ACI Int'l, Inc.*, 2008 WL 1924948, at *2-3 (D. Kan. Apr. 28, 2008).  In *Lawson v. Lapeka, Inc.*, 1991 WL 49775 (D. Kan. Mar. 19, 1991), which predates *Dalal*, the court stated that the failure to include a claim for prejudgment interest in the pretrial order was not dispositive but weighed against granting the relief.  *See id.* at *2.  Interest was discretionary, not mandatory, in *Lawson*, however, and the court denied the claim on its merits.  *See id.*

In support of its waiver argument, AT&T relies on this court's opinion in *Centennial Management Services, Inc. v. Axa Re Vie*, 196 F.R.D. 603 (D. Kan. Aug. 14, 2000).  In *Centennial*, this court denied a motion to amend a judgment to include prejudgment interest on the basis that the motion was untimely.  *See id.* at 607.  In a footnote, however, the court noted that because the plaintiff did not request such interest in the pretrial order, "the court would likely deny" the motion for that reason alone.  *See id.* at 607 n.6.  The court does not consider that footnote particularly helpful to the analysis in the present case, for the

following reasons: in *Centennial*, the court did not directly address the issue of waiver, and the plaintiff's request for prejudgment interest was decided on another basis; it does not appear that the issue was directly before the court and that the court therefore considered relevant authority, including Rule 54(c) and the Tenth Circuit's opinion in *Dalal*; and the court did not consider whether any possible prejudice could have resulted in that case from the omission of the claim from the pretrial order. *See id.* at 607 & n.6.

Nor is the other case from this court cited by AT&T particularly helpful to the argument for waiver in this case. In *Horizon Holdings, L.L.C. v. Genmar Holdings, Inc.*, 244 F. Supp. 2d 1250 (D. Kan. 2003), *aff'd sub nom. O'Tool v. Genmar Holdings, Inc.*, 387 F.3d 1188 (10th Cir. 2004), this court did hold that the plaintiff could not assert post-trial its claim for interest that had not been included in the pretrial order. *See id.* at 1275-76. The claim at issue, however, was one for *postjudgment* interest pursuant to a contractual interest provision. *See id.* The court specifically relied on the fact that the defendant had been deprived of the opportunity to raise factual defenses at trial to the enforcement of the contractual provision. *See id.* Thus, *Horizon* is readily distinguished, as plaintiffs here are absolutely entitled to prejudgment interest as a matter of law (a point not disputed by AT&T), and AT&T could not have raised any issues at trial to defeat that entitlement to prejudgment interest.

New York state law, as applied by the federal courts, argues against waiver here. In *Mallis v. Bankers Trust Co.*, 717 F.2d 683 (2d Cir. 1983), the Second Circuit rejected the argument that the plaintiff had waived a claim for prejudgment interest under N.Y. C.P.L.R.

5001 by failing to include the claim in the jury instructions. *See id.* at 693-94. The court noted that interest was mandatory under the New York statute, and that the only consequence under the statute was that the judge, and not the jury, would fix the date from which interest was computed. *See id.*; *see also Antidote Int'l Films, Inc. v. Bloomsbury Publishing, PLC*, 2007 WL 2734265, at *1 n.1 (S.D.N.Y. Sept. 17, 2007) (following *Mallis* in rejecting waiver argument).

Finally, the court notes that the cases from other federal courts in which claims for prejudgment interest have been deemed waived (cited above) are not particularly persuasive and are easily distinguished from the present case. In its opinion in *Christ* (which was subsequently vacated on other grounds), the court specifically found that the assertion of a claim for prejudgment interest for the first time at trial would unfairly prejudice the defendant. *See* 2006 WL 2385028, at *5, *vacated*, 547 F.3d 1292 (11th Cir. 2008). AT&T would not suffer prejudice in the present case, however. In *Innovations*, the court rejected the plaintiff's argument under Rule 54(c) because an award of prejudgment interest was discretionary in that case and not a matter of right. *See* 2002 WL 1611498, at *2. In the present case, Rule 54(c) would apply because plaintiffs are absolutely entitled to interest under the New York statute. In *Byron*, in addition to noting the absence of a claim for interest in the pretrial order or at trial, the court concluded an award would not have been "justified" given the amount of damages awarded, and the court failed to consider Rule 54(c), any caselaw authority, or the issue of prejudice. *See* 634 F. Supp. at 496. Finally, in *Lorea*, the bankruptcy court concluded that the plaintiff's motion to amend, which had been made

under Rule 60 instead of Rule 59, was untimely, and it also denied the claim for interest on the merits; with respect to waiver, the court did not consider Rule 54(c) or the issue of prejudice. *See* 2007 WL 1580898, at *5-6.

The court concludes that under Rule 54(c), plaintiffs may seek prejudgment interest at this stage even though such a claim was omitted from the pretrial order. Rule 54(c) specifically provides that a party should be granted the relief to which it is entitled, even if such relief has not been requested in the pleadings. *See id.* In this case, plaintiffs are entitled to an award of prejudgment interest; thus, the failure to request such relief in the pretrial order is not dispositive. The court is persuaded by the opinions of the Tenth, Seventh, and Federal Circuit Courts of Appeal that relied on Rule 54(c) in addressing claims for prejudgment interest, and the court believes that the Tenth Circuit would follow *Dalal* if presented with the issue again. AT&T has not cited any case in which a court addressed and rejected the applicability of Rule 54(c) in a situation in which prejudgment interest was mandatory.

Moreover, the court believes that a prejudice analysis is appropriate in determining whether to allow plaintiffs, in effect, to amend the pretrial order at this time to include a claim for prejudgment interest. The Tenth Circuit has stressed that the pretrial order is intended "to facilitate the trial of a lawsuit on its merits and not to defeat it on a technicality," and that "overly technical applications of pretrial orders" should be avoided. *See Trujillo v. Uniroyal Corp.*, 608 F.2d 815, 818 (10th Cir. 1979). The Tenth Circuit has also consistently considered the existence of prejudice in reviewing a district court's decision to allow or

30

exclude at trial matters omitted from the pretrial order. *See, e.g.*, *Roberts v. Roadway Exp., Inc.*, 149 F.3d 1098, 1108 (10th Cir. 1998) (quoting factors from *Smith v. Ford Motor Co.*, 626 F.2d 784, 797 (10th Cir. 1980)).

The court has not changed its view that parties should include all claims, including claims for prejudgment interest, in their pretrial order.  In this case, however, AT&T has not identified any prejudice from the omission of this claim from the pretrial order, and this court cannot imagine any such prejudice, with respect to plaintiffs' entitlement to prejudgment interest.   AT&T does not dispute that plaintiffs would be entitled to interest here. Accordingly, the court concludes that plaintiffs have not waived their claim for prejudgment interest in this case, and the court exercises its discretion to allow the pretrial order to be amended at this time to include such a claim.[8]

### B.   *Application of Interest Rate Under New York or Federal Law*

AT&T next argues that federal law, not New York law, should govern plaintiffs' claim for prejudgment interest, and that the court should exercise its discretion under federal law to apply a rate of prejudgment interest lower than the New York statutory rate of nine percent (9%).  AT&T relies on the CSA's choice-of-law provision, which was amended effective November 1, 2002 (in the middle of the class period) to provide that the CSA "is governed by the Federal Communications Act to the full extent applicable, and otherwise by

---

[8]As noted below, *see infra* Part IV.C, the pretrial order is amended only to the extent that plaintiffs may seek prejudgment interest commencing March 31, 2003, the last day of the class period.

the law of the State of New York."  AT&T argues that the Federal Communications Act (FCA) does apply to this claim because courts have awarded prejudgment interest under the FCA in other cases.

The court has no difficulty rejecting this argument by AT&T.  First, the court does not agree with AT&T's position that this amendment to the CSA should apply to all plaintiffs in the subclass because any breach of contract could only have occurred at the end of the class period.  The fact that the jury considered the entire class period as a whole in calculating damages does not mean that the jury could not have found that AT&T breached the contract throughout the class period by failing to adjust the UCC rate or grant refunds to account for overcollections.

Second, AT&T has not pointed to any provision of the FCA that would govern a claim for prejudgment interest on damages awarded on a state law claim; nor has AT&T cited any case in which prejudgment interest was permitted under the FCA on a state law claim.  *See In re Universal Serv. Fund Tel. Billing Practices Litig.*, 300 F. Supp. 2d 1107, 1146 (D. Kan. 2003) (plaintiffs' claim for breach of contract in this case is not preempted by the FCA).  The cases cited by AT&T involved only awards of prejudgment interest on damages awarded for substantive violations of the FCA.

Accordingly, the court rejects AT&T's argument that the CSA mandates the application of federal law to plaintiffs' claim for prejudgment interest.  "Where state law claims are before a federal court on supplemental jurisdiction, state law governs the court's award of prejudgment interest."  *Olcott v. Delaware Flood Co.*, 327 F.3d 1115, 1126 (10th

Cir. 2003).  In this case, because New York state law governed plaintiffs' claim for breach of contract, New York law also governs plaintiffs' claim for prejudgment interest on  the contract damages.  New York law imposes an interest rate of nine percent (9%) per annum, and the court will apply that rate to plaintiffs' claim for prejudgment interest in this case.

### C.    *Commencement Date for Running of Interest*

The applicable New York statute addresses the commencement date for the running

of prejudgment interest as follows:

> Interest shall be computed from the earliest ascertainable date the cause of
> action existed, except that interest upon damages incurred thereafter shall be
> computed from the date incurred.  Where such damages were incurred at
> various times, interest shall be computed upon each item from the date it was
> incurred or upon all of the damages from a single reasonable intermediate date.

N.Y. C.P.L.R. 5001(b).  If the jury has not fixed this commencement date in its verdict, then

the court shall do so.  *Id.* 5001(c); *Mallis*, 717 F.2d at 694.

Plaintiffs argue that because damages were incurred throughout the class period, the

court should choose June 1, 2002, the midpoint of the class period, as a reasonable

intermediate date for commencement of prejudgment interest under the statute.  In response,

AT&T points to the court's statement in its summary judgment order that it was

not ruling that the contract required correlation between UCC collections and USF payments

during any particular time period.  Based on that statement, AT&T argues that there could

not have been any breach of the contract prior to the end of the class period regardless of

whether the collections and payments failed to correlate for shorter periods of time within

the class period.  Thus, AT&T argues, interest should not commence prior to the end of the

class period.

As explained previously in this opinion, AT&T has not properly interpreted the

court's prior statement.  The contract *did* require that collections and payments correlate over

some period of time; the court was merely stating in its summary judgment order that it

34

would not define that period of time as a matter of law.  The jury could certainly have determined that AT&T breached the contract by failing to achieve the necessary correlation over a few billing cycles or some other reasonable period; thus, the jury could have found breaches by AT&T prior to the end of the class period.

Nevertheless, the court declines plaintiffs' invitation to adopt an intermediate date during the class period for the commencement of prejudgment interest.  Under the New York statute, plaintiffs' failure to include their claim for prejudgment interest in the pretrial order means that the court decides this issue of the commencement date instead of the jury.  Thus, if the claim had been preserved in the pretrial order, AT&T would have had the opportunity to litigate this issue of the commencement date to the jury, argue for a date at the end of the class period, and propose a special jury interrogatory on the issue.  Given the importance this court places on the pretrial order, the court does not fault AT&T for failing to pursue the issue at trial.

Therefore, even though AT&T did not suffer any prejudice from the omission of the claim from the pretrial order with respect to the issue of plaintiffs' entitlement to prejudgment, the court concludes that AT&T did suffer prejudice with respect to the issue of the commencement date for such interest.  For that reason, the court concludes that plaintiffs should not be permitted to amend the pretrial order at this time to allow a claim for prejudgment interest prior to the end of the class period.  The court thus adopts March 31, 2003, the final day of the class period, as the date from which prejudgment interest on plaintiffs' damages award shall run.

D.      *Calculation of Prejudgment Interest*

If plaintiffs accept the remittitur of their damages to $10,931,000.00, then prejudgment interest shall be calcuated as follows:

$10,931,000 x 0.09 x (5 + 233/365 years) = $5,546,958.41.

Thus, if plaintiffs accept the remittitur, the judgment in this case shall be amended to include prejudgment interest in the amount of $5,546,958.41, for a total judgment of $16,477,958.41.

IT IS THEREFORE ORDERED BY THE COURT THAT defendant AT&T's Motion for Judgment as a Matter of Law and for Other Relief (Doc. # 1055) is **granted in part and denied in part**. The motion is **denied** with respect to AT&T's requests for judgment as a matter of law and alternatively for a new trial. The motion is **granted in part and denied in part** with respect to AT&T's request to amend the judgment to effect a remittitur, as set forth herein, and the amount of the verdict in favor of the plaintiff subclass is hereby reduced to $10,931,000.00. If the plaintiff subclass chooses to accept such a remittitur, it shall file a written notice to that effect on or before **March 4, 2009**; otherwise, AT&T will be entitled to a new trial on the issue of the subclass's damages on the claim for breach of contract.

IT IS FURTHER ORDERED BY THE COURT THAT plaintiffs' Motion to Amend Judgment (Doc. # 1053) is **granted in part and denied in part**. The pretrial order in this case is hereby amended to permit the plaintiff subclass to claim prejudgment interest commencing on March 31, 2003, on any award of damages for breach of contract. The

36

plaintiff subclass is hereby awarded prejudgment interest on damages awarded for breach of contract, running from March 31, 2003, until November 19, 2008, the date of judgment, at the rate of nine percent (9%) per annum. If the plaintiff subclass accepts the court's remittitur of the award of damages, the judgment in favor of the subclass shall be amended *nunc pro tunc* to include prejudgment interest in the amount of $5,546,958.41, for a total judgment of $16,477,958.41.

IT IS SO ORDERED.

Dated this 20th day of February, 2009, in Kansas City, Kansas.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge