IN THE UNITED STATES DISTRICT COURT
DISTRICT OF KANSAS

IN RE: UNIVERSAL SERVICE FUND
TELEPHONE BILLING PRACTICES            Case No. 02-MD-1468-JWL
LITIGATION

**MEMORANDUM & ORDER**

This multidistrict litigation involves multiple class action lawsuits arising from the billing practices of defendant AT&T Corporation. Pertinent to the present motion, one subclass of plaintiffs, consisting of all residential long-distance customers of AT&T in California who paid a Universal Service Fund ("USF") charge on or between August 1, 2001 and March 31, 2003, brought a claim against AT&T for breach of contract under New York law, alleging that AT&T breached its long-distance agreements by assessing those plaintiffs more in USF charges than necessary to recover AT&T's own USF payments into the federal USF program. A jury found in favor of the plaintiff class on that claim and awarded damages in the amount of $16,881,000.00 Subsequently, the court granted in part and denied in part AT&T's motion for remittitur, finding that the verdict should be reduced to $10,931,000.00 to remove damages based on USF charges that were billed to but not collected from customers. Plaintiffs accepted that remittitur and the judgment was amended to reflect that change. The judgment was affirmed by the Tenth Circuit. Thereafter, in January 2011, the court granted plaintiffs' motion for approval of notice and distribution plan for the judgment and appointed a claims administrator for facilitating that process. In May 2011, the court granted the motion for final approval of the distribution plan.

In February 2013, Suresh C. Bazaj, a class member, filed a motion for distribution of residual funds (doc. 1150) seeking to distribute the roughly $1 million in residual funds to the San Francisco-based non-profit organization The Utility Reform Network ("TURN"), an organization that advocates for telephone customers. In response, the class plaintiffs requested that the court authorize the payment of late claims in the amount of $227,000 and then suggested that the remaining funds be distributed to existing claimants or, in the alternative, that they be given additional time to suggest additional *cy pres* recipients if the court preferred to dispose of the funds through a *cy pres* distribution. In reply, Mr. Bazaj objected to plaintiffs' proposal to distribute residual funds to existing claimants and again urged the court to make a *cy pres* distribution to TURN.

The court then issued an order authorizing the payment of late claims but declining to resolve Mr. Bazaj's motion as neither Mr. Bazaj nor class plaintiffs provided the court with any legal authority or guiding principles to assist the court in resolving the motion. The court, then, directed the class plaintiffs to file a supplemental response to the motion with specific reference to pertinent legal authority concerning the propriety and applicable standards governing the distribution of cy pres funds. The court also provided Mr. Bazaj an opportunity to file a supplemental reply to class plaintiffs' supplemental response. In their supplemental response, class plaintiffs assert that approximately $1,020,600.88 remains in the litigation fund after the payment of late claims. Class plaintiffs propose that these funds be distributed pro rata by claim to participating class members, such that each participating class member would receive an additional $142 per claim. Alternatively, class plaintiffs suggest distributing the funds under the *cy pres* doctrine to three California non-profit organizations—TURN; Consumer Federation of

California; and Consumer Action. In his supplemental reply, Mr. Bazaj contends that the class will be better served by a cy pres award made solely to TURN.[1]

The court turns first to the suggestion by class plaintiffs that the court should order further distributions to participating class members in lieu of a *cy pres* distribution. This argument stands in stark contrast to the distribution plan proposed by class plaintiffs and approved by this court. That plan expressly provides in the event "any funds remain after the payment of all valid claims, [class plaintiffs] shall return to this Court and propose a method of final distribution under the *cy pres* doctrine." The distribution plan also proposed that funds would be distributed to claimants equally per capita by residential line, with a maximum award of $1000 per claim. Implicit in class plaintiffs' proposal that unclaimed funds be distributed through a cy pres award, then, is the recognition that if unclaimed funds remained, then each claimant necessarily received a $1000 award—an amount that significantly exceeded class members' individual damages, which were estimated to be less than $5.00 per landline. It appears to the court, then, that class plaintiffs, at the time they proposed their distribution plan, realized that any distribution beyond the $1000 per landline (an amount that overcompensated class members for their injuries) would constitute a windfall such that a *cy pres* distribution was appropriate.

Curiously, class plaintiffs at this juncture do not mention the distribution plan and now suggest that any windfall to class plaintiffs should not preclude distribution to participating class members. In support of their argument, class plaintiffs rely on the American Law Institute's

---

[1] No one has suggested conducting a supplemental claims process to identify absent class members and the court presumes that the cost of such a process would significantly outweigh the potential for increased claims.

Principles of the Law of Aggregate Litigation ("ALI Principles"), which express a policy preference that unclaimed funds be redistributed to participating class members "unless the amounts involved are too small to make individual distributions economically viable or other specific reasons exist that would make such further distributions impossible or unfair." See ALI Principles § 3.07(b) (2010). That "policy preference was motivated by a concern that 'few settlements award 100 perfect of a class member's losses, and thus it is unlikely in most cases that further distributions to class members would result in more than 100 percent recovery.'" *In re Lupron Marketing & Sales Practices Lit.*, 677 F.3d 21, 32 (1st Cir. 2012) (quoting ALI Principles 3.07 cmt. b). Thus, at least according to the First Circuit, "[w]here class members have been fully compensated for their losses, this presumption does not apply." *Id.*

Although the ALI Principles take the view that "in most circumstances distributions to class members better approximate the goals of the substantive laws than distributions to third parties that were not directly injured by the defendant's conduct," ALI Principles § 3.07 cmt. b, class plaintiffs have directed the court to no case interpreting this policy preference as a requirement when the participating class members have already received more than 100 percent recovery. *See In re Pharmaceutical Indus. Average Wholesale Price Lit.*, 588 F.3d 24, 35 (1st Cir. 2009) (district court's insistence that class members receive treble damages before any money was distributed through cy pres "set the benchmark well above the ALI's hope that class members might receive 100 percent recovery."). Indeed, each of the pertinent cases rejects the distribution of unclaimed funds to participating class members in favor of cy pres distribution when class members have already received full compensation for their injuries. *See In re Baby Prods. Antitrust Lit.*, 708 F.3d 163, 176 (3d Cir. 2013) (A cy pres distribution is appropriate

4

"where all class members submitting claims have already been fully compensated for their damages by prior distributions" because "additional individual distributions would overcompensate claimant class members at the expense of absent class members."); *In re Lupron*, 677 F.3d at 35-36 (rejecting argument that district court abused its discretion by making a cy pres distribution instead of using residual funds to award treble damages to claimants; it is "well accepted that protesting class members are not entitled to windfalls in preference to cy pres distributions."); *Klier v. Elf Atochem North Am., Inc.*, 658 F.3d 468 (5th Cir. 2011) (consistent with ALI Principles, district court should make additional pro rata distributions to class members "except where an additional distribution would provide a windfall to class members with liquidated damages claims that were 100 percent satisfied by the initial distribution.").

Because class plaintiffs here make no colorable claim that participating class members have not been fully compensated for their injuries, the court rejects class plaintiffs' argument that unclaimed funds should be redistributed to participating (and already overcompensated) class members at the expense of absent class members. Consistent with class plaintiffs' distribution plan, the court will order a cy pres distribution of the unclaimed funds. *See In re Lupron,* 677 F.3d at 35 (rejecting plaintiffs' argument that district court should have used residual funds to award treble damages to the claimants in part because "the parties themselves contemplated" in the settlement agreement that unclaimed funds would be distributed through a cy pres award for the benefit of silent class members).

The court turns, then, to the issue of selecting the appropriate cy pres recipient or recipients. Consistent with the ALI Principles, Mr. Bazaj and class plaintiffs have designated

organizations whose interests they believe reasonably approximate those being pursued by the class. *See In re Lupron*, 677 F.3d at 38 (parties, rather than court, should identify cy pres recipients) (citing ALI Principles § 3.07(c)). As many courts have recognized, the "distribution of funds at the discretion of the court is not a traditional Article III function":

> Federal judges are not generally equipped to be charitable foundations: we are not accountable to boards or members for funding decisions we make; we are not accustomed to deciding whether certain nonprofit entities are more "deserving" of limited funds than others; and we do not have the institutional resources and competencies to monitor that "grantees" abide by the conditions we or the settlement agreements set.

*Id.* (quoting *In re Compact Disc Minimum Advertised Price Antitrust Lit.*, 236 F.R.D. 48, 53 (D. Me. 2006)). For these reasons, the court, in selecting the cy pres recipient or recipients, appropriately limits its consideration to only those organizations suggested by Mr. Bazaj and class plaintiffs.

Both case law and ALI Principles support the use of the "reasonable approximation" test to determine whether an organization's interests are sufficiently aligned with the interests of the class. Toward that end, the First Circuit has identified a number of factors for consideration as to whether distributions reasonably approximate the interests of the class: the purposes of the underlying statutes claimed to have been violated; the nature of the injury to the class members; the characteristics and interests of the class members; the geographical scope of the class; the reasons why the funds have gone unclaimed; and the closeness of the fit between the class and the cy pres recipient. *In re Lupron*, 677 F.3d at 33. The class here consists of all residential long-distance customers of AT&T in California who paid a Universal Service Fund ("USF") charge on or between August 1, 2001 and March 31, 2003. They sustained contractual damages

6

when AT&T breached its long-distance agreements by assessing those plaintiffs more in USF charges than necessary to recover AT&T's own USF payments into the federal USF program. Each of the non-profit organizations proposed by Mr. Bazaj and class plaintiffs, then, advocate (at least to some extent) on behalf of California telecom consumers and, as explained below, the court concludes that each of the three organizations should receive a cy pres distribution of one-third of the residual funds.

As noted earlier, TURN was initially recommended as a cy pres recipient by Mr. Bazaj and class plaintiffs agree that TURN should be included in any cy pres distribution. TURN is a California consumer advocacy organization that, among other things, serves as a "watchdog" for consumers at both the California Public Utilities Commission and the utility companies by seeking to expand consumer rights and challenge phone company abuses. The organization also assists consumers in better understanding their telephone bills, resolving billing disputes and reducing their telephone bills. TURN has more than 40 years of experience and an impressive track record of advocating on behalf of California telecom consumers. The court is persuaded that a cy pres distribution to TURN and the causes it promotes will benefit and protect the interests of both participating and absent class members.

Class plaintiffs further recommend that the court make a cy pres distribution to the Consumer Federation of California (CFC), a non-profit advocacy organization based in Sacramento with over 50 years of experience campaigning for consumer protection laws on behalf of California consumers. CFC supports a variety of issues, including health care reform, predatory lending, privacy protection and food safety, but it remains a longtime advocate for quality telephone services at reasonable rates for California telecom consumers. Moreover,

class plaintiffs have represented to the court that CFC has expressly committed to using any cy pres award solely for the purpose of protecting California telecom consumers. Class plaintiffs have sufficiently demonstrated, then, that CFC's interests are aligned with the interests of both participating and absent class members and that a cy pres distribution to CFC will promote and protect the interests of the class.

Mr. Bazaj has no specific objection to the inclusion of CFC as a cy pres recipient other than the fact that an additional recipient diminishes the results that a single organization might be able to achieve with more funds. Given that there remains more than $1 million to distribute, the court is not persuaded that an award to more than one organization will significantly limit any one organization's ability to promote and protect the interests of the class. In fact, a distribution to more than one organization ensures the promotion of diverse efforts to protect the rights of California telecom consumers. Mr. Bazaj's objection, then, is overruled.

The final organization recommended by class plaintiffs is Consumer Action, yet another agency with more than 40 years of experience advancing the rights of consumers in a variety of areas including telecommunications. Consumer Action's telecom work includes helping consumers choose the phone services that best meet their needs; protecting consumers from "cramming" fraud and abuses; and working to maintain the Universal Service Fee's current "pay-for-what-you-use" system as opposed to a monthly flat-fee system under consideration by the FCC. Despite its commitment to helping consumers in a variety of areas, class plaintiffs have represented to the court that Consumer Action has expressly committed to using any cy pres award for the purpose of protecting the interests of telecom consumers and the court hereby further restricts the use of such an award for the benefit of California telecom consumers. With

those restrictions, the court is persuaded that Consumer Action is an appropriate cy pres recipient and that its interests are closely aligned with the interests of both participating and absent class members.

Mr. Bazaj objects to the inclusion of Consumer Action as a cy pres recipient on the grounds that, according to Mr. Bazaj, Consumer Action "primarily" works with corporate partners such as AT&T and Verizon. The exhibits attached by Mr. Bazaj, however, demonstrate only that Consumer Action partners with large corporations such as AT&T, American Express, Verizon and Capital One for the purpose of producing educational materials in a variety of languages in an effort to reach an ever-growing non-English-speaking demographic of consumers; that AT&T "sponsored" Consumer Action's "WirelessED" project; and that AT&T California funded Consumer Action's "California Lifeline module." According to its website, the WirelessED project (www.wirelessed.org) is a consumer protection service that assists customers in managing their use of mobile voice and data services in a cost-effective way. The service provides e-mail updates to subscribers regarding wireless usage to protect consumers from "bill shock" as a result of overages and assists users with finding a wireless plan that best meets their needs. Consumer Action's website indicates that California Lifeline provides discounts on basic residential telephone service to eligible low-income households and it appears that AT&T has funded California Action's development (in several languages) of brochures, eligibility worksheets and training slides concerning California Lifeline.

Based on AT&T's involvement with these programs, Mr. Bazaj asserts that Consumer Action "cannot serve the interests of the injured California class members and does not meet the criteria for a cy pres award in this case." The court disagrees and concludes that Consumer

Action's partnership with AT&T on these specific projects does not and should not disqualify Consumer Action as a cy pres recipient. There is no evidence in the record that Consumer Action has participated in any project adverse to the interests of California telecom consumers; that its partnership with AT&T on projects has compromised its ability to advocate zealously on behalf of California consumers; or that it has failed to otherwise advocate in the best interests of consumers at any time. Moreover, the inclusion of Consumer Action seems particularly appropriate in light of its commitment to monitoring USF issues and to reaching non-English-speaking consumers such that work done with cy pres funds would likely benefit a larger number of absent class members.

Having concluded that each of the three organizations suggested by Mr. Bazaj and class plaintiffs should share in the cy pres distribution, the court reiterates what should already be clear from this order—that the funds distributed cy pres must be used for a purpose related to the class injury. *See In re Baby Products*, 708 F.3d at 172. Thus, each of the organizations receiving a cy pres distribution pursuant to this order—TURN; CFC; and Consumer Action—must use that distribution for the benefit of California telecom consumers on issues relating to telecommunications services and regulations. While the court does not have the resources to monitor or audit expenditures to confirm that the organizations are abiding by the court's order, the court believes that each of these organizations has experience with cy pres distributions and will take great care to ensure that the funds are used in a way that is both financially sound and comports with the interests of the class.

**IT IS THEREFORE ORDERED BY THE COURT THAT** Suresh C. Bazaj's motion for distribution of residual funds (doc. 1150) is **granted in part and denied in part**.

**IT IS FURTHER ORDERED BY THE COURT THAT** the $1,020,600.88 remaining in the litigation fund shall be distributed equally among The Utility Reform Network; Consumer Federation of California; and Consumer Action.

**IT IS FURTHER ORDERED BY THE COURT THAT** class plaintiffs shall provide to the Claims Administrator the pertinent contact information for the three organizations receiving a cy pres distribution **no later than July 1, 2013** and the Claims Administrator shall close the administration of the fund; shall distribute the remaining funds as directed herein; and shall provide a final report to the court no later than August 15, 2013, reflecting the final disposition of the distribution fund.

**IT IS SO ORDERED.**

Dated this 7th day of June, 2013, at Kansas City, Kansas.

                                        s/ John W. Lungstrum
                                        John W. Lungstrum
                                        United States District Judge